IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE: APPLICATION OF PSA LLC,        CASE NO. _____

      Applicant,

v.

MAKSAT IDENOV,

      Respondent.

_____/

**SWORN DECLARATION OF PHILIPPE NEYROUD
IN SUPPORT OF APPLICATION FOR ORDER UNDER 28 U.S.C. § 1782(a)
PERMITTING PSA LLC TO TAKE DISCOVERY FROM
MR. MAKSAT IDENOV FOR ASSISTANCE IN SWISS PROCEEDING**

1.      My name is Philippe Neyroud. I am a Swiss national and a lawyer admitted to practice law in Switzerland. I graduated from the University of Geneva in 1974 and hold an LLM from the University of California, Berkeley. I was admitted to the Geneva bar in 1974. Throughout my career, I have been member of the Board of the Geneva Bar Association, Member of the Geneva Bar commission (supervisory Board for lawyers), and Member and President of the Bar Exam Board while maintaining a private practice. Currently, I am a founding partner of Aubert Neyroud & Stuckelberg law firm, and I have been engaged to represent PSA LLC ("**PSA**") in its proceeding against Messrs. Hormoz Vasfi, Simon Gabathuler, Victor Vasfi, Best Oil SA, Dragon Production Sàrl, Skema S.p.A., Tozzi Sud S.p.A., Mr. Agostino Bianchi, and Mr. Mario Secondo Cerveglieri (hereinafter referred to jointly as "**Swiss Defendants**") before the Tribunal of first instance in Geneva, Switzerland ("**Swiss proceeding**").

1

2.    I make this sworn Declaration in support of PSA's application for discovery assistance under 28 U.S.C. § 1782(a) in aid of the above-mentioned court proceeding in Switzerland.  The information asserted in this Declaration is based on my investigation and analysis of the relevant documents made available to me in my role as PSA's external legal counsel, including documents attached hereto and submitted as evidence in the Swiss proceeding.

A.    **General information on PSA and its operations**

3.    The relevant facts underlying PSA's Application, as PSA pleads them in the Swiss proceeding, are outlined below.

4.    The Republic of Kazakhstan is the largest country in Central Asia with large volumes of natural resources, including the Kashagan and Karachaganak fields.

5.    The Kashagan field is being developed through a production sharing agreement entered into between the Republic of Kazakhstan and major international oil companies such as AGIP Caspian Sea B.V., an affiliate of the oil major Eni S.p.A., CNCP Kazakhstan B.V., an affiliate of the China National Petroleum Corporation, ExxonMobil Kazakhstan Inc., an affiliate of the  U.S. ExxonMobil Corporation, INPEX North Caspian Sea, Ltd., an affiliate of Japanese INPEX Corporation, Shell Kazakhstan Development B.V., an affiliate of the Dutch Shell plc, TotalEnergies E&P Kazakhstan, an affiliate of the French TotalEnergies SA, and KMG Kashagan, B.V., an affiliate of JSC National Company KazMunayGas, that entered into a consortium called the North Caspian Operating Company ("NCOC") an operating company for the North Caspian Sea Production Sharing Agreement ("NCSPSA").

6.    The Karachaganak field is being developed through a production sharing agreement between the Republic of Kazakhstan and a series of major international oil companies which entered into the Karachaganak venture in the following ownership structure: British Gas

("Shell") with 29.25% share, Eni with 29.25% share, Chevron with 18% share, Lukoil with 13.5% share and JSC NC "KazMunayGas" with 10% share. The Final Production Sharing Agreement ("FPSA") governs the exploitation of the field and the relationship between the parties. Eni together with Shell (through its 100% affiliated company BG Karachaganak Limited) are joint operators.

7.      Production sharing agreements are common in developing countries which lack the resources to independently develop oil fields when these are discovered.  Typically, they permit oil companies to explore and develop a petroleum field while the government retains ownership of the underlying resources. If petroleum is discovered, the oil companies are entitled to recover specified costs by receiving a share of the petroleum produced. The remaining petroleum is then distributed between the oil companies and the host state according to the terms of the sharing agreement.

