# EXHIBIT 3

AUBERT
NEYROUD
STÜCKELBERG
FRATINI

**Gabriel Aubert**
Attorney at Law, Honorary Professor
M.C.L. Georgetown University

**Philippe Neyroud**
Attorney at Law
LL. M. Berkeley University

**Martine Stückelberg**
Attorney at Law
LL.M. Georgetown

**Stephan Fratini**
Attorney at Law
LL.M. University of Sydney

**Selda Berzati**
Attorney at Lawr

*[Stamp of the registry of the court of first instance of the Canton of Geneva with the words 'received at the registry on 20 March 2025']*

By Carrier

Court of First Instance

Rue de l'Athénée 6-8
P.O. Box 3736
1211 Geneva 3

Geneva, 20 March 2025
*philippe.neyroud@ibilex.ch*

***Request for Conciliation***

Madam President, Mr. President,

Acting on behalf of PSA Limited Liability Company, who elects their domicile at our Office, please find enclosed the Request for Conciliation of my client against Mr Hormoz Vasfi *et al.* in 10 copies.

Please accept, Madam President, Mr. President, the assurance of my highest consideration.

Philippe Neyroud
[wet signature]

*Ann. ment.*

# REQUEST FOR CONCILIATION

## Court of first Instance

(Disputed value: CHF 13'175'358.-)

**PSA Limited Liability Company**, with registered office at Syganaq Street, 17/10, Republic of Kazakhstan, Astana, 010000, but electing domicile in the firm Aubert Neyroud Stückelberg Fratini, lawyers, rue François-Versonnex 7, 1207 Geneva, represented by Philippe Neyroud and Stephan Fratini, as well as by Nicoleta Timofti and Letizia Ceccarelli, lawyers in the firm of Squire Patton Boggs LLP, rue du Rhone 67, 1207 Geneva.

Plaintiff

v.

1. **Mr. Hormoz Vasfi**, domiciled at Rue Ferdinand-Hodler 21 - 1207, Geneva;

2. **Mr. Simon Gabathuler**, domiciled at Wolfsagger 14, 9473 Gams, Switzerland;

3. **Mr. Victor Vasfi**, at Mrs. Marie-Claire Halff's house, Chemin de la Tulette 3D, 1223 Cologny;

4. **Best oil SA**, at Vallea SA, Rue du-Roveray 20, 1207 Geneva;

5. **Dragon production Sarl**, at Vallea SA, Rue du-Roveray 20, 1207 Geneva;

6. **SKEMA S.p.A.**, via G. Galilei n. 5, Milan, Italy;

7. **Tozzi Sud S.p.A.**, Foggia S.S. 16, z.i. Incoronata, amministrativa in Mezzano (RA), via Zuccherificio n. 10;

8. **Mr. Agostino Bianchi**, domiciled at via Negri 21, Ravenna (RA), Italy;

9. **Mr. Mario Secondo Cerveglieri**, domiciled at via Monti 41, Milan (MI), Italy;

Defendants

# I. CONCLUSIONS

**THE PLAINTIFF REQUESTS THAT THE COURT OF FIRST INSTANCE PLEASE:**

1. Order the Defendants jointly and severally to pay the sum of EUR 14'000'000, plus interest at the rate of 5% per annum from 31 December 2008.
2. In the alternative, order the Defendants jointly and severally to pay the sum of CHF 13'175'358.- plus interest at the rate of 5 % per annum from 31 December 2008.
3. In the further alternative, order the Defendants jointly and severally to pay the sum of USD 14'664'160.- plus interest at the rate of 5% per annum from 31 December 2008.
4. In any event, award the Defendants jointly and severally all costs.

# II. FACTS

5. The Plaintiff alleges and offers to prove the following facts.

**THE PARTIES**

6. Plaintiff in these proceedings is **PSA Limited Liability Company** ("PSA"), a company incorporated in the Republic of Kazakhstan, and wholly owned by Samruk-Kazyna, the National Wealth Fund. The Plaintiff owns the Republic of Kazakhstan's oil rights to the Kashagan and Karachaganak deposits. It suffered considerable damage resulting from a complex corrupting system, orchestrated by the Defendants from Geneva in particular, who artificially increased the costs of oil recovery by means of fictitious invoices.

7. The first Defendant is Mr. **Hormoz Vasfi**, who at the time of the events was domiciled in Geneva and engaged in activity as an intermediary in the tendering process for the development and exploitation of the Kashagan and Karachaganak oil fields in Kazakhstan. Mr. Hormoz Vasfi was the owner and manager of Best oil SA, Dragon production Sarl, Best oil, Beland Ltd, Alvier Limited and Top Oil UK Ltd and Top Oil Cyprus ("Top oil") which intervened in the corruption scheme described below.

Evidence: Item n°1: Copy of LexisNexis, 16 April 2008.

Evidence: Item n°2: Declaration of identity of beneficial owner, 31 January 2011.

Evidence: Item n°3: Letter from Top Oil, 3 November 2010.

Evidence: Item n°4: Letter from Top Oil, 3 November 2010.

Evidence: Item n°5: Letter from Smekrano to JV Skema Tozzi, 16 December 2008.

Evidence: Item n°6: Letter from Casaroli to Buratti, 28 June 2010.

Evidence: Item n°7: Annex 4 Special focus Client Review of Top Oil, Beland and Vasfi, July 2010.

Evidence: Item n°8: Letter from Casaroli to Buratti enclosing major oil agreements and invoices, 25 June 2010.

Evidence: Item n°9: Letter from Casaroli to Buratti enclosing the main oil agreements, 28 June 2010.

Evidence: Item n°10: Certified copy of Vasfi documents.

Evidence: Item n°11: Barclays wealth Top Oil Identification Form.

Evidence: Item n°12: BSI Geneva report dated 4 November 2008.

Examination of Messrs. Pireddu and Hormoz Vasfi.

8. The second Defendant is **Mr. Simon Gabathuler**, the former director of several companies controlled by the first defendant. It has facilitated the corruption scheme. Mr. Gabathuler was an active participant and not a mere nominee. As director, he was

responsible for operating on behalf of Hormoz Vasfi's companies, including instructions to banks to carry out transfers.

Evidence: Item n°1: Copy of LexisNexis, 16 April 2008.

Evidence: Item n°2: Declaration of identity of beneficial owner, 31 January 2011.

Evidence: Item n°3: Letter from Top Oil, 3 November 2010.

Evidence: Item n°4: Letter from Top Oil, 3 November 2010.

Examination of Mr. Gabathuler.

9. The son of the first defendant, the third Defendant is **Mr. Victor Vasfi**, the manager and sole signatory of Dragon production Sarl, sole director of Best oil SA, and beneficial owner of T-O Top Oil (Cyprus). He has worked closely with his father in the corruption scheme and is the beneficial owner of the bank accounts to which the remuneration for corrupt services has been paid.

Evidence: Item n°13: Letter from the prosecutor of Vasfi, 14 December 2012.

Evidence: Item n°14: Letter from Soteris to Banck of Cyprus, 20 December 2012.

Examination of Victor Vasfi.

10. The fourth and fifth Defendants are Dragon production Sarl and Best oil SA, based in Geneva, owned and controlled by the first and second Defendants and which laundered the proceeds of the infringements committed by the other Defendants.

Evidence: Item n°15: Best oil S.A., Company Report, Federal Office of Justice.

Evidence: Item n°16: Dragon production Sarl, Company Reports, Federal Office of Justice.

11. The sixth and seventh Defendants are the Italian companies **Skema S.p.A.** and **Tozzi Sud S.p.A.**, which formed the Skema Tozzi "joint venture", which won two major tenders for work on the Kashagan oil field, numbers 2004/1089 and 2008/0163, and

participated in the corruption scheme by using the first and second Defendants and their shell companies as intermediaries.

Evidence: Item n°17: Agreement to negotiate sentences of Mr. Bianchi, Mr. Cerveglieri and Consorzio Dinamo.

Examination of Messrs. Bianchi and Cerveglieri.

12. The eighth Defendant is **Mr. Agostino Bianchi**, director of Tozzi Sud S.p.A., who then joined Skema S.p.A. to form the Skema-Tozzi "joint venture". He was vice-president of Skema-Tozzi and used Hormoz Vasfi, among others, to be awarded the contracts in question. The Italian authorities initiated criminal proceedings against Mr. Bianchi for international corruption. These criminal prosecutions culminated in the 2017 plea bargain agreement. Mr. Bianchi confessed his guilt and was sentenced to six months in prison, without any challenge to his involvement in the corruption scheme.

Evidence: Item n°17: Agreement to negotiate sentences of Mr. Bianchi, Mr. Cerveglieri and Consorzio Dinamo.

Examination of Mr. Bianchi.

13. The ninth Defendant is **Mr. Mario Cerveglieri**, CEO and Chairman of Skema S.p.A., who then joined forces with Tozzi Sud S.p.A. to form the Skema-Tozzi joint venture. He was the President of Skema-Tozzi. He also used Mr. Hormoz Vasfi to obtain the contracts in question. The Italian authorities initiated criminal proceedings against Mr. Cerveglieri for international corruption. Criminal prosecutions culminated in the 2017 sentencing agreement. Mr. Cerveglieri confessed his guilt and was sentenced to six months in prison, without any challenge to his involvement in the corruption scheme.

Evidence: Item n°17: Agreement to negotiate sentences of Mr. Bianchi, Mr. Cerveglieri and Consorzio Dinamo.

Examination of Mr. Cerveglieri.

14. In summary, the Defendants listed above all participated in one capacity or another in the corruption scheme orchestrated by the first Defendant, **Mr. Hormoz Vasfi**. They acted in particular from Geneva, a city in which he lived at the time and in which he seems to have kept his domicile.

Examinations of Defendants 1, 2, 3, 8 and 9.

15. The corruption scheme consisted of the first five Defendants receiving illegal payments as intermediaries from companies they had assisted in obtaining the offending contracts – including the sixth and seventh Defendants – for the development and maintenance of the Kashagan and deposits Karachaganak, and to amend the said contracts in order to artificially inflate their value. The illegal proceeds of this activity were used to (i) bribe officials in Kazakhstan, (ii) remunerate certain ENI executives (as an operator in the aforementioned oil field contracts), and (iii) remunerate the Defendants themselves for their fictitious and fraudulent services. The first five Defendants did not in fact perform any bona fide or legitimate services to justify the payments invoiced, the resulting financial burden resting directly on the plaintiff. This scheme used with the sixth and seventh Defendants was used with many other companies, including Breda Energia S.p.A., Tenaris, Petrofac and others (using the same or different intermediaries) for services to Agip KCO and Agip KPO in the Republic of Kazakhstan.

Evidence: Item n°18: First expert report of Mr. Pireddu in Italian procedure No. 15858/2013, 27 February 2015;

Evidence: Item n°19: Second expert report of Mr. Pireddu in Italian procedure No 15858/2013, 29 July 2015;

Evidence: Item n°20: Third expert report of Mr. Pireddu in Italian procedure No 15858/2013, 12 October 2015;

Evidence: Item n°21: Fifth expert report of Mr. Pireddu in Italian procedure No 15858/2013, 22 June 2015.

Examination of Mr. Pireddu.

16. The corruption scheme was supported by an organized network of illegal contacts orchestrated by the first five Defendants. It involved the senior managers of the companies issuing tenders as well as the senior managers of the contracting companies. In reality, these contracts were aimed at creating slush funds to fuel corruption. In certain circumstances, the evidence shows bribes paid to executives within the operating companies themselves, for example Agip KCO. Members of the criminal system communicated with each other through specially created email addresses under false names and used pseudonyms to obscure their identities.

Evidence Item n°18: First expert report of Mr. Pireddu in Italian procedure No 15858/2013, 27 February 2015;

Evidence Item n°19: Second expert report of Mr. Pireddu in Italian procedure No 15858/2013, 29 July 2015;

Evidence Item n°20: Third expert report of Mr. Pireddu in Italian procedure No 15858/2013, 12 October 2015;

Evidence Item n°21: Fifth expert report of Mr. Pireddu in Italian procedure No 15858/2013, 22 June 2015.

Examination of Mr. Pireddu.

17. Several criminal proceedings were initiated in Italy against the first and second Defendants and the eighth and ninth Defendants, who pleaded guilty to international bribery. The first and second

Defendants escaped criminal conviction because of the statute of limitations. In the criminal proceedings in Milan and Monza, several Agip KCO executives were involved, including Mr. **Guido Michelotti**, then President of Agip Caspian Sea BV , Mr. **Umberto Carrara**, then CEO of Agip KCO , Mr. **Luigi Diamante**, then Project Director at Agip KCO in charge of evaluating proposals and recommendations for awarding contracts by tender, Mr. **Paolo Dentali**, Head of Procurement for AGIP KCO, Eni, Mr. **Ernesto Ferlenghi**, then Head of Eni's Moscow office, and Mr. **Diego Braghi** working in various Eni companies, including Agip KCO. The disclosed documents also involve Mr. **Leonida Bortolazzo** and **Mr. Luigi Colombo,** also executives at Agip KCO.

Evidence: Item n°17: Agreement to negotiate sentences of Mr. Bianchi, Mr. Cerveglieri and Consorzio Dinamo;

Evidence: Item n°18: First expert report of Mr. Pireddu in Italian procedure No 15858/2013, 27 February 2015;

Evidence: Item n°22: Press Article about the corruption scandal Unaoil.

Questioning of Guido Michelotti, Umberto Carrara, Luigi Diamante, Paolo Dentali, Ernesto Ferlenghi, Diego Braghi, Leonida Bortolazzo and Luigi Colombo.

Examination of Mr. Pireddu.

18. The proceedings in Italy have made it possible to gather banking documentation to discover the transactions carried out for the functioning of the corruption scheme. The Defendants mainly used the Geneva branch of the BSI (bank account no. [redacted]).

Evidence: Item n°19: Second expert report of Mr. Pireddu in Italian procedure No 15858/2013, 29 July 2015 (pp. 48, 81).

Examination of Mr. Pireddu.

19. Many illicit payments have still not been identified and are still being investigated in Switzerland and abroad, starting with financial transactions through BSI, Credit Suisse/UBS, Barclays, VP Bank Liechtenstein and Banca Intesa. Companies such as Eni, Shell and Worley and prominent Kazakh officials, including Maksat Idenov, are also the focus of the Plaintiff's research because of their involvement and ties with Mr. Hormoz Vasfi. Consequently, the Plaintiff reserves the right to amplify its conclusions.

## III. OTHER ENTITIES AND PERSONS CONCERNED

### A. Top Oil Group/Tecron S.r.l.

20. Top Oil is a Cyprus-registered entity composed of a diverse group of companies located around the world, including the United Kingdom, Cyprus, the Bahamas, Italy and Kazakhstan, controlled by Mr. Hormoz Vasfi and Mr. Gabathuler.

21. Tecron S.r.l. is a company registered in Italy and controlled by Mr. Hormoz Vasfi.

Evidence: Item n°1: Copy of LexisNexis, 16 April 2008.

Evidence: Item n°2: Declaration of identity of beneficial owner, 31 January 2011.

Evidence: Item n°3: Letter from Top Oil, 3 November 2010.

Evidence: Item n°4: Letter from Top Oil, 3 November 2010.

Evidence: Item n°5: Letter from Smekrano to JV Skema Tozzi, 16 December 2008.

Evidence: Item n°6: Letter from Casaroli to Buratti, 28 June 2010.

Evidence: Item n°23: Annex 11 to the first expert report of Mr. Pireddu in Italian proceedings No 15858/2013, 29 July 2015 (report of the company, Tecron S.r.l.).

Examination of Mr. Pireddu.

(1) **MS Alessandra Casaroli**, Secretary of Mr. Hormoz Vasfi - She sent several emails on behalf of Mr. Hormoz Vasfi using his email account alessandra.casaroli@tecron.net.

(2) **Mr. Gennaro Irace,** driver of Mr. Vasfi - recipient of the cash of Mr. Hormoz Vasfi for a total amount of 55,137.50 EUR and 191.4000 Swiss francs over two years.

Evidence: Item n°19: Second expert report of Mr. Pireddu in Italian procedure No 15858/2013, 29 July 2015 (pp. 6, 28, 77, 185).

Examinations of Mr. Pireddu, Ms. Alessandra Casaroli and Mr. Gennaro Irace.

## B. SKEMA-Tozzi

22. Italian joint venture formed by Skema S.p.A. and Tozzi Sud S.p.A. in charge of the electrical system of the Kashagan deposit.

(1) **Mr. Nicola Capone** is the owner of CTC Capone Trading & Consulting S.r.l. and commercial Director of Skema-Tozzi. He received payments from Skema-Tozzi for his illegal intermediary activities in Kazakhstan. Criminal proceedings for international bribery were initiated against him in Italy. The Monza court found that the investigation had uncovered sufficient evidence to support allegations of international corruption against Mr. Guidotti, as well as Mr. Bianchi and Mr. Capone. However, due to the criminal statute of limitations, the court was unable to formally charge Mr. Capone for international corruption

Evidence: Item n°18: First expert report by Mr. Pireddu in Italian procedure No 15858/2013, 27 February 2015 (pp. 20-22);

Evidence: Item n°19: Second expert report of Mr. Pireddu in Italian procedure No 15858/2013, 29 July 2015 (pp. 20, 23, 35, 66-67, 105, 107);

Evidence: Item n°24: Attachment 77 of the second expert report of Mr. Pireddu in Italian proceedings No 15858/2013, 29 July 2015.

Examinations of Messrs. Pireddu and Nicola Capone

## C. Petrofac

23. Petrofac is a Jersey-based global energy services group that designs, builds and maintains infrastructure for oil, gas, refining, petrochemical and renewable energy. The documents seized during the criminal investigations in Monza and Milan, as well

as other leaked documents, provide evidence of the corruption activities carried out by the first five Defendants for the benefit of Petrofac.

(1) **Ayman Asfari,** CEO of Petrofac – asked to be put in contact with a Kazakh official, Mr. Idenov, through Mr. Hormoz Vasfi and Mr. Malcolm Douglas.

(2) **Douglas Malcolm**, Vice-President for Business Development, asked Hormoz Vasfi to help him organize a meeting between Ayman Asfari and Mr. Idenov, a Kazakh official and then head of Eni, who had blocked the award of a major contract to Petrofac and his usual partner, KBR, for the exploitation of the Kashagan deposit.

Evidence: Item n°25: Emails between Tecron and Asfari, June-July 2009.

Evidence: Item n°26: Emails exchanged between Tecron and Petrofac, 23-24 June 2009.

Examinations of Asfari Ayman, Hormoz Vasfi and Malcolm Douglas.

## D. Breda Energia S.p.A. ("Breda")

24. Breda, and its Kazakh branch, Aksay-registered Breda Energia Sesto Industria S.p.A., have won several contracts in Kashagan. Along the way, they used and paid the first five Defendants for illegal and fictitious services to win contracts and amendments, through corruption. There is a bank of evidence that the first five Defendants' contacts and sources provided confidential information and improperly worked on behalf of Breda, to the detriment of their rivals. Furthermore, the evidence indicates that the contracts awarded to Breda underwent unauthorized amendments, significantly increasing their value by millions of dollars. For example, for Contract 2004/1115, which was awarded to Breda for the provision of high-pressure smallbore valves, Exxon and Shell raised concerns over Breda's qualifications during the tender process. Exxon refused to

endorse the award, but Shell eventually agreed. First Defendant assisted Breda throughout the tender process.[1]

Evidence: Item n°27: Email from Vasfi to Bisinella, 2 September 2011.

Evidence: Item n°28: Email from Casaroli to Peluzzi, 6 July 2011.

Evidence: Item n°29: Invoice from Top Oil to Breda, 14 March 2011.

Evidence: Item n°30: Top Oil Payment Receipt, 23 May 2011.

Evidence: Item n°31: Invoice from Top Oil to Breda, 30 March 2011.

Evidence: Item n°32: Invoice from Top Oil to Breda, 9 March 2011.

Evidence: Item n°33: Top Oil Payment Receipt, 23 May 2011.

Evidence: Item n°34: Email from Vasfi to Bisinella, 23 March 2011.

Evidence: Item n°35: Emails between KMG and Tecron, June 2008.

Evidence: Item n°36: Call for tenders for the supply of wellheads and Christmas trees dated 5 June 2008.

Evidence: Item n°37: Bid Evaluation Plan wellheads and Christmas trees (Appendix 3).

Evidence: Item n°38: Email from Bisinella to Casaroli, 27 May 2009.

Evidence: Item n°39: Email from Bisinella to Casaroli, 27 May 2009.

Evidence: Item n°40: Email from Bisinella to Casaroli, 23 June 2009.

Evidence: Item n°41: Karachaganak Project Committee Resolution, November 2008.