8.      PSA is a commercial entity that represents the interests of the Republic of Kazakhstan in the sphere of production sharing agreements.  It is a company incorporated in the Republic of Kazakhstan, and wholly owned by Samruk-Kazyna, the National Wealth Fund.[1]

9.      It is my understanding that because of the strategic and complex nature of the Kashagan and Karachaganak projects (the "**Projects**"), they involved contracts in the aggregate of billions of dollars meant to develop and explore the fields.  The Projects were marred by a corrupt scheme that aimed to defraud PSA and enrich the Swiss Defendants, operators' executives, and other individuals involved in the scheme, through inflated contracts and manipulative practices, as described below.

---

[1] Attached as **Exhibit 1** is a true copy of PSA's website showing that PSA acts as an Authority under the NCSPSA and the FPSA.

**B.    PSA was subject of a complex corruption scheme orchestrated against it**

10.    In the Swiss proceeding, PSA alleges that between 2006 and 2011, the Swiss Defendants engaged in corrupt practices to the detriment of PSA.  The scheme followed a clear pattern: numerous subcontractors were awarded contracts through intermediaries who secured these awards for a low initial budget, only for the contracts to be amended later, inflating the costs—often to ten times the original amount.  Messrs. Hormoz Vasfi and Simon Gabathuler were acting as such middlemen to the benefit of their "clients", including JV Skema-Tozzi, Breda Energia S.p.A., Tenaris Global Services S.A. ("Tenaris"), Petrofac, and others.[2]  Through the fictitious service agreements, exorbitant sums of money generated as additional costs were then funneled into their pockets, and into those of corrupt officials and company executives they colluded with.

11.    The overall scheme was not limited to Messrs. Hormoz Vasfi, Simon Gabathuler, and Victor Vasfi individually.  They used Top Oil Group ("Top Oil") and Tecron S.r.L. ("Tecron"), and other shell companies they controlled, to perpetrate the illicit transactions.  Other individuals involved included, for example, Top Oil and Tecron's employees, as well as Eni and Agip KCO's employees.  Further, management of the Swiss Defendants' "clients", such as, for example, Tenaris, JV Skema-Tozzi and Petrofac, was understandably involved and intimately familiar with the scheme.  Some of Messrs. Vasfi and Gabathuler's "clients" relied on more than one group of middlemen to take care of their illicit business transactions in Kazakhstan.

**C.    The ongoing civil proceeding in Switzerland**

12.    On March 20, 2025, PSA filed a civil action against the Swiss Defendants before the Tribunal of first instance in Geneva, Switzerland, where the Swiss Defendants reside, are

---

[2] Attached as **Exhibit 2** is a true copy of the consultant agreements signed between Messrs. Vasfi and Gabathuler's JV Skema-Tozzi.

domiciled, have their registered offices, and/or are otherwise subject to the court's jurisdiction.[3] This action seeks compensation on behalf of PSA for the Swiss Defendants' violations of Swiss and Kazakhstani law.  In particular, PSA seeks to recover the amounts illicitly extracted from PSA as a result of the corrupt scheme orchestrated by the Swiss Defendants in relation to awarding and/or amending the Contract Nos. 2003/0162, 0163, 0164; 2004/0321, 0322 and 0323; 2005/0775 with Petrofac; and Contract Nos. 2004/1089, 2008/0163 with Skema-Tozzi in relation to the Projects.

13.    PSA's action in the Swiss proceeding is based on Article 41 of the Swiss Code of Obligations providing that "[a]ny person who unlawfully causes damage to another, whether wilfully or negligently, is obliged to provide compensation."[4]  In other words, under the applicable Swiss law provisions, the Swiss Defendants must compensate PSA for damage inflicted by the Swiss Defendants' tortious actions.  In this case, the wrongful illegal acts committed by the Swiss Defendants fall within the definition of complicity with criminal mismanagement, bribery, and money laundering under Articles 158, 322septies, and 305bis ch. 2 of the Swiss Criminal Code in force during the time period of the Swiss Defendants' actions.[5]

**D.    Mr. Maksat Idenov's role**

14.    Mr. Maksat Idenov is currently the head of Strategy and Business Development at Eni US and was formerly an official at KazMunayGas ("KMG"), a Kazakh entity that was involved in the Projects.  He held positions of Vice-President and Managing Director of KMG

---

[3] Attached as **Exhibit 3** is a true copy of the PSA request for conciliation in the Swiss proceeding. The request for conciliation is the mandatory initial step in the Swiss judicial process applicable in this instance.