Evidence: Item n°42: Resolution of the Karachaganak Project Committee, November 2008 (Kazakh version).

Evidence: Item n°43: Email from Bisinella to Casaroli, 9 July 2010.

Evidence: Item n°44: Email from Bisinella to Casaroli, 4 April 2012.

Evidence: Item n°45: Karachaganak Project Committee Resolution, November 2008.

Evidence: Item n°46: Resolution of the Karachaganak Project Committee, November 2008 (Kazakh version).

[1] The Plaintiff is further investigating this matter and will take all necessary steps to retrieve the additional documents relating to this contract.

## E. Tenaris Global Services S.A. ("Tenaris")

25. Tenaris is a global manufacturer of pipes and related services for the energy sector. It is a majority owned subsidiary (60.45%) by the Italian Techint group. Tenaris has been awarded several contracts for the Kashagan project.

26. The first five Defendants used their contacts to rig tenders in favor of Tenaris and to obtain confidential information about the contract award process and information about competitors' bids. In 2021, the SEC entered into a Deferred prosecution Agreement ("DPA") with Tenaris S.A. for corruption in Uzbekistan.

Evidence: Item n°47: Emails exchanged between Casaroli and James Ross, 18 February 2009.

Evidence: Item n°48: Email from Casaroli to James Ross, 19 February 2009.

Evidence: Item n°49: Email from Casaroli to James Ross, 4 March 2009.

Evidence: Item n°50: Email from Casaroli to James Ross, 28 September 2009.

Evidence: Item n°51: Email from Casaroli to James Ross, 4 November 2009.

Evidence: Item n°52: Deferred prosecution Agreement with Tenaris S.A.

Questioning of Jacques Attie, former commercial Director of Tenaris for the Caspian Sea Region.

## F. The Karachaganak deposit and the fraudulent system

27. The Republic of Kazakhstan is the largest country in Central Asia with large volumes of natural resources. The giant Kashagan field, which is part of the North Caspian Project, ranks as one of the largest oil discoveries of the past decades, with approximately 9-13 billion barrels (1-2 billion tons) of recoverable oil. The Kashagan reservoir lies 80km offshore from the City of Atyrau in 3-4 meters of water and is more than 4km deep (4,200 meters). The production facilities comprise offshore and onshore complexes.

Examination of Mr. Pireddu.

28. The Karachaganak field, discovered in 1979, is one of the world’s largest gas and condensate fields. Located in north-west Kazakhstan and covering an area of over 280 square kilometers, it holds estimated hydrocarbons initially in place (HIIP) of 13.6 billion barrels of liquids and 59.4 trillion cubic feet (tcf) of gas, with estimated gross reserves of over 2.4 billion barrels of condensate and 16 tcf of gas.

Examination of Mr. Pireddu.

29. The Kashagan field is operated under a production-sharing contract between the Republic of Kazakhstan and major international oil companies such as AGIP Caspian Sea B.V., a subsidiary of Eni S.p.A., CNCP Kazakhstan B.V., a subsidiary of the China National Petroleum Corporation, ExxonMobil Kazakhstan Inc. a subsidiary of the US company ExxonMobil Corporation, INPEX North Caspian Sea, Ltd, a subsidiary of the Japanese company INPEX Corporation, Shell Kazakhstan Development B.V., a subsidiary of Dutch Shell plc, TotalEnergies E&P Kazakhstan, a subsidiary of the French company TotalEnergies SA, and KMG Kashagan, B.V., a subsidiary of the national company JSC KazMunayGas, which formed a consortium called North Caspian operating Company ("NCOC"), an operating company for the North Caspian Sea production sharing contract ( "NCSPSA").

Examination of Mr. Pireddu.

30. The NCSPA governs the collaboration with various operators over the years from Agip KCO NV to NCOC, which became the sole operator in 2015.

Examination of Mr. Pireddu.

31. The Karachaganak field is being developed through a production sharing agreement between the Republic of Kazakhstan and a series of major international oil companies which entered into the Karachaganak venture in the following ownership structure: British Gas (Shell) with 29.25% share, ENI with 29.25% share, Chevron 18% share, Lukoil with 13.5% share and JSC NC "KazMunayGas" with 10% share. The Final Production Sharing Agreement (FPSA) governs the exploitation of the field and the relationship between the parties. Eni together with Shell (through its 100% affiliated company BG Karachaganak Limited) are joint operators.

Examination of Mr. Pireddu.

32. Production-sharing agreements or contracts are common in developing countries that do not have the resources to independently exploit oil fields when discovered. Typically, they allow oil companies to explore and exploit an oil field while the government retains ownership of the underlying resources. If oil is discovered, oil companies have the right to recover from the government or public entities the specified costs by receiving a share of the oil produced. The rest of the oil is then distributed between the oil companies and the host state according to the terms of the agreement. It is the Plaintiff who holds the rights of the Republic of Kazakhstan and it is therefore it who suffered the damage resulting from the system put in place by the Defendants who artificially increased the costs of recovery, through the use of contracts, amendments and invoices that do not correspond to any real counter-service. The Plaintiff's damage occurred in the reduced quantity of oil compared to that to which it was entitled.

Examination of Mr. Pireddu.

33. Between 2006 and 2011, the Defendants' modus operandi consisted of contracting for a low initial budget and then modifying them by amendments inflating costs up to ten times.

Examination of Mr. Pireddu.

34. The remuneration obtained by the Defendants for their unlawful services amounts to at least 14 million EUR, i.e. the amount paid to Defendants 1 to 5 by Defendants 6 to 9. However, the total damage suffered by the Plaintiff is much greater.

Examination of Mr. Pireddu.

35. The Plaintiff recently received details of this corrupting system by obtaining copies of documents relating to criminal cases, including from the Monza court.

Evidence: Item n°53: Response to PSA's request for documents sent to Monza's prosecutors, October 2023.

Evidence: Item n°54: Request for documents sent by PSA to Monza prosecutors on 6 October 2023.

Evidence: Item n°55: Request for documents on behalf of PSA, 6 September 2023.

36. Specifically, the Plaintiff discovered in the Monza court documents that the first five Defendants formally represented themselves as intermediaries between Agip KCO and multiple subcontractors, including Skema-Tozzi. The Defendants acted as intermediaries to facilitate the delivery of bribes to the leaders of Skema-Tozzi, Eni and Agip KCO as well as Kazakh decision-makers.

Evidence: Item n°19: Second expert report of Mr. Pireddu in Italian procedure No 15858/2013, 29 July 2015.

Examination of Mr. Pireddu.

37. The first and third Defendants were investigated and charged in Italy for international corruption. However, they have benefited from the statute of limitations, which is very short in Italy. In the same proceedings, the eighth and ninth Defendants pleaded guilty to international bribery.

Evidence: Item n° 17: Agreement to negotiate sentences of Mr. Bianchi, Mr. Cerveglieri and Consorzio Dinamo.

38. The contracts put in place by the Defendants for the constitution of a slush fund are as follows:

- Contracts 2003/0162, 0163 and 0164, awarded to Petrofac Ltd (“**Petrofac**”);
- Contracts 2004/0321, 0322 and 0323, awarded to Petrofac;
- Contract 2005/0775, awarded to Petrofac;
- Contract 2004/1089, awarded to Skema-Tozzi, a company registered in Italy; and
- Contract 2008/0163, awarded to Skema-Tozzi.

39. The fictitious contracts awarded to Petrofac were concluded with the help of Unaoil, which was at the heart of a vast international corruption network operating on a global scale, including in the Republic of Kazakhstan. Unaoil's main actors were convicted of corruption by the United States Southern District Court in March 2019.

Evidence: Item n°56: Condemnation of Cyrus Allen Ahsani and Saman Ahsani, US District Court of the Southern District of Texas, Houston Division, March 4, 2019, ¶ 55.

Interrogations of Cyrus Allen Ahsani and Saman Ahsani.

40. Known criminal proceedings have been initiated in Italy (public prosecutors in Milan, Monza and Rome), the United States (United States Department of Justice and Houston Prosecutor’s

Office), the United Kingdom (SFO) and Switzerland (AG) against various companies and individuals involved in the Kashagan project. The evidence gathered by the Plaintiff in these proceedings is both substantial and convincing. However, a significant amount of information and evidence remains inaccessible, as it is either sealed by the court or privately held by individuals and companies.

41. The known evidence discloses that the Defendants orchestrated an illegal scheme primarily aimed at obtaining contracts and inflating contract costs to their customers, including the sixth and seventh Defendants, and their joint venture Skema-Tozzi (and ultimately the eighth and ninth Defendants). The exorbitant sums of money generated by the extra costs were then poured into their pockets and into the pockets of corrupt officials and corporate executives who colluded with them. This system has had devastating consequences for the Plaintiff.

42. The contracts involved in this illegal system are detailed below.

**(a) Contracts 2003/0162, 0163 and 0164 - Petrofac**

43. The first, second, third, fourth and fifth Defendants played a central role in obtaining amendments to the contracts awarded to Petrofac to increase their value and demanded consulting fees commensurate with the increase in the value of the contracts (the value of contracts awarded to Petrofac increased by more than ***USD 526 million***). These Defendants paid for confidential information received from a senior Kazakh official. They did not provide any legitimate services or deliverables.

Evidence: Item n°57: Submission of EMCB for recommendation of increase in LCA and contract duration.

44. In April 2004, Agip KCO and Petrofac signed contracts 2003/0162, 0163 and 0164, with a combined value of USD 579,287,000, covering the "sulfur Plant", the "Gas and LPG

Plant" and the "oil plants". After several changes, the contract value reached USD 1,161,500,000, an increase of USD 526.7 million in just five years.

Evidence: Item n°58: Mancom Resolution No. R2011-02-003 for markets 2003-0162, 0163 and 0164, 21 October 2011 (English version).

Evidence: Item n°59: Mancom Resolution No. R2011-02-003 for contracts 2003-0162, 0163 and 0164, 21 October 2011 (Kazakh version).

Questioning of relevant persons from Petrofac.

**(b) Contracts 2004/0321, 0322 and 0323 - Petrofac**

45. Agip KCO and Petrofac signed contracts 2004/0321, 0322 and 0323, which were later replaced by contract 2007/0577, worth USD 2,119,392, for "on-site support services". As a result of several amendments, the value of Contract 2007/0577 increased by USD 13.4 million.

Evidence: Item n°60: Approval of the award of contracts 2003-0162, 0163, 0164 and 2007-0577, 8 September 2007 (English version).

Evidence: Item n°61: Approval of the award of contracts 2003-0162, 0163, 0164 and 2007-0577, 8 September 2007 (Kazakh version).

Evidence: Item n°62: Approval of Award No. F2013-018, 10 April 2013.

Evidence: Item n°63: Submission to NCOC Contract Board, 20 May 2011.

**(c) Contract 2005/0775 - Petrofac**

46. On 8 September 2005, Agip KCO and Petrofac signed contract 2005/0775, worth USD 95,134,000, for "construction management services". After several changes, the contract value reached USD 306,454,386.

Evidence: Item n°64: Submission to the NCOC Contract Board for the amendment of Contract No. 2005/0775, 18 June 2009;

Evidence: Item n°65: Email of 18 May 2009 from Serik Burkibayev to Vasfi Hormoz, attaching the addendum to contract 2005/0775.

47. Petrofac also admitted to obtaining the amendments from Unaoil, a company with which the Defendants had a close relationship. The first Defendant and Unaoil shared substantial information about the Kashagan projects with a view to facilitating bribery and corruption.

Evidence: Item n°66: Petrofac, Update on Board review, 1 August 2016;

Evidence: Item n°25: Emails between Tecron and Asfari, June-July 2009;

Evidence: Item n°26: Emails exchanged between Tecron and Petrofac, 23-24 June 2009.

**(d) Contract 2004/1089 - Skema-Tozzi**

48. As early as early as 2007, the first, second, third and fourth Defendants, acting through their company, Top Oil, began to bill Skema-Tozzi for services that had not actually been provided, thereby concealing the true nature of their involvement. They acted as intermediaries, manipulating Skema-Tozzi's relationship with AGIP to ensure that Skema-Tozzi obtained amendments to the contract that allowed them to inflate their costs enormously. Eleven amendments to Contract 2004/1089 were signed, illegally increasing the value of this single contract signed by Skema-Tozzi from USD 88.4 million to ***more than USD 492 million***. These increased costs were motivated solely by illegal reasons. All of these unjustified costs were ultimately borne by the Plaintiff. Top Oil paid Paolo Dentali of Agip KCO, the operator of the Kashagan project, for work on Addendum 2 (described below), which increased the value of the contract.

Evidence: Item n°67: Case numbers: 14163/17 R.G.N.R., 64163/17 R.G. Dib. Judgement No.: 12303/19, Roma Criminal Court judgment against Vasfi Hormoz and Simon Gabathuler, 24 September 2019.

Evidence: Item n°68: Case numbers: 14163/17 R.G.N.R., 64163/17 R.G. Dib. Judgment No.: 12303/19, indictment Order of the judge in charge of the preliminary investigations against Vasfi Hormoz and Simon Gabathuler, 6 February 2019.

Evidence: Item n°69: Case numbers: 14163/17 R.G.N.R., 64163/17 R.G. Dib. Judgement n°: 12303/19, reasons for judgment against Vasfi Hormoz and Simon Gabathuler, 24 September 2019.

Evidence: Item n°70: File on Amendment n° 2 of contract n° 2004/1089.

49. As noted above, with respect to the wrongful acts and payments described below, the eighth and ninth Defendants, Mr. Bianchi and Mr. Cerveglieri, owners of Skema-Tozzi, pleaded guilty to international bribery in Italian criminal proceedings.

Evidence: Item n° 17: Agreement to negotiate sentences of Mr. Bianchi, Mr. Cerveglieri and Consorzio Dinamo.

50. On 30 November 2005, Agip KCO and Skema-Tozzi signed Contract 2004/1089, valued at USD 88,439,091, for the equipment of complex A, Riser Island and Drilling Island (“**Contract 2004/1089**”). Contract 2004/1089 has been amended eleven times.

Evidence: Item n° 26: ManCom Resolution No. R-2010-07-055 for Contract 2004/1089, 7 April 2011.

Evidence: Item n°71: Mancom Resolution No. R-2010-07-055 for Contract 2004/1089, 7 April 2011 (English version).

Evidence: Item n°72: Mancom Resolution No. R-2010-07-055 for Contract 2004/1089, 7 April 2011.

Evidence: Item n°73: Mancom Resolution for the approval of Contract 2004/1089, 1 February 1, 2007 (English version).

Evidence: Item n°74: Mancom Resolution for the approval of Contract 2004/1089, February 1, 2007 (Kazakh version).

Evidence: Item n°75: Agreement form between Agip KCO and Skema-Tozzi for Contract 2004/1089, 30 November 2005.

Evidence: Item n°19: Second expert report of Mr. Pireddu in Italian procedure No 15858/2013, 29 July 2015 (p. 145).

51. On 14 August 2006, Agip KCO (Tiziano Colombo) and Skema-Tozzi (Mario Cerveglieri) signed Amendment 1, increasing the contract value by USD 4,800,000.

Evidence: Item n°76: Amendment 1 to Contract 2004/1089, 14 August 2006 (pp. 4-5);

Evidence: Item n°18: First report of Mr. Pireddu in Italian procedure No. 15858/2013, 27 February 2015 (p. 32);

Evidence: Item n°19: Second expert report of Mr. Pireddu in Italian procedure No 15858/2013, 29 July 2015 (pp. 48, 81, 205).

52. Immediately after the signing of Amendment 1, Top Oil, controlled by the Defendants, and Skema-Tozzi entered into a consulting contract.

Evidence: Item n°77: Consulting contract between Top Oil and JV Skema-Tozzi, 2 May 2007.

53. On 25 May 2007, Skema-Tozzi (Mario Cerveglieri) and Agip KCO (Umberto Carrara) signed Amendment 2 bringing the contract to USD 104,670,458. After Amendment 2, a further 9 Amendments were signed.

Evidence: Item n°78: Amendment 2 to Contract 2004/1089, 25 May 2007 (p. 6);

Evidence: Item n°79: Appendix B to Amendment 2 (Compensation), 25 May 2007 (p. 2).

54. On 2 July 2007, Agip KCO (Umberto Carrara) and Skema-Tozzi (Mario Cerveglieri) signed Amendment 3.

Evidence: Item n°80: Amendment 3 to Contract 2004/1089, 2 July 2007 (p. 8).

55. On 12 July 2007, CTC Capone Trading & Consulting S.r.l. of Nicola Capone and Skema-Tozzi entered into a false agreement used as a means of "legitimizing" the fact that Mr. Capone received additional payments from Skema-Tozzi. We have reason to believe that, through this side agreement, part of the

'commissions' that Skema-Tozzi paid to the Defendants was paid to senior Skema-Tozzi officials.

Evidence: Item n°81: Minutes of the interrogation of Cerveglieri of 17 July 2012 before the Milan Prosecutor (p. 5).

Evidence: Item n°82: Application for invalidity under Article 178 (c) of the Italian Code of Criminal Procedure, 17 July 2012.

56. On 12 September 2007, Agip KCO (Umberto Carrara) and Skema-Tozzi (Mario Cerveglieri) signed Amendment 4.

Evidence: Item n°83: Amendment 4 to Contract 2004/1089, 12 September 2007 (p. 3).

57. Immediately after the signing of Amendments Nos. 2 and 3, on 29 October 2007, Top Oil, controlled by the first, second and third Defendants, issued an invoice for USD 250,000 to the eighth and ninth Defendants, Messrs. Bianchi and Cerveglieri, confirming that they and the first defendant, Mr. Hormoz Vasfi, assisted Skema-Tozzi for Amendment 2. This invoice, along with the following three, was for "Promotion, Marketing and Support for KCO for ITT 2004/1089 (provision of local equipment rooms) Amendment 2". The total amount of these invoices for Amendment 2 is USD 1,223,830.

Evidence: Item n°84: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 29 October 2007.

Evidence: Item n°85: Payment order from Top Oil to Skema-Tozzi for Contract 2004/1089, 30 October 2007.

Evidence: Item n°86: Bank statement of Skema-Tozzi, 31 October 2007.

58. On 14 November 2007, Skema-Tozzi sent a letter to Agip KCO outlining a proposal for additional costs resulting from variations from the work under the original contract.

Evidence: Item n°87: Letter from Skema-Tozzi to Agip KCO, 14 November 2007.

59. On 18 January 2008, Agip KCO (Umberto Carrara) and Skema-Tozzi (Mario Cerveglieri) signed Amendment 5.

Evidence: Item n°88: Amendment 5 to Contract 2004/1089, 18 January 2008.

60. After the signing of Amendment 5, on 1 February 2008, the seventh defendant, Tozzi Sud, sent the first Defendant two drafts of Agip KCO's "letter of understanding" to Skema-Tozzi outlining the intention to seek assistance in signing Amendment 6.

Evidence: Item n°89: Email of 1 February 2008 from Tozzi Sud to Vasfi Hormoz attaching Agip KCO's "letter of understanding" projects.

Evidence: Item n°90: Letter of Agreement from Agip KCO to Skema-Tozzi Joint Venture for Contract 2004/1089.

Evidence: Item n°91: Letter of Agreement from Agip KCO to Skema-Tozzi Joint Venture for Contract 2004/1089.

61. In the meantime, after obtaining Amendments 3 and 4 on 1 February 2008, the Defendants' shell company, Top Oil, issued an invoice to Skema-Tozzi for Amendments 3 and 4 for USD 500,000, in the same format as described for Amendment 2. A total of eight invoices were issued for Amendments 3 and 4 for a total amount of USD 2,933,000.

Evidence: Item n°92: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 1 February 2008.

Evidence: Item n°93: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 12 February 2008.

Evidence: Item n°94: Bank statement of Skema-Tozzi, 29 February 2008.

62. On 13 March 2008 and 27 May 2008, Top Oil, the shell company of the first, second and third Defendants, issued two additional invoices to Skema-Tozzi for Amendment 2, for the second and third installments respectively.

Evidence: Item n°95: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 13 March 2008.

Evidence: Item n°96: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 8 April 2008.

Evidence: Item n°97: Bank statement of Skema-Tozzi, 30 April 2008.

Evidence: Item n°98: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 27 May 2008.

Evidence: Item n°99: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 20 June 2008.

Evidence: Item n°100: Bank statement of Skema-Tozzi, 30 June 2008.

63. On 18 April 2008, the shell company of the first, second and third Defendants, TopOil, and Skema-Tozzi signed a new consulting contract, reiterating the 4% commission payable by Skema-Tozzi to Mr. Hormoz Vasfi.

Evidence: Item n°101: Letter from Skema-Tozzi to Top Oil on consultancy agreement, 25 April 2008.