[4] Attached as **Exhibit 4** is a true copy of the relevant parts of the Swiss Code of Obligations.

[5] Attached as **Exhibit 5** is a true copy of the relevant parts of the Swiss Criminal Code.

between June 2007 and April 2010, at the time when the Swiss Defendants engaged in their corruption and bribery scheme.

15.    PSA has learned from the Italian criminal proceeding files and materials that Mr. Maksat Idenov was one of the Kazakh officials that the Swiss Defendants illegally engaged with in relation to the Projects.  In particular, Mr. Agostino Bianchi pleaded guilty to international corruption that involved illicit payments to, *inter alia*, Mr. Maksat Idenov in relation to award and subsequent amendments of the Contract No. 2008/0163, one of the JV Skema-Tozzi contracts at issue in the Swiss proceeding.[6]  Additionally, prior to the official award of one of the amendments to this Contract, Mr. Hormoz Vasfi sent a letter to JV Skema-Tozzi informing them about the award and that Mr. Maksat Idenov would be the one to sign it.[7]

16.    Documentary evidence currently available to PSA also suggests that Mr. Maksat Idenov and Mr. Vasfi maintained a long-standing close relationship.  Mr. Vasfi organized meetings with Mr. Maksat Idenov for some of his "clients," including JV Skema-Tozzi, and also assisted Mr. Idenov with hotel reservations for those meetings.  In relation to these meetings, people involved indicated that "Vasfi had a very respectful attitude towards Idenov, and Idenov treated Vasfi with cordiality."[8]  In his emails, Mr. Maksat Idenov called Mr. Vasfi "brother Hormoz."[9]  Mr. Hormoz Vasfi, in return, always sent regards to Mr. Maksat Idenov's family.[10]

---

[6] Attached as **Exhibit 6** is a true copy of the Plea Bargaining Judgment No. 119/17 of the Court of Monza dated February 10, 2017, pp. 2-4.

[7] Attached as **Exhibit 7** is a true copy of the letter from Vasfi Hormoz to Skema-Tozzi dated September 15, 2009.

[8] Attached as **Exhibit 8** is a true copy of the relevant excerpts of the Crime Report by the Financial Police of Milan in relation to the criminal investigation No. 25303/10 dated May 30, 2014, p. 26.

[9] Attached as **Exhibit 9** is a true copy of the relevant emails between Mr. Idenov and Mr. Vasfi and/or Ms. Casaroli, pp. 3-4.

[10] *See, e.g.,* **Exhibit 9**, pp. 1-2.

6

17.     The emails in PSA's possession further indicate that Mr. Maskat Idenov obtained tangible benefits directly from Mr. Hormoz Vasfi.  For example, Mr. Maksat Idenov reached out to Mr. Hormoz Vasfi (through his secretary Ms. Alessandra Casaroli) asking Mr. Vasfi to organize and pay for his return trip and a hotel room in Almaty in November 2009.[11]

18.     Having left his employment at KMG, in July 2010, Mr. Maksat Idenov joined Eni, the parent company of one of the NCSPSA contracting companies, Agip KCO, and one of the FPSA contracting companies.  This move was quite remarkable as just a few months prior, in January 2010, Mr. Maksat Idenov complained to the U.S. ambassador that "both BG and Italy's ENI [were] corrupt."[12]  Eni, through its various executives, was also implicated in the criminal proceedings in Italy as the illegal proceeds of the Swiss Defendants' activities were used to "remunerate" certain Eni executives for contract awards and amendments.[13]

19.     It is clear from the above that Mr. Maksat Idenov must have personal knowledge and documentary evidence in relation to the overall scheme perpetrated by Messrs. Vasfi, Gabathuler, their affiliates, and shell companies, in relation to the Projects, the mechanics of such scheme, other participants involved on behalf of various entities etc., which is highly relevant to PSA's claims.