Evidence: Item n°102: Consulting agreement between Top Oil and Skema-Tozzi.

64. On 2 May 2008, the shell company of the first, second and third Defendants, Top Oil, issued a further invoice to Skema-Tozzi for USD 250,000 for Amendments 3 and 4, in the same format as those described for Amendment 2.

Evidence: Item n°103: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 2 May 2008.

Evidence: Item n°104: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 30 May 2008.

Evidence: Item n°105: Bank statement of Skema-Tozzi, 31 May 2008.

65. After obtaining Amendment 5, on 27 May 2008, the shell company of the first, second and third Defendants, Top Oil, issued an invoice to Skema-Tozzi for Amendment 5 for USD 319,200, in the same format as described for Amendment 2.

Evidence: Item n°106: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 27 May 2008.

Evidence: Item n°107: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 1 September 2008.

Evidence: Item n°108: Bank statement of Skema-Tozzi, 30 September 2008.

66. On 1 July 2008, the shell company of the first, second and third Defendants, Top Oil, issued a further invoice to Skema-Tozzi for USD 300,000 for Amendments 3 and 4, in the same format as those described for Amendment 2.

Evidence: Item n°109: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 1 July 2008.

Evidence: Item n°110: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 30 July 2008.

Evidence: Item n°111: Bank statement of Skema-Tozzi, 30 September 2008.

67. On 15 July 2008, the first Defendant wrote to the eighth and ninth Defendants, Mr. Bianchi and Mr. Cerveglieri, advising them that an amendment to Contract 2004/1089 had been approved in the amount of USD 28,200,772.

Evidence: Item n°112: Email from Vasfi to Skema-Tozzi, 15 July 2008.

68. Two days later, on 17 July 2008, Agip KCO (Umberto Carrara) and Skema-Tozzi (Mario Cerveglieri) signed Amendment 6. On the same date, Amendment 7 was also signed, increasing Contract 2004/1089 costs by USD 11,260,000.

Evidence: Item n°113: Amendment 6 to Contract 2004/1089, 17 July 2008;

Evidence: Item n°114: Amendment 7 to Contract 2004/1089, 17 July 2008.

69. On 12 August 2008, Agip KCO (Umberto Carrara) and Skema-Tozzi (Mario Cerveglieri) signed Amendment 8.

Evidence: Item n°115: Amendment 8 to Contract 2004/1089, 12 August 2008.

70. On 23 September 2008, the eighth defendant, Mr. Bianchi (South Tozzi) sent the first Defendant the most recent letter from Skema-Tozzi to Agip KCO and a copy of Amendment 8. The agreed cost increase was USD 6,387,251.

Evidence: Item n°116: Email from Tozzi Sud to Vasfi Hormoz, 23 September 2008, attaching KCO documents.

71. On 1 October 2008, the first, second and third Defendants, through their shell company, Top Oil, sent Skema-Tozzi the fourth invoice relating to Amendment 2.

Evidence: Item n°117: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 1 October 2008.

Evidence: Item n°118: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 12 November 2008.

Evidence: Item n°119: Bank statement of Skema-Tozzi, 30 November 2008.

72. On 3 November 2008, the first, second and third Defendants, through their shell company, Top Oil, sent Skema-Tozzi another invoice for USD 300,000 for Amendments 3 and 4, in the same format as described for Amendment 2.

Evidence: Item n°120: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 3 November 2008.

Evidence: Item n°121: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 1 December 2008.

Evidence: Item n°122: Bank statement of Skema-Tozzi, 31 December 2008.

73. On 27 November 2008, the first defendant, Mr. Hormoz Vasfi, sent an email to Kazakh officials to promote Tozzi's interests at the expense of another contractor, Isker.

Evidence: Item n°123: Email from Vasfi Hormoz, 27 November 2008.

74. After obtaining Amendment 7, on 2 February 2009, the first, second and third Defendants, through their shell company, Top

Oil, invoiced Skema-Tozzi USD 300,000 for Amendment 7 (first tranche) in the same format as described for Amendment 2.

Evidence: Item n°124: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 5 January 2009.

Evidence: Item n°125: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 30 January 2009

Evidence: Item n°126: Bank statement of Skema-Tozzi, 31 March 2009.

75. On 2 February 2009, the first, second and third Defendants, through their shell company, Top Oil, sent Skema-Tozzi another invoice for USD 150,400 for Amendment 7 (second installment) in the same format as described for Amendment 2.

Evidence: Item n°127: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 2 February 2009.

Evidence: Item n°128: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 23 February 2009.

Evidence: Item n°129: Bank statement of Skema-Tozzi, 31 March 2009

76. Similarly for Amendment 8, after obtaining the Amendment on 2 March 2009, the first, second and third Defendants, through their shell company, Top Oil, issued to Skema-Tozzi an invoice for USD 259,490 for Amendment 8, in the same format as described for Amendment 2.

Evidence: Item n°130: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 2 March 2009.

Evidence: Item n°131: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 2 April 2009.

Evidence: Item n°132: Bank statement of Skema-Tozzi, 30 April 2009.

77. On 1 July 2009, the first, second and third Defendants, through their shell company, Top Oil, sent Skema-Tozzi a new invoice for USD 250,000 for Amendments 3 and 4, in the same format as described for Amendment 2.

Evidence: Item n°133: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 1 July 2009.

Evidence: Item n°134: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 24 July 2009.

Evidence: Item n°135: Bank statement of Skema-Tozzi, 30 September 2009.

78. On 22 July 2009, Agip KCO (Leonardo Zammarano) and Skema-Tozzi (Mario Cerveglieri) signed Amendment 9.

Evidence: Item n°136: Amendment 9 to Contract 2004/1089, 22 July 2009.

Evidence: Item n°137: Amendment 9 Annex 1 to Contract 2004/1089, 22 July 2009.

79. On 1 September 2009, the first, second and third Defendants, through their shell company, Top Oil, sent Skema-Tozzi another invoice for USD 250,000 for Amendments 3 and 4, in the same format as described for Amendment 2.

Evidence: Item n°138: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 1 September 2009.

Evidence: Item n°139: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 17 November 2009.

Evidence: Item n°140: Bank statement of Skema-Tozzi, 31 December 2009.

80. On 28 September 2009, the first defendant, Mr. Hormoz Vasfi, sent an email to Kazakh officials stating that Agip KCO wished to entrust additional work to Skema-Tozzi under Contract 2004/1089 and that he wanted KMG to assure him that there would be no objection, arguing that any tender would lead to a delay and an increase in costs.

Evidence: Item n°141: Email from Vasfi Hormoz, 28 September 2009.

81. On 1 October 2009, the eighth defendant, Mr. Bianchi, sent the first Defendant two documents from Agip KCO relating to Contracts 2004/1089 and 2008/0163. In that email, Mr. Bianchi did admit that he had obtained the documents improperly.

Evidence: Item n°142: Email from Skema-Tozzi to Vasfi Hormoz, 1 October 2009.

82. On 5 October 2009, the first defendant, Mr. Hormoz Vasfi, emailed Kazakh officials urging them to amend Contract 2004/1089.

Evidence: Item n°143: Email from Vasfi Hormoz, 5 October 2009.

83. On the same day, a few minutes later, the first respondent, Mr. Hormoz Vasfi, emailed Kazakh officials asking them to approve the Amendment.

Evidence: Item n°144: Email from Vasfi Hormoz, 5 October 2009.

84. On 2 November 2009, the first, second and third Defendants, through their shell company, Top Oil, sent Skema-Tozzi another invoice for USD 250,000 for Amendments 3 and 4, in the same format as those described for Amendment 2.

Evidence: Item n°145: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 2 November 2009.

Evidence: Item n°146: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 28 December 2009.

Evidence: Item n°147: Bank statement of Skema-Tozzi, 31 December 2009.

85. On 18 December 2009, the ninth defendant, Mr. Cerveglieri, sent a fax to the first defendant, Mr. Hormoz Vasfi, stating that, following a conversation on the same day, Skema-Tozzi would make a payment of USD 900,000 to the first, second and third Defendants through their shell company, Top Oil, in settlement of its unpaid debt, for all work performed (and unpaid invoices) up to Contract Amendment 8.

Evidence: Item n°148: Letter from Skema-Tozzi to Top Oil, 18 December 2009.

86. On 21 December 2009, the second Defendant replied in writing to the ninth defendant, Mr. Cerveglieri, stating that the amount owed was in fact USD 1,083,000.

Evidence: Item n°149: SKEMA-Tozzi's Transfer Report, 21 December 2009.

Evidence: Item n°150: Letter from Top Oil to Skema-Tozzi, 21 December 2009.

87. On 21 December 2009, the first, second and third Defendants, through their shell company, Top Oil, sent Skema-Tozzi the final invoice of USD 833,000 for Amendments 3 and 4, in the same form as described for Amendment 2.

Evidence: Item n°151: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 21 December 2009.

Evidence: Item n°152: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 20 January 2010.

Evidence: Item n°153: Bank statement of Skema-Tozzi, 31 March 2010.

88. On 5 March 2010, the first Defendant sent Skema-Tozzi a letter on Top Oil letterhead containing information on internal developments within NCOC.

Evidence: Item n°154: Letter from Vasfi Hormoz to Skema-Tozzi, 5 March 2010.

89. In April 2010, Agip KCO (Leonardo Zammarano) and Skema-Tozzi (Mario Cerveglieri) signed Amendment 10, which is not dated.

Evidence: Item n°155: Amendment 10 to Contract 2004/1089, April 2010.

Evidence: Item n°156: Attachment 1 Amendment 10 to Contract 2004/1089, April 2010.

90. On 22 April 2010, the first defendant, Mr. Hormoz Vasfi, sent an email to Kazakh officials requesting a number of documents, including documents relating to Amendment 10 to Contract 2004/1089.

Evidence: Item n°157: Email from Vasfi Hormoz, 22 April 2010.

91. On 20 May 2010, the eighth defendant, Mr. Bianchi, sent copies of Amendment 10 to Contract 2004/0189 (among other documents) to the first defendant.

Evidence: Item n°158: Email from Skema-Tozzi to Vasfi Hormoz, 20 May 2010.

92. On 1 June 2010, the first, second and third Defendants, through their shell company, Top Oil, issued an invoice to Skema-Tozzi for a total amount of USD 2,613,403.99. This amount was based on a 4% commission for a series of invoices for work under Contract 2004/1089 with a total value of USD 65,335,099.68. The invoice was paid on 22 June 2010. They did not provide any legitimate services to Skema-Tozzi.

Evidence: Item n°159: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 1 June 2010.

Evidence: Item n°160: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 25 June 2010.

Evidence: Item n°161: Bank statement of Skema-Tozzi, 30 June 2010.

93. On 5 November 2010, the first, second and third Defendants, through their shell company, Top Oil, invoiced Skema-Tozzi for an additional amount of USD 850,000. The invoice referred to services rendered under Contract 2004/1089, but did not mention explicit invoices or Amendments. Payment was made on 16 November 2010.

Evidence: Item n°162: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 5 November 2010.

Evidence: Item n°163: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 16 November 2010.

Evidence: Item n°164: Bank statement of Skema-Tozzi, 31 December 2010.

94. On 3 January 2011, the first, second and third Defendants, through their shell company, Top Oil, re-invoiced Skema-Tozzi for USD 850,000, again for services rendered under Contract 2004/1089. Payment was made on 14 January 2011.

Evidence: Item n°165: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 3 January 2011.

Evidence: Item n°166: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 14 January 2011.

Evidence: Item n°167: Bank statement of Skema-Tozzi, 31 March 2011.

95. On 2 February 2011, the first, second and third Defendants, through their shell company, Top Oil, re-invoiced Skema-Tozzi for services rendered in connection with Contract 2004/1089, again in the amount of USD 850,000. Skema-Tozzi made this payment on 11 February 2011.

Evidence: Item n°168: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 2 February 2011.

Evidence: Item n°169: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 11 February 2011.

Evidence: Item n°170: Bank statement of Skema-Tozzi, 31 March 2011.

96. On 7 March 2011, the first, second and third Defendants, through their shell company, Top Oil, invoiced Skema-Tozzi USD 938,000 for services rendered under Contract 2004/1089. The invoice was paid on 21 March 2011.

Evidence: Item n°171: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 7 March 2011.

Evidence: Item n°172: Payment order from Skema-Tozzi to Top Oil for Contract 2004/1089, 21 March 2011.

Evidence: Item n°173: Bank statement of Skema-Tozzi, 31 March 2011.

97. On 25 May 2011, the first, second and third Defendants, through their shell company, Top Oil, sent a smaller invoice to Skema-Tozzi, in the amount of USD 250,000, for services rendered under Contract 2004/1089. It was not possible to identify Skema-Tozzi's confirmation of payment of this latter invoice, but there is no indication that it was not paid.

Evidence: Item n°174: Invoice from Top Oil to Skema-Tozzi for Contract 2004/1089, 25 May 2011.

98. On 7 June 2011, the first, second and third Defendants, through their shell company, Top Oil, sent another invoice for USD 250,000 to Skema-Tozzi for this contract. Again, it was not possible to confirm the payment in Skema-Tozzi's documents, but there is no indication that this invoice remained unpaid.

Evidence: Item n°175: Invoice from Top Oil to Skema-Tozzi for Contract /1089, 7 June 2011.

99. On 21 June 2011, the first respondent, Mr. Hormoz Vasfi, emailed Mr. Zhurebekov (who used the nickname "Bob Turner") requesting a copy of Amendment 11.

Evidence: Item n°176: Email from Vasfi Hormoz to Zhurebekov, 21 June 2011.

100. On 24 May 2011, Agip KCO (Umberto Carrara) and Skema-Tozzi (Mario Cerveglieri) signed Amendment 11. The value of the approved contract was USD 478 million.

Evidence: Item n°177: Amendment 11 to Contract 2004/1089, 24 May 2011;

Evidence: Item n°178: Attachment 1 to Amendment 11 to Contract 2004/1089, 24 May 2011.

Evidence: Item n°179: Attachment 2 to Amendment 11 to Contract 2004/1089, 24 May 2011.

Evidence: Item n°180: Attachment 3 to Amendment 11 to Contract 2004/1089, 24 May 2011.

Evidence: Item n°181: Agip KCO Contract award recommendation for Contract 2004/1089.

Evidence: Item n°182: Agip KCO Contract modification recommendation for Contract 2004/1089.

Evidence: Item n°183: Agip KCO Contract modification recommendation for Contract 2004/1089.

Evidence: Item n°184: Agip KCO Contract modification recommendation for Contract 2004/1089.

Evidence: Item n°185: NCOC Contract Amendment No. CA 10.

**(e) Contract 2008/0163 - Skema-Tozzi**

101. The unlawful system, as described above, involved the first five Defendants obtaining contract amendments for Skema-Tozzi that inflated contract costs. They subsequently billed Skema-Tozzi for fictitious services, collecting funds that were then routed to disloyal employees, Kazakh officials and the Defendants themselves.

102. On 23 April 2008, Agip KCO sent a formal letter of intent to Skema-Tozzi, authorizing it to start preliminary work on the project. The maximum value set out in this letter of intent is USD 39 million, which marks the first official step in the development of the project. The letter was subsequently amended.

Evidence: Item n°186: Letter of intent from Agip KCO to Skema-Tozzi, 23 April 2008.

103. On 27 June 2008, the consortium approved Contract 2008/0163 for the total value indicated in the letter of intent (USD 39 million).

Evidence: Item n°187: Fan approval of key contract award, 27 June 2008.

104. On 8 April 2009, the first Defendant was in possession of a draft Amendment 3 to the letter of Intent, dated 8 April 2009, which was finalized on 5 May 2009. This amendment, signed by Mr. Carrara and Mr. Cerveglieri (the latter on 14 May 2009), further increased the value to ***USD 90 million***, expanded preliminary activities and exercised working options, thus extending the duration of the letter of intent. At this point, Skema-Tozzi had already received payments amounting to USD 45.1 million, although the formal contract has not yet been signed.

105. The first Defendant was clearly in possession of confidential documents which he exchanged for his benefit.

Evidence: Item n°188: Amendment 3 to letter of Intent for Contract 2008/0163, 5 May 2009.

106. On 22 June 2009, the first Defendant notified Skema-Tozzi of an upcoming discussion by the EMCB recommending an increase in the value of the contract.

Evidence: Item n°189: Letter from Hormoz Vasfi to Skema-Tozzi, 22 June 2009.

107. On 9 September 2009, in order to demonstrate its access to inside information, the first Defendant sent an email to the eighth and ninth Defendants, Mr. Bianchi and Mr. Cerveglieri, to share a confidential document approving a contract amendment.

Evidence: Item n°190: Email from Vasfi Hormoz to Skema-Tozzi, 9 September 2009, sharing the draft amendment to Contract 2008/0163.

Evidence: Item n°191: Draft amendment to Contract 2008/0163 (English version).

Evidence: Item n°192: Draft amendment of Contract 2008/0163 (Kazakh version).

108. On 15 September 2009, the first Defendant sent a letter to the eighth defendant, Mr. Bianchi, at Skema-Tozzi, informing him of the award of an amendment to Contract 2008/0163 and that Mr. Idenov would be the only one to sign it. This demonstrates that the first Defendant had knowledge of this confidential information before the company.

Evidence: Item n°193: Letter from Vasfi Hormoz to Skema-Tozzi, 15 September 2009.

109. On 18 September 2009, Skema-Tozzi (Mr. Cerveglieri) and Agip KCO (Leonardo Zammarano, suspected of having leaked information to Mr. Hormoz Vasfi) officially signed Contract 2008/0163, fixing prices at USD 24,912,528 for retail engineering and EUR 159,480,855.63 for supply and manufacturing.

Evidence: Item n°194: Agreement form between Agip KCO and Skema-Tozzi for Contract 2008/0163, 18 September 2009.

110. Between April 2010 and July 2011, several amendments to the contract increased the total value of the contract, causing dramatic inflation in value. These include:

(a) Amendment 1 - signed on 21 April 2010, it revises the delivery dates, adds a new Article and increases the contract price to USD 24,912,528.00 plus EUR 217,866,465.23

Evidence: Item n°195: Amendment 1 to Contract 2008/0163, 1 April 2010.

Evidence: Item n°196: Annex B to Contract 2008/0163, 18 September 2009.

(b) Amendment 2 - signed on 13 July 2010, introduces unit prices and excludes certain elements, further increasing the contract price to USD 25,005,328.43 plus EUR 242,588,036.82.

Evidence: Item n°197: Amendment 2 to Contract 2008/0163, 13 July 2010.

(c) Amendment 3 - signed on 12 December 2011 - introduces new provisions and increases the price to USD 25,005,328.43 plus EUR 260,473,599.53.

Evidence: Item n°198: Amendment 3 to Contract 2008/0163,12 December 2011.

111. Between October 2009 and May 2011, after the contract was signed, the first five Defendants worked actively with Skema-Tozzi to obtain amendments and engage in high-level contacts for approvals. Numerous emails exchanged between the first Defendant and Kazakh government officials, as well as other insiders, illustrate the ongoing manipulation and sharing of information to ensure contract changes to his own advantage.

Evidence: Item n°199: Email exchange between Vasfi Hormoz and Zhurebekov, June 2011;

Evidence: Item n°200: Vasfi email to Kazakh officials, 6 May 2011;

Evidence: Item n°201: Email from Vasfi Hormoz to Kazakh officials, 22 April 2010;

Evidence: Item n°202: Email from Vasfi Hormoz to Aman Maximov, 21 January 2010;

Evidence: Item n°203: Email from Vasfi Hormoz to Aman Maximov, 27 November 2009;

Evidence: Item n°204: Email from Vasfi Hormoz to Aman Maximov, 11 November 2009;

Evidence: Item n°205: Email from Vasfi Hormoz to Aman Maximov, 3 November 2009;

Evidence: Item n°206: Email from Vasfi Hormoz to Kazakh officials, 5 October 2009.

112. As a result of its unlawful actions, between December 2008 and July 2011, after each amendment, the first, second and third Defendants, through their shell company, Top Oil, billed Skema-Tozzi for services related to promoting the contract and obtaining the letter of intent, receiving substantial payments on the basis of a 4% fee agreement.

Evidence: Item n°207: Annotation of the Milan Financial Police.

113. These invoices, issued under various corporate names (Top Oil Ltd and T-O Top Oil Cyprus Ltd), show numerous payments made over time:

(a) 1 December 2008 - first invoice for promotion, marketing and support in the amount of USD 250,000.

Evidence: Item n°208: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 1 December 2008.

Evidence: Item n°209: Payment order from Skema-Tozzi to Top Oil for Contract 2008/0163, 30 December 2008.