**E.     Information in Mr. Maksat Idenov's possession located outside of Switzerland is required**

20.     While PSA obtained some information in relation to the Swiss Defendants from the Italian and other foreign proceedings, a significant amount of information and evidence remains inaccessible to PSA, as it is either sealed by the court or held privately by individuals

---

[11] **Exhibit 9**, pp. 6-8.

[12] Attached as **Exhibit 10** is a true copy of the WikiLeaks Cable 10ASTANA72_a "Kazakhstan: Money and Power," dated January 25, 2010, p. 4.

[13] *See, e.g.,* **Exhibit 8**, pp. 2, 10.

and companies. Based on the above, information and documents in Mr. Maksat Idenov's possession is required for use in the Swiss proceeding. This information is necessary to advance the Swiss proceeding and to shed further light on the Swiss Defendants' wrongdoings, other actors involved in the scheme, other possible contracts and transactions affected, and the extent of harm suffered by PSA.

21.     Due to the transnational nature of the corruption scheme that the Swiss Defendants orchestrated, and because Mr. Maksat Idenov resides in Houston, Texas,[14] information in Mr. Maksat Idenov's possession is located outside of Switzerland and is specifically required in the Swiss proceeding. As described above, it is known that Mr. Maksat Idenov was intimately familiar with the Swiss Defendants' corruption and bribery scheme in relation to the Projects and had personal relationships with at least some of the Swiss Defendants. However, PSA has no mechanism available to it under the applicable Swiss law to access this information without this Court's assistance, as detailed below in Section F.

**F.    Swiss Law on Discovery**

22.     Swiss civil procedure law requires the parties themselves to gather and submit physical evidence. However, there is generally no right to pre-trial discovery comparable to the broad discovery process in the United States. As such, as a general rule, the parties to litigation in Switzerland must make their cases and defenses with the documents and information that they have at their disposal. Put differently, unlike in litigation in the Unites States, the parties are not obliged by Swiss law to disclose documents and materials to their adversaries that are relevant to the parties' dispute.

---

[14] Attached as **Exhibit 11** is a true copy of an excerpt of the report confirming Mr. Idenov's current residence.

8

23.     Relatedly, there are limits on the role of Swiss courts under Swiss civil procedure law to intervene in discovery.  A party can petition a Swiss court to order the other party (or a third party) to disclose *specifically* identified documents or data in its possession.  Courts typically only grant such requests after deciding that such evidence is necessary to establish legally relevant and disputed facts of a case.  If a party to a proceeding refuses to produce the information after it has received a court order, however, the court cannot compel compliance.  If a party refuses to produce the evidence without legitimate reasons, a Swiss court will consider this while appraising the evidence, but such non-compliance will not trigger other additional sanctions against a party.

24.     This procedure is of limited utility here because while PSA is highly confident that relevant information and documents are in Mr. Maksat Idenov's possession, PSA has no way to identify such relevant documents with the particularity that Swiss law would require.  Furthermore, this procedure is only limited to documentary evidence and does not encompass a possibility for PSA to depose Mr. Maksat Idenov in relation to his personal knowledge of the Swiss Defendants' corruption and bribery scheme at issue in the Swiss proceeding.

25.     At the same time, while discovery available under Swiss civil procedure law is limited, Swiss courts are permitted to consider documentary and other evidence obtained in accordance with the lawful discovery procedures in foreign jurisdictions, including those of the United States.  Thus, any order by this Court for the production of discovery to be used in the Swiss proceeding would not contravene the Swiss legal system.

9

Pursuant to 28 U.S.C. § 1746(1), I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and understanding.

Executed on ___25 March 2025___

By: _____
Philippe Neyroud