Evidence: Item n°210: Bank statement of Skema-Tozzi, 31 December 2008

(b) 2 February 2009 - Invoice for promotion, marketing and support for USD 250,000

Evidence: Item n°211: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 2 February 2009.

Evidence: Item n°212: Payment order from Skema-Tozzi to Top Oil for Contract 2008/0163, 23 February 2009.

Evidence: Item n°213: Bank statement of Skema-Tozzi, 28 February 2009.

(c) 1 April 2009 - Invoice for promotion, marketing and support for USD 217,000.

Evidence: Item n°214: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 1 April 2009.

Evidence: Item n°215: Payment order from Skema-Tozzi to Top Oil for Contract 2008/0163, 13 May 2009.

Evidence: Item n°216: Bank statement of Skema-Tozzi, 31 May 2009.

(d) 18 May 2009 - Invoice for promotion, marketing and support for USD 279,501.

Evidence: Item n°217: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 18 May 2009.

Evidence: Item n°218: Payment order from Skema-Tozzi to Top Oil for Contract 2008/0163, 23 July 2009.

Evidence: Item n°219: Bank statement of Skema-Tozzi, 31 July 2009

(e) 3 May 2010 - Invoice of 4% fee for an amount of USD 2,524,000.

Evidence: Item n°220: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 3 May 2010.

Evidence: Item n°221: Payment order from Skema-Tozzi to Top Oil for Contract 2008/0163, 7 June 2010.

Evidence: Item n°222: Bank statement of Skema-Tozzi, 30 June 2010.

(f) 3 May 2010 - fee invoice of 4% for an amount of 2,100,234.18 EUR.

Evidence: Item n°223: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 3 May 2010.

Evidence: Item n°224: Payment order from Skema-Tozzi to Top Oil for Contract 2008/0163, 8 June 2010.

Evidence: Item n°225: Bank statement of Skema-Tozzi, 30 June 2010.

(g) 1 June 2010 - fee invoice of 4% for an amount of 1,420,000 EUR.

Evidence: Item n°226: Invoice Top Oil to Skema-Tozzi for Contract 2008/0163, 1 June 2010.

Evidence: Item n°227: Payment order from Skema-Tozzi to Top Oil for Contract 2008/0163, 24 June 2010.

Evidence: Item n°228: Bank statement of Skema-Tozzi, 30 June 2010.

(h) 26 October 2010 - Invoice for the second tranche of 600,000 EUR.

Evidence: Item n°229: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 26 October 2010.

Evidence: Item n°230: Payment order from Skema-Tozzi to Top Oil for Contract 2008/0163, 5 November 2010.

Evidence: Item n°231: Bank statement of Skema-Tozzi, 31 December 2010.

(i) 22 November 2010 - Invoice for the second tranche of 600,000 EUR.

Evidence: Item n°232: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 22 November 2010.

Evidence: Item n°233: Payment order from Skema-Tozzi to Top Oil for Contract 2008/0163, 13 December 2010.

Evidence: Item n°234: Bank statement of Skema-Tozzi, 31 December 2010.

(j) 16 December 2010 - Invoice for the third installment for an amount of 600,000 EUR.

Evidence: Item n°235: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 16 December 2010.

Evidence: Item n°236: Payment order from Skema-Tozzi to Top Oil for Contract 2008/0163, 30 December 2010.

Evidence: Item n°237: Bank statement of Skema-Tozzi, 31 December 2010.

(k) 17 January 2011 - Invoice for the fourth installment for an amount of 600,000 EUR.

Evidence: Item n°238: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 17 January 2011.

Evidence: Item n°239: Payment order from Skema-Tozzi to Top Oil for Contract 2008/0163, 1 February 2011.

Evidence: Item n°240: Bank statement of Skema-Tozzi, February 2011.

(l) 15 February 2011 - Invoice of the fifth installment for an amount of 644,000 EUR.

Evidence: Item n°241: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 15 February 2011.

Evidence: Item n°242: Payment order from Skema-Tozzi to Top Oil for Contract 2008/0163, 18 March 2011.

Evidence: Item n°243: Bank statement of Skema-Tozzi, 31 March 2011.

(m) 16 May - 15 June 2011 - Monthly payments of EUR 200,000, marking the final stages of the services invoiced for Contract 2008/0163.

Evidence: Item n°244: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 16 May 2011.

Evidence: Item n°245: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 15 June 2011.

(n) 1 July 2011 - Invoice for the eighth installment of Contract 2004/1089 in the amount of USD 250,000.

Evidence: Item n°246: Invoice from Top Oil to Skema-Tozzi for Contract_2004/1089, 1 July 2011.

(a) 15 July 2011 - Invoice for the eighth installment of Contract 2008/0163 for an amount of 200,000 EUR.

Evidence: Item n°247: Invoice from Top Oil to Skema-Tozzi for Contract 2008/0163, 15 July 2011.

114. As described above, in late 2011, Italian prosecutors began investigating Contract 2008/0163 due to evidence of inflated contract values, bid manipulation and corruption. Investigations revealed that Skema-Tozzi and its associates intentionally made low offers knowing that they would have been able to substantially increase fees through amendments. Prosecutors identified Hormoz Vasfi's insider network in Kazakhstan and Agip KCO as having played a key role in manipulating the contract changes.

115. Between 2009 and 2011, more than EUR 14 million was paid by Skema-Tozzi to the first five Defendants for their illegal services (*pretium sturpi)*.

## IV. QUALIFICATION UNDER KAZAKH LAW

116. The facts described above constitute violations of several provisions of the Kazakh Constitution, criminal law and civil law committed by the Defendants.

117. As noted above,[2] from 2004 to 2011, the first, second and third Defendants, acting through numerous shell companies, including the shell company Top Oil, orchestrated and managed a transnational corruption scheme. This system aimed to obtain contracts and subsequent modifications for the Kashagan project, inflating contract costs to the entities they assisted (Skema-Tozzi and Petrofac). These costs were then transferred to the pockets of corrupt officials who were in collusion with them.

118. Defendants' actions constitute serious violations of the 1997 Criminal Code of the Republic of Kazakhstan:

i) **Part 1 of Article 235-2:** Penalizing the creation and leadership of a transnational organized group for committing one or more crimes, as well as active participation in such a group.

ii) **Part 2 of Article 313:** Penalizing repeated mediation in bribery, within the context of an organized group, by facilitating agreements or their implementation between the bribe-taker and bribe-giver.

iii) **Article 190, Fraud**: Embezzlement of another's property or acquisition of the right to another's property by deceit or abuse of trust, shall be punishable as follows

119. Defendants' action also constitute serious violation of Kazakhstan's Civil Code and Constitution:

i) **The Constitution of the Republic of Kazakhstan** provides a guarantee of human and civil rights, Articles 12-13, including the right to judicial protection of rights, and that no one can infringe on the rights of another person/citizen, but this rather includes all kinds of rights and responsibility (civil, criminal, administrative).

ii) **Article 9. Protection of Civil Rights:** Protection of civil rights is carried out by court, arbitration by: recognition of rights;

2 See section V [*sic*] above.

> restoration of the situation that existed before the violation of the right; suppression of actions that violate the right or threaten to violate it; awarding to fulfil the obligation in kind; recovery of losses, penalties; invalidation of a void transaction and application of the consequences of its invalidity; compensation for moral harm; termination or change of legal relations; invalidation of a void or voidable transaction; recognition of a violation of the right. Legal entities do not have the right to compensation for moral damage. […] 4. The person whose right has been violated may demand full compensation for the losses caused to him/her, unless otherwise provided for by legislative acts or the contract. Losses shall mean expenses incurred or to be incurred by the person whose right has been violated, loss or damage to his property (real damage), as well as unreceived income which this person would have received under normal conditions of turnover if his/her right had not been violated (lost profit).

## V. LEGAL SUBMISSION

### A. Jurisdiction

120. The jurisdiction of the Geneva Court in this case is well-founded. Firstly, the first, third, fourth, and fifth Defendants either reside, are domiciled, or have their registered offices in Geneva. Additionally, critical aspects of the alleged wrongdoings occurred within Geneva, notably through the use of local bank accounts at BSI SA CH-1204 Geneva to receive illicit funds. These factors enable the Court to assert jurisdiction under the provisions that address tort claims, aligning with both the domestic and international legal frameworks.

Evidence: Item n°8: Second expert report of Mr. Pireddu in Italian procedure No 15858/2013, 29 July 2015.

121. Moreover, for the second Defendant, Article 129 of Switzerland Federal Code on Private international Law allows for jurisdiction over individuals who are not domiciled in Switzerland if other connected parties, such as co-Defendants, are located in Geneva.

### B. Merits

**1. Liability for illegal acts**

**a. Legal grounds of the claim**

122. Pursuant to Article 41 CO:

> 1. Any person who unlawfully causes damage to another, whether willfully or negligently, is obliged to provide compensation.
> 2. A person who willfully causes damage to another in an immoral manner is likewise obliged to provide compensation.

123. The general conditions of liability under Article 41 CO are therefore as follows:

i. an illegal act, so the breach of a norm protecting others or an absolute right of the victim in the absence of justifying reasons;

ii. fault, deliberate or through negligence;

iii. damage, so the involuntary reduction in the assets of a person;

iv. the causal link, natural and adequate, between the illegal act and the damage.

124. In this case, the wrongful illegal acts committed by the Defendants fall within the definition of complicity with criminal mismanagement, bribery and money laundering. Each of these shall be examined hereunder.

**2. Wrongful illegal acts: Complicity in criminal mismanagement**

**a. Applicable principles**

125. Pursuant to 158 CP, any person who by law, an official order, a legal transaction or authorization granted to him, has been entrusted with the management of the property of another or the supervision of such management, and in the course of and in breach of his duties causes or permits that other person to sustain financial loss shall be liable to a custodial sentence not exceeding three years or to a monetary penalty. Any person who acts in the same manner in his capacity as the manager of a business, but without specific instructions, shall be liable to the same penalty. If the offender acts with a view to securing an unlawful financial gain for himself or another, a custodial sentence of from one to five years may be imposed.

### 3. Wrongful illegal acts: bribery

#### a. The applicable principles

126. Pursuant to Article 322septies CP:

> Any person who offers, promises or gives a member of a judicial or other authority, a public official, an officially-appointed expert, translator or interpreter, an arbitrator, or a member of the armed forces who is acting for a foreign state or international organisation an undue advantage, or gives such an advantage to a third party, in order that the person carries out or fails to carry out an act in connection with his official activities which is contrary to his duties or dependent on his discretion,
> any person who as a member of a judicial or other authority, a public official, an officially-appointed expert, translator or interpreter, an arbitrator, or a member of the armed forces of a foreign state or of an international organisation demands, secures the promise of, or accepts an undue advantage for himself or for a third party in order that he carries out or fails to carry out an act in connection with his official activity which is contrary to his duty or dependent on his discretion, shall be liable to a custodial sentence not exceeding five years or to a monetary penalty.

127. The constituent elements of the offence are therefore as follows:

i. a foreign public official;

ii. the offer, promise or granting (active corruption), respectively the solicitation, the fact of being promised or of accepting (passive corruption);

iii. an undue advantage;

iv. a link between the undue advantage and the behaviour of the public official;

v. these elements must be undertaken with awareness and intent.

### 4. The money laundering

#### a. The applicable principles

128. Pursuant to Article 305bis ch. 1 CP (in its content in force at the time of the facts):

> Any person who carries out an act that is aimed at frustrating the identification of the origin, the tracing or the forfeiture of assets which he knows or must assume originate from a felony or aggravated tax misdemeanour shall be liable to a custodial sentence not exceeding three years or to a monetary penalty.

129. In serious cases, the penalty is a custodial sentence not exceeding five years or a monetary penalty. A serious case is constituted, in particular, where the offender:

> a. acts as a member of a criminal or terrorist organisation;

b. acts as a member of a group that has been formed for the purpose of the continued conduct of money laundering activities; or
c. achieves a large turnover or substantial profit through commercial money laundering.

130. The offender is also liable to the foregoing penalties where the main offence was committed abroad, provided such an offence is also liable to prosecution at the place of commission.

### 5. Obligation to return pursuant to Article 423 CO

#### a. Applicable principles

131. Pursuant to Article 423 CO:

132. Where agency activities were not carried out with the best interests of the principal in mind, he is nonetheless entitled to appropriate any resulting benefits. The principal is obliged to compensate the agent and release him from obligations assumed only to the extent the principal is enriched. The investment advice relationship is a relationship of mandate and Articles 394 et seq. are applicable to it.

* * *

In view of the foregoing, **PSA Limited Liability Company** hereby declares that it will elect domicile for service in the firm Aubert Neyroud Stückelberg Fratini, Avocats, rue François-Versonnex 7, 1207 Genève and give power of attorney to represent it to Philippe Neyroud and Stephan Fratini, as well as Nicoleta Timofti and Letizia Ceccarelli, lawyers for Squire Patton Boggs LLP, rue du Rhone 67, 1207 Geneva, including for the purposes of the conciliation hearing. Counsel have full powers to represent the company, as well as to negotiate and settle, without reservation.

For the Plaintiff,

Dias Ibrashev

AUBERT
NEYROUD
STÜCKELBERG
FRATINI

**Gabriel Aubert**
Avocat, professeur honoraire
M.C.L. Georgetown University

**Philippe Neyroud**
Avocat
LL.M. Berkeley University

**Martine Stückelberg**
Avocate
LL.M. Georgetown University

**Stephan Fratini**
Avocat
LL.M. University of Sydney

**Selda Berzati**
Avocate

DÉPOSÉ AU GREFFE LE
2 0 MAR. 2025
RÉP. ET CANTON DE GENÈVE
TRIBUNAL DE PREMIÈRE INSTANCE

Par porteur

Tribunal de première instance
Rue de l'Athénée 6-8
Case postale 3736
1211 Genève 3

Genève, le 20 mars 2025
*philippe.neyroud@ibilex.ch*

***Requête de conciliation***

Madame la Présidente, Monsieur le Président,

Agissant pour PSA Limited Liability Company, qui fait élection de domicile en l'Etude, je vous prie de bien vouloir trouver ci-joint la requête de conciliation de ma mandante à l'endroit de M. Hormoz Vasfi *et al.* en 10 exemplaires.

Je vous prie de trouver ici, Madame la Présidente, Monsieur le Président, l'assurance de ma parfaite considération.

Philippe Neyroud

*Ann. ment.*

7, rue François-Versonnex
1207 Genève - Suisse
T +41 22 707 47 70
www.ibilex.ch

DÉPOSÉ AU GREFFE LE 20 MAR. 2025 RÉP. ET CANTON DE GENÈVE TRIBUNAL DE PREMIÈRE INSTANCE

# REQUETE DE CONCILIATION

**Tribunal de première instance**

(Valeur litigieuse : CHF 13'175'358.-)

**PSA Limited Liability Company**, dont le siège social est situé rue Syganaq, 17/10, République du Kazakhstan, Astana, 010000, mais faisant élection de domicile en l'Etude Aubert Neyroud Stückelberg Fratini, avocats, rue François-Versonnex 7, 1207 Genève, comparant par Me Philippe Neyroud et Me Stephan Fratini, ainsi que par Me Nicoleta Timofti et Letizia Ceccarelli, avocates en l'Etude de Squire Patton Boggs LLP, rue du Rhône 67, 1207 Genève.

demanderesse

v.

1. **M. Hormoz Vasfi**, domicilié à rue Ferdinand-Hodler 21 – 1207, Genève ;

2. **M. Simon Gabathuler**, domicilié à Wolfsagger 14, 9473 Gams (Suisse) ;

3. **M. Victor Vasfi**, chez Mme Marie-Claire Halff, chemin de la Tulette 3D, 1223 Cologny

4. **Best Oil SA**, chez VALLEA SA, Rue Du-Roveray 20, 1207 Genève ;

5. **Dragon Production Sàrl**, chez VALLEA SA, Rue Du-Roveray 20, 1207 Genève;

6. **Skema S.p.A.**, via G. Galilei n. 5, Milan, Italie ;

7. **Tozzi Sud S.p.A.**, Foggia S.S. 16, z.i. Incoronata, amministrativa in Mezzano (RA), via Zuccherificio n. 10 ;

8. **M. Agostino Bianchi**, domicilié à Via Negri 21, Ravenne (RA), Italie ;

9. **M. Mario Secondo Cerveglieri**, domicilié à Via Monti 41, Milan (MI), Italie ;

défendeurs

# I. CONCLUSIONS

## LA DEMANDERESSE CONCLUT À CE QU'IL

### PLAISE AU TRIBUNAL DE PREMIERE INSTANCE

1. Condamner les défendeurs conjointement et solidairement à lui verser la somme de EUR 14'000'000 , plus intérêts au taux de 5 % par an à compter du 31 décembre 2008.

2. Subsidiairement, condamner les défendeurs conjointement et solidairement à lui verser la somme de CHF 13'175'358.-, plus intérêts au taux de 5 % par an à compter du 31 décembre 2008.

3. Plus subsidiairement encore, condamner les défendeurs conjointement et solidairement à lui verser la somme de USD 14'664'160 .-, plus intérêts au taux de 5 % par an à compter du 31 décembre 2008.

4. En tout état, condamner les défendeurs conjointement et solidairement en tous les dépens.

# II. FAITS

5. La demanderesse allègue et offre de prouver les faits suivants.

**LES PARTIES**

6. La demanderesse PSA Limited Liability Company (« PSA »), est une société constituée en République du Kazakhstan et détenue à 100 % par Samruk-Kazyna, le Fonds National du Patrimoine. La demanderesse est titulaire des droits pétroliers de la République du Kazakhstan des gisements Kashagan et Karachaganak. Elle a subi un dommage considérable résultant d'un système corruptif complexe, orchestré par les défendeurs à partir de Genève notamment, qui ont artificiellement augmenté les coûts du recouvrement du pétrole, au moyen de factures fictives.

7. Le premier défendeur est M. Hormoz Vasfi, qui au moment des faits était domiciliée à Genève et déployait une activité en tant d'intermédiaire dans le processus d'appel d'offres formées pour le développement et l'exploitation des gisements pétroliers de Kashagan et Karachaganak au Kazakhstan. M. Hormoz Vasfi était le propriétaire et l'animateur de Best Oil SA, Dragon Production Sàrl, Best Oil, Beland Ltd, Alvier Limited et Top Oil UK Ltd et Top Oil Cyprus (« Top Oil ») qui sont intervenues dans le cadre du système de corruption décrit ci-dessous.

| | |
|---|---|
| Preuve : Pièce n°1 : | Copie de LexisNexis, 16 avril 2008 |
| Preuve : Pièce n°2 : | Déclaration d'identité du bénéficiaire effectif, 31 janvier 2011 |
| Preuve : Pièce n°3 : | Lettre de Top Oil, 3 novembre 2010 |
| Preuve : Pièce n°4 : | Lettre de Top Oil, 3 novembre 2010 |
| Preuve : Pièce n°5 : | Lettre de Smekrano à la JV Skema Tozzi, 16 décembre 2008. |
| Preuve : Pièce n°6 : | Lettre de Casaroli à Buratti, 28 juin 2010. |
| Preuve : Pièce n°7 : | Annexe 4 Special Focus Client Review of Top Oil, Beland and Vasfi, juillet 2010. |
| Preuve : Pièce n°8 : | Lettre de Casaroli à Buratti joignant les principaux accords pétroliers et factures, 25 juin 2010. |
| Preuve : Pièce n°9 : | Lettre de Casaroli à Buratti joignant les principaux accords pétroliers, 28 juin 2010. |
| Preuve : Pièce n°10 : | Copie certifiée conforme des documents de Vasfi. |
| Preuve : Pièce n°11 : | Formulaire d'identification Top Oil de Barclays Wealth. |
| Preuve : Pièce n°12 : | Rapport du BSI à Genève, daté du 4 novembre 2008. |

Interrogatoire de MM. Pireddu et Hormoz Vasfi.

8. Le deuxième défendeur est **M. Simon Gabathuler**, l'ancien directeur de plusieurs sociétés contrôlées par le premier défendeur. Il a facilité les systèmes de corruption. M. Gabathuler était un participant actif et non un simple prête-nom. En tant que directeur, il était chargé d'opérer au nom des

sociétés de M. Hormoz Vasfi notamment des instructions aux banques pour opérer les transferts.

Preuve : Pièce n°1 : Copie de LexisNexis, 16 avril 2008.

Preuve : Pièce n°2 : Déclaration d'identité du bénéficiaire effectif, 31 janvier 2011.

Preuve : Pièce n°3 : Lettre de Top Oil, 3 novembre 2010.

Preuve : Pièce n°4 : Lettre de Top Oil, 3 novembre 2010.

Interrogatoire de M. Gabathuler.

9. Fils du premier défendeur, le troisième défendeur est **M. Victor Vasfi**, le gérant et seul signataire de la société Dragon Production Sàrl, administrateur unique de la société Best Oil SA, et propriétaire effectif de T-O Top Oil (Chypre). Il a agi en étroite collaboration avec son père dans le cadre des systèmes de corruption et il est l'ayant droit économique des comptes bancaires sur lesquels ont été versés la rémunération des services corruptifs.

Preuve : Pièce n°13 : Lettre du procureur de Vasfi, 14 décembre 2012.

Preuve : Pièce n°14 : Lettre de Soteris à Banck de Chypre, 20 décembre 2012.

Interrogatoire de M. Victor Vasfi.

10. Les quatrième et cinquième défendeurs sont les sociétés Dragon Production Sàrl et Best Oil SA, basées à Genève, détenues et contrôlées par les premier et deuxième défendeurs et qui ont blanchit le produits des infractions commises par les autres défendeurs.

Preuve : Pièce n°15 : BEST Oil S.A., Company Report, Office fédéral de la justice.

Preuve : Pièce n°16 : Dragon production Sàrl, Company Reports, Office fédéral de la justice.

11. Les sixième et septième défendeurs sont les sociétés italiennes **Skema S.p.A.** et **Tozzi Sud S.p.A.**, qui ayant constitué le « joint-venture » Skema Tozzi, ont remporté deux appels d'offres importants pour des travaux sur le champ pétrolier de Kashagan, numéros 2004/1089 et 2008/0163, et ont participé au

système de corruption en utilisant comme intermédiaires les premier et deuxième défendeurs et leurs sociétés écrans.

Preuve : Pièce n°17 : Accord de négociation de peine de M. Bianchi, M. Cerveglieri et Consorzio Dinamo

Interrogatoire de MM. Bianchi et Cerveglieri.

12. Le huitième défendeur est **M. Agostino Bianchi**, directeur de Tozzi Sud S.p.A., qui s'est ensuite associé à Skema S.p.A. pour former le « joint venture » Skema-Tozzi. Il était vice-président de Skema-Tozzi et il a eu recours notamment à M. Hormoz Vasfi, pour se faire adjuger les contrats incriminés. Les autorités italiennes ont engagé des procédures pénales contre M. Bianchi pour corruption internationale. Ces poursuites pénales ont abouti à l'accord de négociation de peine de 2017. M. Bianchi a reconnu sa culpabilité et a été condamné à six mois de prison, sans que son implication dans le système de corruption ne soit contestée.

Preuve : Pièce n° 17 : Accord de négociation de peine de M. Bianchi, M. Cerveglieri et Consorzio Dinamo.

Interrogatoire de M. Bianchi.

13. Le neuvième défendeur est **M. Mario Cerveglieri**, PDG et président de Skema S.p.A., qui s'est ensuite associé à Tozzi Sud S.p.A. pour former le « joint venture » Skema-Tozzi. Il fut le Président de Skema-Tozzi. Il a aussi eu recours à M. Hormoz Vasfi, pour obtenir les contrats incriminés. Les autorités italiennes ont engagé des procédures pénales contre M. Cerveglieri pour corruption internationale. Les poursuites pénales ont abouti à l'accord de négociation de peine de 2017. M. Cerveglieri a reconnu sa culpabilité et il a été condamné à six mois de prison, sans que son implication dans le système de corruption ne soit contestée.

Preuve : Pièce n° 17 : Accord de négociation de peine de M. Bianchi, M. Cerveglieri et Consorzio Dinamo.

Interrogatoire de M. Cerveglieri.

14. En résumé, les défendeurs énumérés ci-dessus ont tous participé à un titre ou à un autre au système de corruption orchestré par le premier **M. Hormoz Vasfi**. Ils ont agi notamment de Genève, ville dans laquelle ce dernier vivait à l'époque et dans laquelle il semble avoir conservé son domicile.

Interrogatoires des défendeurs 1, 2, 3, 8 et 9.

15. Le système de corruption consistait pour les cinq premiers défendeurs à recevoir des paiements illégaux en tant qu'intermédiaires de la part de sociétés qu'ils avaient assisté dans l'obtention des contrats incriminés – y compris les sixième et septième défenderesses – pour le développement et l'entretien des gisements de Kashagan et Karachaganak, ainsi que pour amender lesdits contrats afin d'en gonfler artificiellement la valeur. Le produit illégal de cette activité a été utilisé pour (i) corrompre des fonctionnaires au Kazakhstan, (ii) « rémunérer » certains cadres d'ENI (en tant qu'opérateur dans les contrats d'exploitation des champs pétroliers susmentionnés) et (iii) « rémunérer » les défendeurs eux-mêmes pour leurs services fictifs et frauduleux. Les cinq premiers défendeurs n'ont en fait rendu aucun service véritable ou légitime justifiant les paiements facturés, la charge financière en résultant reposant directement sur la demanderesse. Ce stratagème utilisé avec les sixième et septième défendeurs a été utilisé avec de nombreuses autres sociétés, notamment, Breda Energia S.p.A., Tenaris, Petrofac et d'autres (utilisant les mêmes intermédiaires ou des intermédiaires différents) pour des services à Agip KCO et Agip KPO en République du Kazakhstan.

Preuve : Pièce n°18 : Premier rapport d'expert de M. Pireddu dans la procédure italienne n° 15858/2013, 27 février 2015 ;

Preuve : Pièce n°19 : Deuxième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 29 juillet 2015 ;

Preuve : Pièce n°20 : Troisième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 12 octobre 2015 ;

Preuve : Pièce n°21 : Cinquième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 22 juin 2015.

Interrogatoire de M. Pireddu.

16. Le système de corruption était soutenu par un réseau organisé de contacts illégaux, orchestré par les cinq premiers défendeurs. Il impliquait les cadres supérieurs des entreprises qui émettaient des appels d'offres ainsi que les cadres supérieurs des entreprises adjudicataires. En réalité, ces contrats visaient à créer des caisses noires destinée à alimenter la corruption. Dans certaines circonstances, les preuves recueillies démontrent le versement de pots-de-vin en faveur de cadres déloyaux au sein des sociétés d'exploitation elles-mêmes, par exemple Agip KCO. Les membres du système criminel communiquaient entre eux par le biais d'adresses électroniques créées à cet effet sous de faux noms et utilisaient des pseudonymes pour occulter leur identité.

Preuve : Pièce n° 18 : Premier rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 27 février 2015 ;

Preuve : Pièce n° 19 : Deuxième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 29 juillet 2015 ;

Preuve : Pièce n° 20 : Troisième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 12 octobre 2015 ;

Preuve : Pièce n° 21 : Cinquième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 22 juin 2015.

Interrogatoire de M. Pireddu.

17. Plusieurs procédures pénales ont été engagées en Italie contre les premier et deuxième défendeurs et contre les huitième et neuvième défendeurs, lesquels ont plaidé coupables de corruption internationale. Les premier et deuxième défendeurs ont échappé à toute condamnation pénale en raison de la prescription. Dans les procédures pénales de Milan et de Monza, plusieurs dirigeants d'Agip KCO furent impliqués, notamment M. **Guido Michelotti**, alors président d'Agip Caspian Sea BV, M. **Umberto Carrara**, alors PDG d'Agip KCO, M. **Luigi Diamante**, alors Directeur du Projet chez Agip KCO

chargé d'évaluer les propositions et les recommandations pour l'attribution des contrats par appel d'offres, M. **Paolo Dentali**, responsable des achats pour AGIP KCO, Eni, M. **Ernesto Ferlenghi**, alors chef du bureau d'Eni à Moscou, et M. **Diego Braghi** travaillant dans diverses entreprises d'Eni, y compris Agip KCO. Les documents divulgués impliquent également M. **Leonida Bortolazzo** et **M. Luigi Colombo,** également cadres chez Agip KCO.

Preuve : Pièce n° 17 : Accord de négociation de peine de M. Bianchi, M. Cerveglieri et Consorzio Dinamo

Preuve : Pièce n° 18 : Premier rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 27 février 2015 ;

Preuve : Pièce n°22 : Article de presse sur le scandale de corruption Unaoil.

Interrogatoire de MM. Guido Michelotti, Umberto Carrara, Luigi Diamante, Paolo Dentali, Ernesto Ferlenghi, Diego Braghi, Leonida Bortolazzo et Luigi Colombo.

Interrogatoire de M. Pireddu.

18. Les procédures en Italie ont permis de rassembler la documentation bancaire permettant de découvrir les transactions effectuées pour le fonctionnement du système de corruption. Les défendeurs utilisaient principalement la succursale genevoise de la BSI (compte bancaire n°[redacted]).

Preuve : Pièce n° 19 : Deuxième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 29 juillet 2015 (pp. 48, 81).

Interrogatoire de M. Pireddu.

19. De nombreux paiements illicites n'ont toujours pas été identifiés dont les recherches se poursuivent en Suisse et à l'étranger, à commencer par les transactions financières effectuées par l'intermédiaire de BSI, Crédit Suisse/UBS, Barclays, VP Bank au Liechtenstein et Banca Intesa. Des sociétés telles qu'Eni, Shell et Worley et des responsables kazakhs de premier plan, dont Maksat Idenov, sont également l'objet des recherches de

la demanderesse en raison de leur implication et de leurs liens avec M. Hormoz Vasfi. Par conséquent, la demanderesse se réserve d'amplifier ses conclusions.

## III. AUTRES ENTITÉS ET PERSONNES CONCERNÉES

### A. Top Oil Group/Tecron S.r.l.

20. Top Oil est une entité enregistrée à Chypre et composée d'un groupe hétéroclite de sociétés réparties dans le monde entier, notamment au Royaume-Uni, à Chypre, aux Bahamas, en Italie et au Kazakhstan, contrôlées par M. Hormoz Vasfi et M. Gabathuler.

21. Tecron S.r.l. est une société enregistrée en Italie et contrôlée par M. Hormoz Vasfi.

| | |
|---|---|
| Preuve : Pièce n° 1 : | Copie de LexisNexis, 16 avril 2008. |
| Preuve : Pièce n°2 : | Déclaration d'identité du bénéficiaire effectif, 31 janvier 2011. |
| Preuve : Pièce n°3 : | Lettre de Top Oil, 3 novembre 2010. |
| Preuve : Pièce n°4 : | Lettre de Top Oil, 3 novembre 2010. |
| Preuve : Pièce n°5 : | Lettre de Smekrano à la JV Skema Tozzi, 16 décembre 2008. |
| Preuve : Pièce n°6 : | Lettre de Casaroli à Buratti, 28 juin 2010. |
| Preuve : Pièce n°23 : | Annexe 11 du premier rapport d'expert de M. Pireddu dans la procédure italienne n° 15858/2013, 29 juillet 2015 (rapport de la société, Tecron S.r.l.). |

Interrogatoire de M. Pireddu.

(1) **Madame Alessandra Casaroli**, secrétaire de M. Hormoz Vasfi - elle a envoyé plusieurs courriels au nom de M. Hormoz Vasfi en utilisant son compte de messagerie alessandra.casaroli@tecron.net.

(2) **M. Gennaro Irace,** chauffeur de M. Vasfi - récipiendaire de l'argent liquide de M. Hormoz Vasfi pour un montant total de 55 137,50 euros et 191 4000 francs suisses sur deux ans.

Preuve : Pièce n° 19 : Deuxième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 29 juillet 2015 (pp. 6, 28, 77, 185).

Interrogatoires de M. Pireddu, Mme Alessandra Casaroli et M. Gennaro Irace.

**B. Skema-Tozzi**

22. Joint-venture italienne formée par Skema S.p.A. et Tozzi Sud S.p.A. en charge du système électrique du gisement de Kashagan.

(1) **M. Nicola Capone est** propriétaire de CTC Capone Trading & Consulting S.r.l. et directeur commercial de Skema-Tozzi. Il a reçu des paiements de Skema-Tozzi pour ses activités illégales d'intermédiaire au Kazakhstan. Des poursuites pénales pour corruption internationale ont été engagées contre lui en Italie. Le tribunal de Monza a estimé que l'enquête avait mis au jour des preuves suffisantes pour étayer les allégations de corruption internationale à l'encontre de M. Guidotti, ainsi que de M. Bianchi et de M. Capone. Toutefois, en raison de de la prescription pénale, le tribunal n'a pas été en mesure d'inculper officiellement M. Capone pour corruption internationale

Preuve : Pièce n° 18 : Premier rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 27 février 2015 (pp. 20-22) ;

Preuve : Pièce n° 19 : Deuxième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 29 juillet 2015 (pp. 20, 23, 35, 66-67, 105, 107) ;

Preuve : Pièce n°24 : Pièce jointe 77 du deuxième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 29 juillet 2015.

Interrogatoires de MM. Pireddu et Nicola Capone

**C. Petrofac**

23. Petrofac est un groupe mondial de services énergétiques basé à Jersey qui conçoit, construit et entretient des infrastructures pour le pétrole, le gaz, le raffinage, la pétrochimie et les énergies renouvelables. Les documents saisis au cours des instructions pénales de Monza et de Milan, ainsi que d'autres documents ayant fait l'objet d'une fuite, donnent rapportent la preuve des activités de corruption mises en place par les cinq premiers défendeurs au profit de Petrofac.

(1) **Ayman Asfari,** PDG de Petrofac – a demandé d'être mis en contact avec un fonctionnaire kazakh, M. Idenov, par l'intermédiaire de M. Hormoz Vasfi et M. Malcolm Douglas.

(2) **Douglas Malcolm**, vice-président chargé du développement commercial, a demandé à M. Hormoz Vasfi de l'aider à organiser une réunion entre Ayman Asfari et M. Idenov, fonctionnaire kazakh et puis dirigeant d'Eni, qui avait bloqué l'attribution d'un contrat important à Petrofac et à son partenaire usuel, KBR, pour l'exploitation du gisement de Kashagan.

Preuve : Pièce n°25 : Courriels entre Tecron et Asfari, juin-juillet 2009

Preuve : Pièce n°26 : Courriels échangés entre Tecron et Petrofac, 23-24 juin 2009

Interrogatoires de MM. Asfari Ayman, Hormoz Vasfi et Malcom Douglas.

## D. Breda Energia S.p.A. (« Breda »)

24. Breda, et sa branche kazakhe, Breda Energia Sesto Industria S.p.A., enregistrée à Aksay, ont obtenu l'adjudication de plusieurs contrats et avenants pour le projet Kashagan en échange de pots de vins. Dans ce contexte, Breda a recouru aux services des cinq premiers défendeurs. En outre, il s'est avéré que les contrats adjugés à Breda ont fait l'objet d'avenants non autorisés, qui ont augmenté le coût de plusieurs millions. Par exemple, pour le contrat n° 2004/1115, qui a été adjugé à Breda pour la fourniture de vannes à haute pression de petit diamètre, Exxon et Shell ont émis des doutes sur les qualifications de Breda au cours de la procédure d'appel d'offres. Exxon a refusé d'approuver le contrat, mais Shell a finalement accepté. Le premier défendeur a assisté Breda tout au long de la procédure d'appel d'offres.[1]

Preuve : Pièce n°27 : Courriel de Vasfi à Bisinella, 2 septembre 2011

Preuve : Pièce n°28 : Courriel de Casaroli à Peluzzi, 6 juillet 2011

Preuve : Pièce n°29 : Facture de Top Oil à Breda, 14 mars 2011

Preuve : Pièce n°30 : Oil Payment Receipt, 23 mai 2011.

1 La Demanderesse mène une enquête plus approfondie sur cette question et prendra toutes les mesures nécessaires pour récupérer les documents supplémentaires relatifs à ce contrat.

| | |
|---|---|
| Preuve : Pièce n°31 : | Facture de Top Oil à Breda, 30 mars 2011. |
| Preuve : Pièce n°32 : | Facture de Top Oil à Breda, 9 mars 2011. |
| Preuve : Pièce n°33 : | Top Oil Payment Receipt, 23 mai 2011. |
| Preuve : Pièce n°34 : | Courriel de Vasfi à Bisinella, 23 mars 2011. |
| Preuve : Pièce n°35 : | Courriels entre KMG et Tecron, juin 2008. |
| Preuve : Pièce n°36 : | Appel d'offres pour la fourniture de têtes de puits et d'arbres de Noël daté du 5 juin 2008. |
| Preuve : Pièce n°37 : | Plan d'évaluation des soumissions têtes de puits et arbres de Noël (annexe 3). |
| Preuve : Pièce n°38 : | Courriel de Bisinella à Casaroli, 27 mai 2009. |
| Preuve : Pièce n°39 : | Courriel de Bisinella à Casaroli, 27 mai 2009. |
| Preuve : Pièce n°40 : | Courriel de Bisinella à Casaroli, 23 juin 2009. |
| Preuve : Pièce n°41 : | Résolution du Comité du projet Karachaganak, novembre 2008 (version anglaise). |
| Preuve : Pièce n°42 : | Résolution du Comité du projet Karachaganak, novembre 2008 (version kazakhe). |
| Preuve : Pièce n°43 : | Courriel de Bisinella à Casaroli, 9 juillet 2010. |
| Preuve : Pièce n°44 : | Courriel de Bisinella à Casaroli, 4 avril 2012. |
| Preuve : Pièce n°45 : | Résolution du Comité du projet Karachaganak, novembre 2008 (version anglaise). |
| Preuve : Pièce n°46 : | Résolution du Comité du projet Karachaganak, novembre 2008 (version kazakhe). |

## E. Tenaris Global Services S.A. (« Tenaris »)

25. Tenaris est un fabricant mondial de tuyaux et de services connexes pour le secteur de l'énergie. Il s'agit d'une filiale détenue majoritairement (60,45 %) par le groupe italien Techint. Tenaris a obtenu l'adjudication de plusieurs contrats pour le projet Kashagan.

26. Les cinq premiers défendeurs ont utilisé leurs contacts pour truquer les appels d'offres en faveur de Tenaris et pour obtenir des renseignements confidentiels sur le processus d'adjudication des contrats et des informations

sur les offres des concurrents. En 2021, la SEC a conclu un « Deferred Prosecution Agreement » (« DPA ») avec Tenaris S.A. pour corruption en Ouzbékistan.

Preuve : Pièce n°47 : Courriels échangés entre Casaroli et James Ross, 18 février 2009.

Preuve : Pièce n°48 : Courriel de Casaroli à James Ross, 19 février 2009.

Preuve : Pièce n°49 : Courriel de Casaroli à James Ross, 4 mars 2009.

Preuve : Pièce n°50 : Courriel de Casaroli à James Ross, 28 septembre 2009.

Preuve : Pièce n°51 : Courriel de Casaroli à James Ross, 4 novembre 2009.

Preuve : Pièce n°52 : Accord de poursuite différée avec Tenaris S.A.

Interrogatoire de M. Jacques Attie, ancien directeur commercial de Tenaris pour la région de la Mer Caspienne.

## F. Le gisement de Karachaganak et le système frauduleux

27. La République du Kazakhstan est le plus grand pays d'Asie centrale, avec d'importants volumes de ressources naturelles. Le gisement géant de Kashagan, qui fait partie du « North Caspian Project », est l'une des plus grandes découvertes de pétrole des dernières décennies, avec environ 9 à 13 milliards de barils (1 à 2 milliards de tonnes) de pétrole récupérable. Le gisement de Kashagan se trouve à 80 km au large de la ville d'Atyrau, par 3-4 mètres d'eau et à plus de 4 km de profondeur (4 200 mètres). Les installations de production comprennent des complexes offshores et onshore.

Interrogatoire de M. Pireddu.

28. Le gisement de Karachaganak, découvert en 1979, est l'un des plus grands gisements de gaz et de condensats au monde. Situé au nord-ouest du Kazakhstan et couvrant une superficie de plus de 280 kilomètres carrés, il contient des hydrocarbures estimés à 13,6 milliards de barils et 59,4 billions BCF (billion cubic feet) de gaz, avec des réserves brutes estimées à plus de 2,4 milliards de barils de condensats et 16 BCF de gaz.

Interrogatoire de M. Pireddu.

29. Le gisement de Kashagan est exploité dans le cadre d'un contrat de partage de la production conclu entre la République du Kazakhstan et de grandes compagnies pétrolières internationales telles que AGIP Caspian Sea B.V., une filiale de la compagnie pétrolière Eni S.p.A., CNCP Kazakhstan B.V., une filiale de la China National Petroleum Corporation, ExxonMobil Kazakhstan Inc. une filiale de la compagnie américaine ExxonMobil Corporation, INPEX North Caspian Sea, Ltd, une filiale de la société japonaise INPEX Corporation, Shell Kazakhstan Development B.V., une filiale de la société Dutch Shell plc, TotalEnergies E&P Kazakhstan, une filiale de la société française TotalEnergies SA, et KMG Kashagan, B.V., une filiale de la société nationale JSC KazMunayGas, qui ont formé un consortium appelé North Caspian Operating Company (« NCOC »), une société d'exploitation pour le contrat de partage de la production de la mer Caspienne du Nord (« NCSPSA »).

Interrogatoire de M. Pireddu.

30. Le NCSPA régit la collaboration, avec diverses entités servant d'opérateurs au fil des années, passant d'Agip KCO NV à la North Caspian Operating Company (« NCOC »), qui est devenue l'unique opérateur en 2015.

Interrogatoire de M. Pireddu.

31. Le gisement de Karachaganak est également exploité dans le cadre d'un accord de partage de la production entre la République du Kazakhstan et une série de grandes compagnies pétrolières, British Gas (Shell) avec 29,25 % des parts, ENI avec 29,25 % des parts, Chevron avec 18 % des parts, Lukoil avec 13,5 % des parts et JSC NC « KazMunayGas » avec 10 % des parts. L'Accord Final de Partage de la Production (« FPSA ») régit l'exploitation du gisement et les relations entre les parties. Eni et Shell (par l'intermédiaire de sa société affiliée à 100 % BG Karachaganak Limited) sont les opérateurs conjoints.

Interrogatoire de M. Pireddu.

32. Les accords ou contrats de partage de la production sont usuels dans les pays en développement qui ne disposent pas des ressources nécessaires pour exploiter de manière indépendante les gisements de pétrole lorsqu'ils sont découverts. En règle générale, ils permettent aux compagnies pétrolières d'explorer et d'exploiter un gisement de pétrole tandis que le gouvernement reste propriétaire des ressources sous-jacentes. Si du pétrole est découvert, les compagnies pétrolières ont le droit de récupérer auprès du gouvernement ou des entités publiques les coûts spécifiés en recevant une part du pétrole produit. Le reste du pétrole est ensuite réparti entre les compagnies pétrolières et l'État hôte selon les termes de l'accord. C'est la demanderesse qui titulaire des droits de République du Kazakhstan et c'est donc elle qui a subi le dommage résultant du système mis en place par les défendeurs qui ont artificiellement augmenté les coûts de recouvrement, par le recours à des contrats, des avenants et des factures ne correspondant à aucune véritable contre prestation. Le dommage de la demanderesse s'est réalisé dans la quantité réduite de pétrole comparé à celle à laquelle elle avait droit.

Interrogatoire de M. Pireddu.

33. Entre 2006 et 2011, le modus operandi des défendeurs a consisté dans la conclusion de contrats pour un budget initial peu élevé pour ensuite les modifier par des avenants gonflant les coûts jusqu'à dix fois.

Interrogatoire de M. Pireddu.

34. La rémunération obtenue par les défendeurs pour leur services illicites s'élève à 14 millions d'euros au moins, soit le montant payé aux défendeurs 1 à 5 par défendeurs 6 à 9. Cependant, le dommage total subi par la demanderesse est beaucoup plus important.

Interrogatoire de M. Pireddu.

35. La demanderesse a reçu connaissance récemment les détails de ce système corruptif par l'obtention des copies des documents relatifs aux affaires pénales, notamment du tribunal de Monza.

Preuve : Pièce n°53 : Réponse à la demande de documents envoyée par PSA aux procureurs de Monza, octobre 2023.

Preuve : Pièce n°54 : Demande de documents envoyée par PSA aux procureurs de Monza, le 6 octobre 2023.

Preuve : Pièce n°55 : Demande de documents au nom de PSA, 6 septembre 2023.

36. Plus précisément, la demanderesse a découvert dans les documents du tribunal de Monza que les cinq premiers défendeurs se présentaient officiellement comme des intermédiaires entre Agip KCO et de multiples sous-traitants, notamment Skema-Tozzi. Les défendeurs ont agi comme intermédiaires pour faciliter l'acheminement des pots-de-vin aux dirigeants de Skema-Tozzi, Eni et Agip KCO ainsi qu'aux décideurs kazakhs.

Preuves : Point n° 19 : Deuxième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 29 juillet 2015.

Interrogatoire de M. Pireddu.

37. Les premier et troisième défendeurs ont fait l'objet d'une enquête et d'une inculpation en Italie pour corruption internationale. Toutefois, ils ont bénéficié de la prescription pénale qui est très courte en Italie. Dans le cadre de la même procédure, les huitième et neuvième défendeurs ont plaidé coupable de corruption internationale.

Preuve : Pièce n° 17 : Accord de négociation de peine de M. Bianchi, M. Cerveglieri et Consorzio Dinamo.

38. Les contrats mis en place par les défendeurs destinés à la constitution d'une caisse noire sont les suivants :

- Contrats 2003/0162, 0163 et 0164, adjugés à Petrofac Ltd (« **Petrofac** »);
- Contrats 2004/0321, 0322 et 0323, adjugés à Petrofac ;

- Contrat 2005/0775, adjugés à Petrofac ;
- Contrat 2004/1089, adjugés à Skema-Tozzi, une société enregistrée en Italie ; et
- Contrat 2008/0163, adjugés à Skema-Tozzi.

39. Les contrats fictifs adjugés à Petrofac ont été conclu grâce avec le concours la société Unaoil qui était au cœur d'un vaste réseau international de corruption opérant à l'échelle mondiale, y compris en République du Kazakhstan. Les principaux acteurs d'Unaoil ont été condamnés pour corruption par le tribunal du district sud du Texas des États-Unis en mars 2019.

Preuve : Pièce n°56 : Condemnation de Cyrus Allen Ahsani et Saman Ahsani, US District Court of the Southern District of Texas, Houston Division, 4 mars 2019, ¶ 55.

Interrogatoires de Cyrus Allen Ahsani et Saman Ahsani.

40. Les procédures pénales connues ont été engagées en Italie (ministères publics de Milan, Monza et Rome), aux États-Unis (ministère de la justice des États-Unis et bureau du procureur de Houston), au Royaume-Uni (SFO) et en Suisse (AG) à l'encontre de diverses sociétés et personnes impliquées dans le projet Kashagan. Les preuves recueillies par la demanderesse au cours de ces procédures sont à la fois substantielles et convaincantes. Cependant, un nombre important d'informations et de preuves restent inaccessibles, car elles sont soit scellées par le tribunal, soit détenues à titre privé par des personnes et des entreprises

41. Les preuves connues révèlent que les défendeurs ont orchestré un stratagème illégal visant principalement à obtenir des contrats et à gonfler les coûts contractuels au profit de leurs clients, y compris les sixième et septième Défendeurs, et leur joint-venture Skema-Tozzi (et finalement les huitième et neuvième défendeurs). Les sommes d'argent exorbitantes générées par les coûts supplémentaires ont ensuite été versées dans leurs poches et dans celles de fonctionnaires corrompus et de dirigeants d'entreprises qui étaient de

connivence avec eux. Ce système a entraîné des conséquences dévastatrices pour la demanderesse.

42. Les contrats impliqués dans ce système illicite sont détaillés ci-dessous.

**(a) Contrats 2003/0162, 0163 et 0164 - Petrofac**

43. Les premier, deuxième, troisième, quatrième et cinquième défendeurs ont joué un rôle central dans l'obtention d'avenants aux contrats attribués à Petrofac afin d'en augmenter la valeur et ont exigé de recevoir des honoraires de conseil proportionnels à l'augmentation de la valeur des contrats (la valeur des contrats adjugés à Petrofac a augmenté de plus de ***526 millions USD***). Ces défendeurs ont monnayé les informations confidentielles reçues d'un haut fonctionnaire kazakh. Ils n'ont fourni aucun service ni prestation légitimes.

Preuve : Pièce n°57 : Soumission de l'EMCB pour la recommandation de l'augmentation de l'ACV et de la durée du contrat.

44. En avril 2004, Agip KCO et Petrofac ont signé les contrats 2003/0162, 0163 et 0164, d'une valeur combinée de 579 287 000 USD, couvrant l'« usine de soufre », l' « usine de gaz et de GPL » et les « usines pétrolières ». Après plusieurs modifications, la valeur des contrats a atteint 1 161 500 000 USD, soit une augmentation de 526,7 millions USD en seulement cinq ans.

Preuve : Pièce n°58 : Mancom résolution No. R2011-02-003 pour les marchés 2003-0162, 0163 et 0164, 21 octobre 2011 (version anglaise).

Preuve : Pièce n°59 : Mancom résolution No. R2011-02-003 pour les contrats 2003-0162, 0163 et 0164, 21 octobre 2011 (version kazakhe).

Interrogation des personnes concernées de Petrofac.

**(b) Contrats 2004/0321, 0322 et 0323 - Petrofac**

45. Agip KCO et Petrofac ont signé les contrats 2004/0321, 0322 et 0323, qui ont ensuite été remplacés par le contrat 2007/0577, d'une valeur de 2 119 392 USD, portant sur les « Services d'assistance sur site ». À la suite de plusieurs avenants, la valeur du contrat 2007/0577 a augmenté de 13,4 millions d'USD.

| | |
|---|---|
| Preuve : Pièce n°60 : | Approbation de l'adjudication des marchés 2003-0162, 0163, 0164 et 2007-0577, 8 septembre 2007 (version anglaise). |
| Preuve : Pièce n°61 : | Approbation de l'adjudication des marchés 2003-0162, 0163, 0164 et 2007-0577, 8 septembre 2007 (version kazakhe). |
| Preuve : Pièce n°62 : | Approbation de l'attribution n° F2013-018, 10 avril 2013. |
| Preuve : Pièce n°63 : | Soumission au « Contract Board » de NCOC, 20 mai 2011. |

**(c) Contrat 2005/0775 - Petrofac**

46. Le 8 septembre 2005, Agip KCO et Petrofac ont signé le contrat 2005/0775, d'une valeur de 95 134 000 USD, portant sur les « services de gestion de la construction ». Après plusieurs modifications, la valeur du contrat a atteint 306 454 386 USD.

| | |
|---|---|
| Preuve : Pièce n°64 : | Soumission au « Contract Board » de NCOC pour l'amendement du Contrat n° 2005/0775, 18 juin 2009 ; |
| Preuve : Pièce n°65 : | Courriel du 18 mai 2009 de Serik Burkibayev à Vasfi Hormoz, joignant l'avenant au contrat 2005/0775. |

47. Pour obtenir les avenants, Petrofac a également admis avoir eu recours à Unaoil, une société avec laquelle les défendeurs entretenaient des liens étroits. Le premier défendeur et Unaoil ont partagé des informations substantielles sur les projets Kashagan en vue de faciliter mutuellement les manœuvres de corruption.

| | |
|---|---|
| Preuve : Pièce n°66 : | Petrofac, Update on Board review, 1er août 2016 ; |
| Preuve : Pièce n° 25 : | Courriels entre Tecron et Asfari, juin-juillet 2009 ; |
| Preuve : Pièce n° 26 : | Courriels échangés entre Tecron et Petrofac, 23-24 juin 2009 . |

**(d) Contrat 2004/1089 - Skema-Tozzi**

48. Dès le début de l'année 2007, les premier, deuxième, troisième et quatrième défendeurs, agissant par l'intermédiaire de leur société, Top Oil, ont commencé à facturer à Skema-Tozzi des services qui n'avaient pas été réellement fournis, dissimulant ainsi la véritable nature de leur implication. Ils ont agi en tant qu'intermédiaires, manipulant les relations de Skema-Tozzi avec AGIP pour s'assurer que Skema-Tozzi obtienne des avenants au

contrat qui leur permettaient de gonfler énormément leurs coûts. Onze avenants au contrat 2004/1089 ont en effet été signés, augmentant illicitement la valeur de ce seul contrat signé par Skema-Tozzi de 88,4 millions USD à ***plus de 492 millions USD***. Ces coûts accrus étaient uniquement motivés par des raisons illégales. Tous ces coûts injustifiés ont finalement été supportés par la demanderesse. Top Oil a payé Paolo Dentali d'Agip KCO, l'opérateur du projet Kashagan, pour des travaux relatifs à l'avenant 2 (décrit ci-dessous), qui a augmenté la valeur du contrat.

| | |
|---|---|
| Preuve : Pièce n°67 : | Numéros des affaires : 14163/17 R.G.N.R., 64163/17 R.G. Dib. Jugement n° : 12303/19, arrêt de la Cour pénale des Roms contre Vasfi Hormoz et Simon Gabathuler, 24 septembre 2019. |
| Preuve : Pièce n°68 : | Numéros des affaires : 14163/17 R.G.N.R., 64163/17 R.G. Dib. Arrêt n° : 12303/19, acte d'accusation ordonnance du juge chargé des enquêtes préliminaires contre Vasfi Hormoz et Simon Gabathuler, 6 février 2019. |
| Preuve : Pièce n°69 : | Numéros des affaires : 14163/17 R.G.N.R., 64163/17 R.G. Dib. Jugement n° : 12303/19, motivation de l'arrêt contre Vasfi Hormoz et Simon Gabathuler, 24 septembre 2019. |
| Preuve : Pièce n°70 : | Dossier sur la modification n° 2 du contrat n° 2004/1089. |

49. Comme indiqué précédemment, en ce qui concerne les faits et les paiements illicites décrits ci-dessous, les huitième et neuvième défendeurs, M. Bianchi et M. Cerveglieri, propriétaires de Skema-Tozzi, ont plaidé coupable de corruption internationale dans le cadre d'une procédure pénale italienne.

| | |
|---|---|
| Preuve : Pièce n° 17 : | Accord de négociation de peine de M. Bianchi, M. Cerveglieri et Consorzio Dinamo. |

50. Le <u>30 novembre 2005</u>, Agip KCO et Skema-Tozzi ont signé le contrat 2004/1089, d'une valeur de 88.439.091 USD, portant sur l'équipement du « Complex A », de « Riser Island » et de « Drilling Island » (« **contrat 2004/1089** »). Le contrat 2004/1089 a été modifié onze fois.

| | |
|---|---|
| Preuve : Pièce n°26 : | Résolution ManCom n° R-2010-07-055 pour le contrat n° 2004/1089 7 avril 2011 ; |

| | |
|---|---|
| Preuve : Pièce n°71 : | Mancom résolution No. R-2010-07-055 pour le contrat no 2004/1089, 7 avril 2011 (version anglaise). |
| Preuve : Pièce n°72 : | Mancom résolution No. R-2010-07-055 pour le contrat no 2004/1089, 7 avril 2011. |
| Preuve : Pièce n°73 : | Résolution Mancom pour l'approbation du contrat n° 2004/1089, 1er février 2007 (version anglaise). |
| Preuve : Pièce n°74 : | Résolution Mancom pour l'approbation du contrat n° 2004/1089, 1er février 2007 (version kazakhe). |
| Preuve : Pièce n°75 : | Formulaire d'accord entre Agip KCO et Skema-Tozzi pour le contrat n° 2004/1089, 30 novembre 2005. |
| Preuve : Pièce n°19 : | Deuxième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 29 juillet 2015 (p. 145). |

51. Le 14 août 2006, Agip KCO (Tiziano Colombo) et Skema-Tozzi (Mario Cerveglieri) ont signé l'avenant 1, augmentant la valeur du contrat de 4 800 000 USD.

| | |
|---|---|
| Preuve : Pièce n°76 : | Avenant 1 au contrat 2004/1089, 14 août 2006 (pp. 4-5) ; |
| Preuve : Pièce n°18 : | Premier rapport de M. Pireddu dans la procédure italienne n° 15858/2013, 27 février 2015 (p. 32) ; |
| Preuve : Pièce n°19 : | Deuxième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 29 juillet 2015 (pp. 48, 81, 205). |

52. Juste après la signature de l'avenant n°1, Top Oil, contrôlée par les défendeurs, et Skema-Tozzi ont conclu un contrat de conseil.

| | |
|---|---|
| Preuve : Pièce n°77 : | Contrat de conseil entre Top Oil et JV Skema-Tozzi, 2 mai 2007. |

53. Le 25 mai 2007, Skema-Tozzi (Mario Cerveglieri) et Agip KCO (Umberto Carrara) ont signé l'avenant 2 portant le contrat à 104 670 458 USD. Après l'avenant 2, 9 autres avenants ont été signés.

| | |
|---|---|
| Preuve : Pièce n°78 : | Avenant 2 au contrat 2004/1089, 25 mai 2007 (p. 6) ; |
| Preuve : Pièce n°79 : | Annexe B à l'avenant 2 (compensation), 25 mai 2007 (p. 2). |

54. Le 2 juillet 2007, Agip KCO (Umberto Carrara) et Skema-Tozzi (Mario Cerveglieri) ont signé l'avenant 3.

Preuve : Pièce n°80 : Avenant 3 au contrat 2004/1089, 2 juillet 2007 (p. 8).

55. Le 12 juillet 2007, CTC Capone Trading & Consulting S.r.l. de Nicola Capone et Skema-Tozzi ont conclu un faux accord utilisé comme moyen de « légitimer » le fait que M. Capone reçoive des paiements supplémentaires de la part de Skema-Tozzi. Nous avons des raisons de croire que, par le biais de cet accord parallèle, une partie des 'commissions' que Skema-Tozzi a payées aux défendeurs a été reversée à des cadres supérieurs de Skema-Tozzi.

Preuve : Pièce n°81 : Procès-verbal de l'interrogatoire de Cerveglieri du 17 juillet 2012 devant le procureur de Milan (p. 5).

Preuve : Pièce n°82 : Requête en nullité en vertu de l'article 178 c) du Code de procédure pénale italien, 17 juillet 2012.

56. Le 12 septembre 2007, Agip KCO (Umberto Carrara) et Skema-Tozzi (Mario Cerveglieri) ont signé l'avenant 4.

Preuve : Pièce n°83 : Avenant 4 au contrat 2004/1089, 12 septembre 2007 (p. 3).

57. Juste après la signature des avenants 2 et 3, le 29 octobre 2007, Top Oil, contrôlée par les premier, deuxième et troisième défendeurs, a émis une facture de 250.000 USD, adressée aux huitième et neuvième défendeurs, MM. Bianchi et Cerveglieri, confirmant qu'eux-mêmes et le premier défendeur, M. Hormoz Vasfi, ont assisté Skema-Tozzi pour l'avenant 2. Cette facture, ainsi que les trois suivantes, concernaient la « Promotion, marketing et support pour l'obtention du contrat KCO pour l'ITT 2004/1089 (Fourniture de salles d'équipement locales) Avenant 2 ». Le montant total de ces factures pour l'avenant 2 s'élève à 1.223.830 USD.

Preuve : Pièce n°84 : Facture de Top Oil à Skema-Tozzi pour le contrat 2004/1089, 29 octobre 2007.

Preuve : Pièce n°85 : Ordre de paiement de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 30 octobre 2007.

Preuve : Pièce n°86 : Relevé bancaire de Skema-Tozzi, 31 octobre 2007.

58. Le 14 novembre 2007, Skema-Tozzi a envoyé une lettre à Agip KCO exposant une proposition de coûts supplémentaires résultant de variations par rapport aux travaux prévus dans le contrat initial.

Preuve : Pièce n°87 : Lettre de Skema-Tozzi à Agip KCO, 14 novembre 2007.

59. Le 18 janvier 2008, Agip KCO (Umberto Carrara) et Skema-Tozzi (Mario Cerveglieri) ont signé l'avenant 5.

Preuve : Pièce n°88 : Avenant 5 au contrat 2004/1089, 18 janvier 2008.

60. Après la signature de l'avenant 5, le 1er février 2008, le septième défendeur, Tozzi Sud, a envoyé à la première défenderesse deux projets de « Letter of Understanding » d'Agip KCO à Skema-Tozzi soulignant l'intention de demander de l'aide pour la signature de l'avenant 6.

Preuve : Pièce n°89 : Courriel du 1er février 2008 de Tozzi Sud à Vasfi Hormoz joignant les projets de « Letter of Understanding » d'Agip KCO.

Preuve : Pièce n°90 : Lettre d'entente d'Agip KCO à la coentreprise Skema-Tozzi pour le contrat 2004-1089.

Preuve : Pièce n°91 : Lettre d'entente d'Agip KCO à la coentreprise Skema-Tozzi pour le contrat 2004-1089.

61. Entre-temps, après avoir obtenu les avenants 3 et 4, le 1er février 2008, la société écran des défendeurs, Top Oil, a émis à l'attention de Skema-Tozzi une facture de 500.000 USD pour les avenants 3 et 4, dans le même format que ceux décrits pour l'avenant 2. Au total, huit factures ont été émises pour les avenants 3 et 4 pour un montant total de 2.933.000 USD.

Preuve : Pièce n°92 : Facture de Top Oil à Skema-Tozzi pour le contrat 2004/1089, 1er février 2008.

Preuve : Pièce n°93 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 12 février 2008.

Preuve : Pièce n°94 : Relevé bancaire de Skema-Tozzi, 29 février 2008.

62. Le 13 mars 2008 et le 27 mai 2008, Top Oil, la société écran des premier, deuxième et troisième défendeurs, a émis à l'attention de Skema-Tozzi deux factures supplémentaires pour l'avenant 2, respectivement pour la deuxième et la troisième tranche.

| | |
|---|---|
| Preuve : Pièce n°95 : | Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 13 mars 2008. |
| Preuve : Pièce n°96 : | Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 8 avril 2008. |
| Preuve : Pièce n°97 : | Relevé bancaire de Skema-Tozzi, 30 avril 2008. |
| Preuve : Pièce n°98 : | Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 27 mai 2008. |
| Preuve : Pièce n°99 : | Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 20 juin 2008. |
| Preuve : Pièce n°100 : | Relevé bancaire de Skema-Tozzi, 30 juin 2008. |

63. Le 18 avril 2008, la société écran des premier, deuxième et troisième défendeurs, Top Oil, et Skema-Tozzi ont signé un nouveau contrat de conseil, réitérant la commission de 4 % à payer par Skema-Tozzi à M. Hormoz Vasfi.

| | |
|---|---|
| Preuve : Pièce n°101 : | Lettre de Skema-Tozzi à Top Oil sur l'accord de conseil, 25 avril 2008. |
| Preuve : Pièce n°102 : | Accord de conseil entre Top Oil et Skema-Tozzi. |

64. Le 2 mai 2008, la société écran des premier, deuxième et troisième défendeurs, Top Oil, a émis à l'attention de Skema-Tozzi une autre facture de 250 000 USD pour les avenants 3 et 4, dans le même format que ceux décrits pour l'avenant 2.

| | |
|---|---|
| Preuve : Pièce n°103 : | Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 2 mai 2008. |
| Preuve : Pièce n°104 : | Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 30 mai 2008. |
| Preuve : Pièce n°105 : | Relevé bancaire de Skema-Tozzi, 31 mai 2008. |

65. Après avoir obtenu l'avenant 5, le 27 mai 2008, la société écran des premier, deuxième et troisième défendeurs, Top Oil, a émis à l'attention de Skema-Tozzi une facture de 319 200 USD pour l'avenant 5, dans le même format que celui décrit pour l'avenant 2.

Preuve : Pièce n°106 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 27 mai 2008.

Preuve : Pièce n°107 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 1er septembre 2008.

Preuve : Pièce n°108 : Relevé bancaire de Skema-Tozzi, 30 septembre 2008.

66. Le 1er juillet 2008, la société écran des premier, deuxième et troisième défendeurs, Top Oil, a émis à l'attention de Skema-Tozzi une autre facture de 300 000 USD pour les avenants 3 et 4, dans le même format que ceux décrits pour l'avenant 2.

Preuve : Pièce n°109 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 1er juillet 2008.

Preuve : Pièce n°110 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 30 juillet 2008.

Preuve : Pièce n°111 : Relevé bancaire de Skema-Tozzi, 30 septembre 2008.

67. Le 15 juillet 2008, le premier défendeur a écrit aux huitième et neuvième défendeurs, M. Bianchi et à M. Cerveglieri, pour leur signaler qu'un avenant au contrat 2004/1089 avait été approuvé pour un montant de 28.200.772 USD.

Preuve : Pièce n°112 : Courriel de Vasfi à Skema-Tozzi, 15 juillet 2008.

68. Deux jours plus tard, le 17 juillet 2008, Agip KCO (Umberto Carrara) et Skema-Tozzi (Mario Cerveglieri) ont signé l'avenant 6. À la même date, l'avenant 7 a également été signé, augmentant les coûts du contrat 2004/1089 de 11 260 000 USD.

Preuve : Pièce n°113 : Avenant 6 au contrat 2004/1089, 17 juillet 2008 ;

Preuve : Pièce n°114 : Avenant 7 au contrat 2004/1089, 17 juillet 2008.

69. Le 12 août 2008, Agip KCO (Umberto Carrara) et Skema-Tozzi (Mario Cerveglieri) ont signé l'avenant 8.

Preuve : Pièce n°115 : Avenant 8 au contrat 2004/1089, 12 août 2008.

70. Le 23 septembre 2008, le huitième défendeur, M. Bianchi (Tozzi Sud) a envoyé au premier défendeur la lettre la plus récente que Skema-Tozzi avait envoyée à Agip KCO ainsi qu'une copie de l'avenant 8. L'augmentation de coût convenue était de 6.387.251 USD.

Preuve : Pièce n°116 : Courriel de Tozzi Sud à Vasfi Hormoz, 23 septembre 2008, annexant les documents de KCO.

71. Le 1er octobre 2008, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont adressé à Skema-Tozzi la quatrième facture relative à l'avenant 2.

Preuve : Pièce n°117 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 1er octobre 2008.

Preuve : Pièce n°118 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 12 novembre 2008.

Preuve : Pièce n°119 : Relevé bancaire de Skema-Tozzi, 30 novembre 2008.

72. Le 3 novembre 2008, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont adressé à Skema-Tozzi une autre facture de 300 000 USD pour les avenants 3 et 4, dans le même format que ceux décrits pour l'avenant 2.

Preuve : Pièce n°120 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 3 novembre 2008.

Preuve : Pièce n°121 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 1er décembre 2008.

Preuve : Pièce n°122 : Relevé bancaire de Skema-Tozzi, 31 décembre 2008.

73. Le 27 novembre 2008, le premier défendeur, M. Hormoz Vasfi, a envoyé un courrier électronique à des fonctionnaires kazakhs pour promouvoir les intérêts de Tozzi au détriment d'un autre entrepreneur, Isker.

Preuve : Pièce n°123 : Courriel de Vasfi Hormoz, 27 novembre 2008.

74. Après avoir obtenu l'avenant 7, le 2 février 2009, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont adressé à Skema-Tozzi une facture de 300 000 USD pour l'avenant 7 (première tranche) dans le même format que celui décrit pour l'avenant 2.

Preuve : Pièce n°124 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 5 janvier 2009.

Preuve : Pièce n°125 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 30 janvier 2009

Preuve : Pièce n°126 : Relevé bancaire de Skema-Tozzi, 31 mars 2009.

75. Le 2 février 2009, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont adressé à Skema-Tozzi une autre facture de 150.400 USD pour l'avenant 7 (deuxième tranche) dans le même format que celui décrit pour l'avenant 2.

Preuve : Pièce n°127 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 2 février 2009.

Preuve : Pièce n°128 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 23 février 2009.

Preuve : Pièce n°129 : Relevé bancaire de Skema-Tozzi, 31 mars 2009

76. De même pour l'avenant 8, après avoir obtenu l'avenant, le 2 mars 2009, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont émis à l'attention de Skema-Tozzi une facture de 259.490 USD pour l'avenant 8, dans le même format que celui décrit pour l'avenant 2.

Preuve : Pièce n°130 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 2 mars 2009.

Preuve : Pièce n°131 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 2 avril 2009.

Preuve : Pièce n°132 : Relevé bancaire de Skema-Tozzi, 30 avril 2009.

77. Le 1er juillet 2009, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont adressé à Skema-Tozzi une nouvelle facture de 250 000 USD pour les avenants 3 et 4, dans le même format que ceux décrits pour l'avenant 2.

Preuve : Pièce n°133 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 1er juillet 2009.

Preuve : Pièce n°134 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 24 juillet 2009.

Preuve : Pièce n°135 : Relevé bancaire de Skema-Tozzi, 30 septembre 2009.

78. Le 22 juillet 2009, Agip KCO (Leonardo Zammarano) et Skema-Tozzi (Mario Cerveglieri) ont signé l'avenant 9.

Preuve : Pièce n°136 : Avenant 9 au contrat n° 2004/1089, 22 juillet 2009.

Preuve : Pièce n°137 : Avenant 9 Annexe 1 au contrat n° 2004/1089, 22 juillet 2009.

79. Le 1er septembre 2009, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont adressé à Skema-Tozzi une autre facture de 250 000 USD pour les avenants 3 et 4, dans le même format que ceux décrits pour l'avenant 2.

Preuve : Pièce n°138 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 1er septembre 2009.

Preuve : Pièce n°139 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 17 novembre 2009.

Preuve : Pièce n°140 : Relevé bancaire de Skema-Tozzi, 31 décembre 2009.

80. Le 28 septembre 2009, le premier défendeur, M. Hormoz Vasfi, a envoyé un courriel à des fonctionnaires kazakhs indiquant qu'Agip KCO souhaitait confier des travaux supplémentaires à Skema-Tozzi dans le cadre du contrat 2004/1089 et qu'il voulait avoir l'assurance de KMG qu'il n'y aurait pas d'objection, arguant que tout appel d'offres entraînerait un retard et une augmentation des coûts.

Preuve : Pièce n°141 : Courriel de Vasfi Hormoz, 28 septembre 2009.

81. Le 1er octobre 2009, le huitième défendeur, M. Bianchi, a envoyé au premier défendeur deux documents d'Agip KCO relatifs aux contrats 2004/1089 et 2008/0163. Dans ce courriel, M. Bianchi a effectivement admis qu'il avait obtenu les documents de manière irrégulière.

Preuve : Pièce n°142 : Courriel de Skema-Tozzi à Vasfi Hormoz, 1er octobre 2009.

82. Le 5 octobre 2009, le premier défendeur, M. Hormoz Vasfi, a envoyé un courriel à des fonctionnaires kazakhs pour les inciter à modifier le contrat 2004/1089.

Preuve : Pièce n°143 : Courriel de Vasfi Hormoz, 5 octobre 2009.

83. Le même jour, quelques minutes plus tard, le premier défendeur, M. Hormoz Vasfi, a envoyé un courriel aux fonctionnaires kazakhs pour leur demander d'approuver l'avenant.

Preuve : Pièce n°144 : Courriel de Vasfi Hormoz, 5 octobre 2009.

84. Le 2 novembre 2009, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont adressé à Skema-Tozzi une autre facture de 250 000 USD pour les avenants 3 et 4, dans le même format que ceux décrits pour l'avenant 2.

Preuve : Pièce n°145 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 2 novembre 2009.

Preuve : Pièce n°146 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 28 décembre 2009.

Preuve : Pièce n°147 : Relevé bancaire de Skema-Tozzi, 31 décembre 2009.

85. Le 18 décembre 2009, le neuvième défendeur, M. Cerveglieri, a envoyé un fax au premier défendeur, M. Hormoz Vasfi, indiquant que, suite à une conversation le même jour, Skema-Tozzi allait procéder à un paiement de 900.000 USD aux premier, deuxième et troisième défendeurs par l'intermédiaire de leur société écran, Top Oil, en règlement de sa dette

impayée, pour tout le travail fourni (et les factures impayées) jusqu'à l'avenant 8 du contrat.

Preuve : Pièce n°148 : Lettre de Skema-Tozzi à Top Oil, 18 décembre 2009.

86. Le 21 décembre 2009, le deuxième défendeur a répondu par écrit au neuvième défendeur, M. Cerveglieri, en indiquant que la somme due s'élevait en fait à 1 083 000 USD.

Preuve : Pièce n°149 : Skema-Tozzi's Transfer Report, 21 décembre 2009.

Preuve : Pièce n°150 : Lettre de Top Oil à Skema-Tozzi, 21 décembre 2009.

87. Le 21 décembre 2009, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont adressé à Skema-Tozzi la facture finale de 833 000 USD pour les avenants 3 et 4, sous la même forme que celle décrite pour l'avenant 2.

Preuve : Pièce n°151 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 21 décembre 2009.

Preuve : Pièce n°152 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 20 janvier 2010.

Preuve : Pièce n°153 : Relevé bancaire de Skema-Tozzi, 31 mars 2010.

88. Le 5 mars 2010, le premier défendeur a envoyé à Skema-Tozzi une lettre sur papier à en-tête de Top Oil contenant des informations sur les développements internes au sein de NCOC.

Preuve : Pièce n°154 : Lettre de Vasfi Hormoz à Skema-Tozzi, 5 mars 2010.

89. En avril 2010, Agip KCO (Leonardo Zammarano) et Skema-Tozzi (Mario Cerveglieri) ont signé l'avenant 10, qui n'est toutefois pas daté.

Preuve : Pièce n°155 : Avent 10 au contrat 2004/1089, avril 2010.

Preuve : Pièce n°156 : Pièce jointe 1 modification 10 au contrat n° 2004/1089, avril 2010.

90. Le 22 avril 2010, le premier défendeur, M. Hormoz Vasfi, a envoyé un courrier électronique à des fonctionnaires kazakhs pour leur demander un

certain nombre de documents, y compris les documents relatifs à l'avenant 10 du contrat 2004/1089.

Preuve : Pièce n°157 : Courriel de Vasfi Hormoz, 22 avril 2010.

91. Le 20 mai 2010, le huitième défendeur, M. Bianchi, a envoyé au premier défendeur des copies de l'avenant 10 du contrat 2004/0189 (entre autres documents).

Preuve : Pièce n°158 : Courriel de Skema-Tozzi à Vasfi Hormoz, 20 mai 2010.

92. Le 1er juin 2010, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont émis une facture à Skema-Tozzi pour un montant total de 2 613 403,99 USD. Ce montant était basé sur une commission de 4 % pour une série de factures pour des travaux sous le contrat 2004/1089 d'une valeur totale de 65 335 099,68 USD. La facture a été payée le 22 juin 2010. Ils n'ont fourni aucun service légitime à Skema-Tozzi.

Preuve : Pièce n°159 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 1er juin 2010.

Preuve : Pièce n°160 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 25 juin 2010.

Preuve : Pièce n°161 : Relevé bancaire de Skema-Tozzi, 30 juin 2010.

93. Le 5 novembre 2010, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont adressé une facture à Skema-Tozzi pour un montant supplémentaire de 850 000 USD. La facture faisait référence à des services rendus dans le cadre du contrat 2004/1089, mais ne mentionnait pas de factures explicites ou d'avenants. Le paiement a été effectué le 16 novembre 2010.

Preuve : Pièce n°162 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 5 novembre 2010.

Preuve : Pièce n°163 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 16 novembre 2010.

Preuve : Pièce n°164 : Relevé bancaire de Skema-Tozzi, 31 décembre 2010.

94. Le 3 janvier 2011, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont adressé une nouvelle facture à Skema-Tozzi pour un montant de 850 000 USD, toujours pour des services rendus dans le cadre du contrat 2004/1089. Le paiement a été effectué le 14 janvier 2011.

Preuve : Pièce n°165 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 3 janvier 2011.

Preuve : Pièce n°166 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 14 janvier 2011.

Preuve : Pièce n°167 : Relevé bancaire de Skema-Tozzi, 31 mars 2011.

95. Le 2 février 2011, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont adressé une nouvelle facture à Skema-Tozzi pour des services rendus en relation avec le contrat 2004/1089, toujours pour un montant de 850 000 USD. Skema-Tozzi a effectué ce paiement le 11 février 2011.

Preuve : Pièce n°168 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 2 février 2011.

Preuve : Pièce n°169 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 11 février 2011.

Preuve : Pièce n°170 : Relevé bancaire de Skema-Tozzi, 31 mars 2011.

96. Le 7 mars 2011, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont adressé à Skema-Tozzi une facture de 938 000 USD pour des services rendus dans le cadre du contrat 2004/1089. La facture a été payée le 21 mars 2011.

Preuve : Pièce n°171 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 7 mars 2011.

Preuve : Pièce n°172 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2004/1089, 21 mars 2011.

Preuve : Pièce n°173 : Relevé bancaire de Skema-Tozzi, 31 mars 2011.

97. Le 25 mai 2011, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont envoyé une plus petite facture à Skema-Tozzi, d'un montant de 250 000 USD, pour des services rendus dans le cadre du contrat 2004/1089. Il n'a pas été possible d'identifier la confirmation du paiement par Skema-Tozzi de cette dernière facture, mais rien n'indique qu'elle n'a pas été payée.

Preuve : Pièce n°174 : Facture de Top Oil à Skema-Tozzi pour le contrat n° 2004/1089, 25 mai 2011.

98. Le 7 juin 2011, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont envoyé une autre facture de 250 000 USD à Skema-Tozzi pour ce contrat. Là encore, il n'a pas été possible de confirmer le paiement dans les documents de Skema-Tozzi, mais rien n'indique que cette facture soit restée impayée.

Preuve : Pièce n°175 : Facture de Top Oil à Skema-Tozzi pour le contrat 2004/1089, 7 juin 2011.

99. Le 21 juin 2011, le premier défendeur, M. Hormoz Vasfi, a envoyé un courriel à M. Zhurebekov (qui utilisait le surnom de « Bob Turner ») pour lui demander une copie de l'avenant 11.

Preuve : Pièce n°176 : Courriel de Vasfi Hormoz à Zhurebekov, 21 juin 2011.

100. Le 24 mai 2011, Agip KCO (Umberto Carrara) et Skema-Tozzi (Mario Cerveglieri) ont signé l'avenant 11. La valeur du contrat approuvé a atteint 478 millions USD.

Preuve : Pièce n°177 : Avenant 11 au contrat 2004/1089, 24 mai 2011 ;

Preuve : Pièce n°178 : Pièce jointe 1 à la modification 11 au contrat n° 2004/1089, 24 mai 2011.

Preuve : Pièce n°179 : Pièce jointe 2 à la modification 11 au contrat n° 2004/1089, 24 mai 2011.

Preuve : Pièce n°180 : Pièce jointe 3 à la modification 11 au contrat n° 2004/1089, 24 mai 2011.

Preuve : Pièce n°181 : Agip KCO Recommandation d'attribution de contrat pour le contrat 2004/1089.

Preuve : Pièce n°182 : Agip KCO Recommandation de modification de contrat pour le contrat 2004/1089.

Preuve : Pièce n°183 : Agip KCO Recommandation de modification de contrat pour le contrat 2004/1089.

Preuve : Pièce n°184 : Agip KCO Recommandation de modification de contrat pour le contrat 2004/1089.

Preuve : Pièce n°185 : NCOC Amendement de contrat n°. CA 10.

(e) **Contrat 2008/0163 - Skema-Tozzi**

101. Le système illicite, tel qu'il a été décrit précédemment, impliquait que les cinq premiers défendeurs obtiennent des modifications de contrat pour Skema-Tozzi qui gonflaient les coûts contractuels. Par la suite, ils ont facturé à Skema-Tozzi des services fictifs, collectant des fonds qui ont ensuite été acheminés vers des employés déloyaux, des fonctionnaires kazakhs et les défendeurs eux-mêmes.

102. Le 23 avril 2008, Agip KCO a envoyé une lettre d'intention formelle à Skema-Tozzi, l'autorisant à commencer les travaux préliminaires sur le projet. La valeur maximale fixée dans cette lettre d'intention est de 39 millions d'USD, ce qui marque la première étape officielle du développement du projet. La lettre a été modifiée par la suite.

Preuve : Pièce n°186 : Lettre d'intention d'Agip KCO à Skema-Tozzi, 23 avril 2008.

103. Le 27 juin 2008, le consortium a approuvé le contrat 2008/0163 pour la valeur totale indiquée dans la lettre d'intention (39 millions USD).

Preuve : Pièce n°187 : Approbation par le NCP de l'attribution des principaux contrats, 27 juin 2008.

104. Le 8 avril 2009, le premier défendeur était en possession d'un projet d'avenant 3 à la lettre d'intention, daté du 8 avril 2009, qui a été finalisé le 5 mai 2009. Cet avenant signé par M. Carrara et M. Cerveglieri (ce dernier le 14 mai 2009), augmentait encore la valeur à ***90 millions USD***, élargissait les activités préliminaires et exerçait des options de travail, prolongeant ainsi la

durée de la lettre d'intention. A ce stade, Skema-Tozzi avait déjà reçu des paiements pour un montant de 45,1 millions de dollars, bien que le contrat formel n'ait pas encore été signé.

105. Le premier défendeur était clairement en possession de documents confidentiels qu'il a échangés à son profit.

Preuve : Pièce n°188 : Avenant 3 à la lettre d'intention pour le contrat 2008/0163, 5 mai 2009.

106. Le 22 juin 2009, le premier défendeur notifié à Skema-Tozzi une discussion à venir de l'EMCB recommandant une augmentation de la valeur du contrat.

Preuve : Pièce n°189 : Lettre de Hormoz Vasfi à Skema-Tozzi, 22 juin 2009.

107. Le 9 septembre 2009, afin de démontrer son accès à des informations privilégiées, le premier défendeur a envoyé un courrier électronique aux huitième et neuvième défendeurs, M. Bianchi et M. Cerveglieri, afin de partager un document confidentiel d'approbation d'une modification de contrat.

Preuve : Pièce n°190 : Courriel de Vasfi Hormoz à Skema-Tozzi, 9 septembre 2009, partageant le projet d'avenant au contrat 2008/0163.

Preuve : Pièce n°191 : Projet de modification du contrat 2008/0163 (version anglaise).

Preuve : Pièce n°192 : Projet de modification du contrat 2008/0163 (version kazakhe).

108. Le 15 septembre 2009, le premier défendeur a envoyé une lettre au huitième Défendeur, M. Bianchi, chez Skema-Tozzi, l'informant de l'attribution d'un avenant au contrat 2008/0163 et que M. Idenov serait le seul à le signer. Ceci démontre que le premier défendeur avait connaissance de ces informations confidentielles avant la société.

Preuve : Pièce n°193 : Lettre de Vasfi Hormoz à Skema-Tozzi, 15 septembre 2009.

109. Le 18 septembre 2009, Skema-Tozzi (M. Cerveglieri) et Agip KCO (Leonardo Zammarano), soupçonné d'avoir divulgué des informations à M. Hormoz Vasfi) ont officiellement signé le contrat 2008/0163, fixant les prix

à 24 912 528 USD pour l'ingénierie de détail et à 159 480 855,63 EUR pour la fourniture et la fabrication.

Preuve : Pièce n°194 : Formulaire d'accord entre Agip KCO et Skema-Tozzi pour le contrat 2008/0163, 18 septembre 2009.

110. Entre avril 2010 et juillet 2011, plusieurs avenants au contrat ont augmenté la valeur totale du contrat, entraînant une inflation spectaculaire de la valeur. Il s'agit notamment de :

(a) L'avenant 1 - Signé le 21 avril 2010, il révise les dates de livraison, ajoute un nouvel article et augmente le prix du contrat à 24 912 528,00 USD plus 217 866 465,23 EUR

Preuve : Pièce n°195 : Avenant 1 au contrat 2008/0163, 1er avril 2010.

Preuve : Pièce n°196 : Annexe B au contrat 2008/0163, 18 septembre 2009.

(b) L'avenant 2 - signé le 13 juillet 2010, introduit des prix unitaires et exclut certains éléments, augmentant encore le prix du contrat à 25 005 328,43 USD plus 242 588 036,82 EUR.

Preuve : Pièce n°197 : Avenant 2 au contrat 2008/0163, 13 juillet 2010.

(c) L'avenant 3 - signé le 12 décembre 2011 - introduit de nouvelles dispositions et augmente le prix à 25 005 328,43 USD plus 260 473 599,53 EUR.

Preuve : Pièce n°198 : Avenant 3 au contrat 2008/0163, 12 décembre 2011.

111. Entre octobre 2009 et mai 2011, après la signature du contrat, les cinq premiers défendeurs ont travaillé activement avec Skema-Tozzi pour obtenir des modifications et engager des contacts de haut niveau pour obtenir des approbations. De nombreux courriels échangés entre le premier défendeur et des représentants du gouvernement kazakh, ainsi que d'autres initiés, illustrent la manipulation continue et le partage d'informations afin de garantir des modifications de contrat à son propre avantage.

Preuve : Pièce n°199 : Échange de courriels entre Vasfi Hormoz et Zhurebekov, juin 2011;

Preuve : Pièce n°200 : Courriel de Vasfi aux responsables kazakhs, 6 mai 2011 ;

Preuve : Pièce n°201 : Courriel de Vasfi Hormoz aux responsables kazakhs, 22 avril 2010 ;

Preuve : Pièce n°202 : Courriel de Vasfi Hormoz à Aman Maximov, 21 janvier 2010 ;

Preuve : Pièce n°203 : Courriel de Vasfi Hormoz à Aman Maximov, 27 novembre 2009 ;

Preuve : Pièce n°204 : Courriel de Vasfi Hormoz à Aman Maximov, 11 novembre 2009 ;

Preuve : Pièce n°205 : Courriel de Vasfi Hormoz à Aman Maximov, 3 novembre 2009 ;

Preuve : Pièce n°206 : Courriel de Vasfi Hormoz aux responsables kazakhs, 5 octobre 2009.

112. En conséquence de ses actions illégales, entre décembre 2008 et juillet 2011, après chaque modification, les premier, deuxième et troisième défendeurs, par l'intermédiaire de leur société écran, Top Oil, ont facturé Skema-Tozzi pour des services liés à la promotion du contrat et à l'obtention de la lettre d'intention, recevant des paiements substantiels sur la base d'un accord d'honoraires de 4 %.

Preuve : Pièce n°207 : Annotation de la police financière de Milan.

113. Ces factures, émises sous différentes raisons sociales (Top Oil Ltd et T-O Top Oil Cyprus Ltd), font état de nombreux paiements effectués au fil du temps :

(a) 1er décembre 2008 - Première facture pour la promotion, le marketing et le soutien pour un montant de 250 000 USD.

Preuve : Pièce n°208 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 1er décembre 2008.

Preuve : Pièce n°209 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2008/0163, 30 décembre 2008.

Preuve : Pièce n°210 : Relevé bancaire de Skema-Tozzi, 31 décembre 2008

(b) 2 février 2009 - Facture pour la promotion, le marketing et le soutien pour 250 000 USD

Preuve : Pièce n°211 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 2 février 2009.

Preuve : Pièce n°212 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2008/0163, 23 février 2009.

Preuve : Pièce n°213 : Relevé bancaire de Skema-Tozzi, 28 février 2009.

(c) 1er avril 2009 - Facture pour la promotion, le marketing et l'assistance pour 217 000 USD.

Preuve : Pièce n°214 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 1er avril 2009.

Preuve : Pièce n°215 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2008/0163, 13 mai 2009.

Preuve : Pièce n°216 : Relevé bancaire de Skema-Tozzi, 31 mai 2009.

(d) 18 mai 2009 - Facture pour la promotion, le marketing et l'assistance pour 279 501 USD.

Preuve : Pièce n°217 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 18 mai 2009.

Preuve : Pièce n°218 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2008/0163, 23 juillet 2009.

Preuve : Pièce n°219 : Relevé bancaire de Skema-Tozzi, 31 juillet 2009

(e) 3 mai 2010 - Facture de 4% d'honoraires pour un montant de 2.524.000 USD.

Preuve : Pièce n°220 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 3 mai 2010.

Preuve : Pièce n°221 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2008/0163, 7 juin 2010.

Preuve : Pièce n°222 : Relevé bancaire de Skema-Tozzi, 30 juin 2010.

(f) 3 mai 2010 - Facture d'honoraires de 4 % pour un montant de 2 100 234,18 euros.

Preuve : Pièce n°223 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 3 mai 2010.

Preuve : Pièce n°224 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2008/0163, 8 juin 2010.

Preuve : Pièce n°225 : Relevé bancaire de Skema-Tozzi, 30 juin 2010.

(g) 1er juin 2010 - Facture d'honoraires de 4 % pour un montant de 1 420 000 euros.

Preuve : Pièce n°226 : Facture Top Oil à Skema-Tozzi pour le contrat 2008/0163, 1er juin 2010.

Preuve : Pièce n°227 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2008/0163, 24 juin 2010.

Preuve : Pièce n°228 : Relevé bancaire de Skema-Tozzi, 30 juin 2010.

(h) 26 octobre 2010 - Facture de la deuxième tranche de 600 000 euros.

Preuve : Pièce n°229 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 26 octobre 2010.

Preuve : Pièce n°230 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2008/0163, 5 novembre 2010.

Preuve : Pièce n°231 : Relevé bancaire de Skema-Tozzi, 31 décembre 2010.

(i) 22 novembre 2010 - Facture de la deuxième tranche de 600 000 euros.

Preuve : Pièce n°232 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 22 novembre 2010.

Preuve : Pièce n°233 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2008/0163, 13 décembre 2010.

Preuve : Pièce n°234 : Relevé bancaire de Skema-Tozzi, 31 décembre 2010.

(j) 16 décembre 2010 - Facture du troisième versement pour un montant de 600 000 euros.

Preuve : Pièce n°235 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 16 décembre 2010.

Preuve : Pièce n°236 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2008/016330 décembre 2010.

Preuve : Pièce n°237 : Relevé bancaire de Skema-Tozzi, 31 décembre 2010.

(k) 17 janvier 2011 - Facture du quatrième versement pour un montant de 600 000 euros.

Preuve : Pièce n°238 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 17 janvier 2011.

Preuve : Pièce n°239 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2008/0163, 1er février 2011.

Preuve : Pièce n°240 : Relevé bancaire de Skema-Tozzi, février 2011.

(l) 15 février 2011 - Facture du cinquième versement pour un montant de 644 000 euros.

Preuve : Pièce n°241 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 15 février 2011.

Preuve : Pièce n°242 : Ordre de paiement de Skema-Tozzi à Top Oil pour le contrat n° 2008/0163, 18 mars 2011.

Preuve : Pièce n°243 : Relevé bancaire de Skema-Tozzi, 31 mars 2011.

(m) 16 mai - 15 juin 2011 - Versements mensuels de 200 000 EUR, marquant les dernières étapes des services facturés pour le contrat 2008/0163.

Preuve : Pièce n°244 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 16 mai 2011.

Preuve : Pièce n°245 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 15 juin 2011.

(n) 1er juillet 2011 - Facture de la huitième tranche du contrat 2004/1089 pour un montant de 250 000 USD.

Preuve : Pièce n°246 : Facture de Top Oil à Skema-Tozzi pour le contrat 2004/1089, 1er juillet 2011.

(a) 15 juillet 2011 - Facture de la huitième tranche du contrat 2008/0163 pour un montant de 200 000 euros.

Preuve : Pièce n°247 : Facture de Top Oil à Skema-Tozzi pour le contrat 2008/0163, 15 juillet 2011.

114. Comme décrit ci-dessus, fin 2011, les procureurs italiens ont commencé à enquêter sur le contrat 2008/0163 en raison de preuves de valeurs contractuelles gonflées, de manipulation d'appels d'offres et de corruption. Les enquêtes ont révélé que Skema-Tozzi et ses associés ont intentionnellement fait des offres basses en sachant qu'ils auraient été en mesure d'augmenter les frais de manière substantielle par le biais d'avenants. Les procureurs ont identifié le réseau d'initiés de M. Hormoz Vasfi au sein du Kazakhstan et d'Agip KCO comme ayant joué un rôle déterminant dans la manipulation des modifications du contrat.

115. Entre 2009 et 2011, une somme supérieure à 14 millions d'euros a été versée par Skema-Tozzi aux cinq premiers défendeurs pour leurs services illégaux (*pretium sturpi*).

## IV. QUALIFICATION EN VERTU DU DROIT KAZAKHE

116. Les faits décrits ci-dessus constituent des violations de plusieurs dispositions de la Constitution kazakhe, du droit pénal et du droit civil commises par les défendeurs.

117. Comme indiqué ci-dessus,[2] de 2004 à 2011, les premier, deuxième et troisième défendeurs, agissant par l'intermédiaire de nombreuses sociétés écrans, y compris la société écran Top Oil, ont orchestré et géré un système de corruption transnational. Ce système visait à obtenir des contrats et des modifications ultérieures pour le projet Kashagan, en gonflant les coûts contractuels au profit des entités qu'ils assistaient (Skema-Tozzi et Petrofac). Ces coûts ont ensuite été transférés dans les poches des officiels corrompus qui étaient de connivence avec eux.

118. Les actions des défendeurs constituent des violations graves du code pénal datant de 1997 de la République du Kazakhstan :

i) **Partie 1 de l'article 235-2 :** pénalisation de la création et de la direction d'un groupe organisé transnational en vue de commettre un ou plusieurs crimes, ainsi que de la participation active à un tel groupe.

ii) **Partie 2 de l'article 313 :** pénalisation de l'intermédiation répétée en matière de corruption, dans le cadre d'un groupe organisé, en facilitant les accords ou leur mise en œuvre entre le corrupteur et le corrompu.

iii) **Article 190, Fraude** : le détournement du bien d'autrui ou l'acquisition d'un droit sur le bien d'autrui par tromperie ou abus de confiance est puni comme suit.

119. L'action des défendeurs constitue également une violation grave du code civil et de la Constitution du Kazakhstan :

i) **La Constitution de la République du Kazakhstan** garantit les droits de l'homme et du citoyen (articles 12 et 13), y compris le droit à la protection judiciaire des droits, et stipule que nul ne peut porter atteinte aux droits d'une autre personne ou d'un autre citoyen, ce qui englobe tous les types de droits et de responsabilités (civiles, pénales et administratives).

---

2 Voir la section V ci-dessus.

ii) **Article 9. Protection des droits civils :** La protection des droits civils est assurée par les tribunaux ou le recourt à l'arbitrage : reconnaissance des droits ; rétablissement de la situation qui existait avant la violation du droit ; suppression des actions qui violent le droit ou menacent de le violer ; attribution de l'exécution de l'obligation en nature ; récupération des pertes, pénalités ; invalidation d'une transaction nulle et application des conséquences de sa nullité ; réparation du préjudice moral ; résiliation ou modification des relations juridiques ; invalidation d'une transaction nulle ou annulable ; reconnaissance d'une violation du droit. Les personnes morales n'ont pas le droit de réparer le préjudice moral. [...] 4. La personne dont le droit a été violé peut exiger la réparation intégrale des dommages qui lui ont été causés, sauf disposition contraire des actes législatifs ou du contrat. Par préjudice, on entend les dépenses engagées ou à engager par la personne dont le droit a été violé, la perte ou l'endommagement de ses biens (préjudice réel), ainsi que les revenus non perçus que cette personne aurait obtenus dans des conditions normales de chiffre d'affaires si son droit n'avait pas été violé (manque à gagner).

## V. EN DROIT

### A. Compétence

120. La compétence du Tribunal de Genève dans cette affaire est fondée. Tout d'abord, les premier, troisième, quatrième et cinquième défendeurs résident, sont domiciliés ou ont leur siège social à Genève. En outre, des aspects essentiels des actes répréhensibles allégués ont eu lieu à Genève, notamment par l'utilisation de comptes bancaires locaux à BSI SA CH-1204 Genève pour recevoir des fonds illicites. Ces facteurs permettent à la juridiction de céans d'affirmer sa compétence en vertu des dispositions relatives aux actions délictuelles, en conformité avec les cadres juridiques nationaux et internationaux.

Preuve : Pièce n°8 : Deuxième rapport d'expertise de M. Pireddu dans la procédure italienne n° 15858/2013, 29 juillet 2015.

121. En outre, pour le deuxième défendeur, l'article 129 du code fédéral suisse sur le droit international privé autorise la compétence à l'égard de personnes qui ne sont pas domiciliées en Suisse si d'autres parties liées, telles que les codéfendeurs, sont domiciliées à Genève.

## B. Fond

### 1. Responsabilité en cas d'actes illégaux

#### a. Motifs juridiques de la demande

122. Conformément à l'article 41 CO :

> 1. Toute personne qui cause illégalement un dommage à autrui, que ce soit délibérément ou par négligence, est tenue de le réparer.
> 2. La personne qui cause volontairement un dommage à autrui de manière immorale est également tenue de le réparer.

123. Les conditions générales de responsabilité de l'article 41 CO sont donc les suivantes :

i. un acte illégal, donc la violation d'une norme protégeant autrui ou d'un droit absolu de la victime en l'absence de raisons justificatives ;

ii. faute, délibérée ou par négligence ;

iii. le dommage, donc la réduction involontaire du patrimoine d'une personne

iv. le lien de causalité, naturel et adéquat, entre l'acte illégal et le dommage.

124. En l'espèce, les actes illicites fautifs commis par les défendeurs relèvent de la définition de la complicité de gestion criminelle, de corruption et de blanchiment d'argent. Chacun d'entre eux sera examiné ci-après.

### 2. Actes illégaux fautifs : complicité de mauvaise gestion criminelle

#### a. Principes applicables

125. En vertu de 158 CP, toute personne qui, en vertu de la loi, d'un ordre officiel, d'un acte juridique ou d'une autorisation qui lui a été accordée, a été chargée de la gestion des biens d'autrui ou du contrôle de cette gestion, et qui, dans l'exercice et en violation de ses fonctions, cause ou permet à cette autre personne de subir un préjudice financier, est passible d'une peine privative de liberté n'excédant pas trois ans ou d'une peine pécuniaire. Celui qui aura agi de la même manière en qualité de gérant d'affaires, mais sans instructions particulières, sera puni de la même peine. Si l'auteur agit dans le but d'obtenir un gain financier illicite pour lui-même ou pour autrui, une peine privative de liberté d'un à cinq ans peut être prononcée.

**3. Actes illégaux répréhensibles : corruption**

**a. Les principes applicables**

126. Conformément à l'article 322septies CP :

> Toute personne qui offre, promet ou donne à un membre d'une autorité judiciaire ou autre, à un agent public, à un expert, traducteur ou interprète officiellement désigné, à un arbitre ou à un membre des forces armées agissant pour le compte d'un État étranger ou d'une organisation internationale, un avantage indu, ou donne un tel avantage à un tiers, afin que cette personne accomplisse ou n'accomplisse pas, dans le cadre de ses activités officielles, un acte contraire à ses devoirs ou dépendant de son pouvoir d'appréciation,
> toute personne qui, en tant que membre d'une autorité judiciaire ou autre, fonctionnaire public, expert, traducteur ou interprète officiellement désigné, arbitre ou membre des forces armées d'un État étranger ou d'une organisation internationale, exige, fait promettre ou accepte un avantage indu pour elle-même ou pour un tiers afin qu'elle accomplisse ou n'accomplisse pas, dans le cadre de son activité officielle, un acte contraire à son devoir ou dépendant de son pouvoir d'appréciation, est passible d'une peine privative de liberté n'excédant pas cinq ans ou d'une peine pécuniaire.

127. Les éléments constitutifs de l'infraction sont donc les suivants :

i. un agent public étranger

ii. l'offre, la promesse ou l'octroi (corruption active), respectivement la sollicitation, le fait d'être promis ou d'accepter (corruption passive)

iii. un avantage indu

iv. un lien entre l'avantage indu et le comportement de l'agent public

v. ces éléments doivent être entrepris avec conscience et intention.

**4. Le blanchiment d'argent**

**a. Les principes applicables**

128. Conformément à l'article 305bis ch. 1 CP (dans son contenu en vigueur au moment des faits) :

> Toute personne qui accomplit un acte visant à faire échouer l'identification de l'origine, la localisation ou la confiscation d'avoirs dont elle sait ou doit supposer qu'ils proviennent d'un crime ou d'un délit fiscal aggravé est passible d'une peine privative de liberté n'excédant pas trois ans ou d'une peine pécuniaire.

129. Dans les cas graves, la sanction est une peine privative de liberté n'excédant pas cinq ans ou une peine pécuniaire. Un cas grave est notamment constitué lorsque l'auteur de l'infraction :

a. agit en tant que membre d'une organisation criminelle ou terroriste

b. agit en tant que membre d'un groupe constitué dans le but de poursuivre des activités de blanchiment de capitaux ; ou

c. réalise un chiffre d'affaires important ou un bénéfice substantiel grâce au blanchiment d'argent à des fins commerciales.

130. L'auteur de l'infraction est également passible des peines susmentionnées lorsque l'infraction principale a été commise à l'étranger, à condition que cette infraction soit également passible de poursuites au lieu où elle a été commise.

### 5. Obligation de retour en vertu de l'article 423 CO

#### a. Principes applicables

131. Conformément à l'article 423 CO :

132. Lorsque les activités de l'agence n'ont pas été exercées dans l'intérêt du commettant, celui-ci a néanmoins le droit de s'approprier les avantages qui en résultent. Le mandant n'est tenu d'indemniser l'agent et de le libérer des obligations qu'il a assumées que dans la mesure où le mandant s'est enrichi. La relation de conseil en investissement est une relation de mandat et les articles 394 et suivants lui sont applicables.

* * *

Au vu de ce qui précède, **PSA Limited Liability Company** déclare par la présente faire élection de domicile en l'Etude Aubert Neyroud Stückelberg Fratini, avocats, rue François-Versonnex 7, 1207 Genève et donner procuration pour la représenter à Me Philippe Neyroud et à Me Stephan Fratini, ainsi qu'à Me Nicoleta Timofti et à Letizia Ceccarelli, avocates de Squire Patton Boggs LLP, rue du Rhône 67, 1207 Genève, y compris aux fins de l'audience de conciliation. Nos avocats disposent des pleins pouvoirs pour représenter la société, ainsi que pour négocier et transiger, sans réserve.

Pour la demanderesse,

Dias Ibrashev