# EXHIBIT 8

| | | ENCL.AA |
|---|---|---|
| (10) TECNIMONT KT S.p.A. | *page 122* | 248 - 274 |
| (11) SINI S.p.A. | *page 134* | 275 - 313 |
| (12) TECNIMONT S.p.A. | *page 146* | 314 - 326 |
| D. THE ISSUANCE OF INVOICES FOR NON-EXISTENT TRANSACTIONS | *page 151* | 327 |
| (1) Companies attributable to Guidotti | *page 151* | |
| (2) Companies attributable to Borghi | *page 151* | 328 |
| (3) Companies attributable to the Vasfi | *page 152* | |
| 3. CONSIDERATIONS REGARDING THE EXISTENCE OF THE CRIMES REFERRED TO IN ART. 2 AND 8 OF LEGISLATIVE DECREE 74/2000 | *page 153* | |




[signature]

## 1. PRESSED

The criminal proceedings 25303/10 originated from the statements made by Mario REALI[6], former representative of ENI S.p.A. in Russia, on the award of contracts by companies of the Eni group, concerning the context of exploitation activities of two oil fields located in Kazakhstan in the locations of Karachaganak[7] and Kashagan[8].

According to these statements, suppliers would have paid bribes equal to 10% of the amount of the tenders won. The sums in question would then have been "turned" for the benefit of representatives of the local Kazakh government and Eni officials.

From one of the latter, FERLENGHI Ernesto[9], the Royal reported that he had learned, at the end of 2004, of the existence of a bribe in the amount of Euro 1,500,000.00 destined for the same Ferlenghi.

The latter would have received the sum in question through the intermediary Massimo GUIDOTTI.

The Royal also learned from Ferlenghi himself that the movements of money, originating from the above bribes, would be "managed" through an Israeli company, or attributable to Israeli subjects[10]. For the aforementioned money movements, the Israeli ‘subject’ would have used bank accounts in Dubai or Abu Dhabi with Switzerland as the final destination for these sums.

---

[6] Born in Foiano Chiana (AR) on [redacted]. He was an Eni employee from 1981 to 2002, so from 06/30/2002 to 31.2005, he was an external collaborator: he always worked at Eni offices in Moscow.
[7] A deposit located in the northwest of Kazakhstan, one of the largest in the world with over 280 square kilometers, with an estimated potential of 1,200 million tonnes of oil and 1.35 trillion cubic meters of gas. Today, the consortium signatory to the site exploitation contract, called KPO - Karachaganak Petroleum Operating, is formed by Eni S.p.A., BG GROUP (first signatories of the contract in 1992), Chevron, Lukoil (added in 1997) and the state company KazMunayGas (returned in 2011).
[8] *Offshore oil field located* in the northeastern part of the Caspian Sea, off the coast of Kazakhstan, 80 km south of the city of Atyrau: it is estimated to have commercial reserves between 9 and 16 billion barrels of oil. AGIP Caspian Sea B.V. (a company controlled by Eni International B.V., directly owned by Eni S.p.A.) signed, on 11/18/1997, the *Production Sharing Agreement* for the exploitation activities of the Kashagan site, entered into between the Republic of Kazakhstan and 7 international oil companies, including Eni S.p.A. and KazMunayTeniz, controlled by KazMunayGas, delegated, in turn, by the Kazakh government to act as its representative. AGIP Caspian Sea B.V. has also, as representative of all Contractors in respect of the Republic of Kazakhstan, signed the *Joint Operating Agreement*, which has defined attributions and responsibilities for carrying out the operations. AGIP Caspian Sea B.V. operates in the territory through its subsidiary AGIP KCO.
[9] Born in Rome on [redacted] and domiciled in [redacted], enrolled in the AIRE since 2005, with residence abroad in Moscow (Russia), Konsomolsky Prospekt 32 Kv. 92 32. He was an Eni representative in Kazakhstan from 2002 to 2005, when he was sent to the Moscow offices which had belonged to Reali, where he is still head of the Eni Office of International Relations. ***Even after his transfer to Moscow, according to Reali, “in fact (...) Ferlenghi is still dealing with Kazakhstan."***
[10] In this regard, the Royals verbatim states *“... it may also have been registered elsewhere and simply be owned by Israelis”.*



[signature]

The investigations resulting from the statements of the Royal made by this Department within the scope of the delegation issued, on 09/22/2010, by the Subst. Proc. of the Public Prosecutor's Office of the Court of Milan Dr. Fabio De Pasquale, and subsequent delegations issued by the Judicial Authority itself as described **in Attachment 1,** that chronologically summarizes the activities carried out, have revealed a strong network of illegal contacts between **executives of contracting companies responsible for awarding *oil and gas* contracts** in certain geographic areas (Kazakhstan, Kuwait and the United Arab Emirates) **and executives of several companies interested in these tenders**, through **intermediary groups,** that they used, in turn, of Italian companies, as well as companies formally headquartered abroad[11] but, in fact, managed by Italian territory.

Therefore, this Department has reviewed the following documentation:

- results of the technical[12] investigations carried out during the periods from 10/20/2010 to 07/10/2011 and from 03/20/2012 to 07/03/2012;

- material, both hard copy and in electronic media, seized during the search operations carried out, on 10/27/2010, at the headquarters of the commercial and industrial consulting company GM OIL AND GAS S.r.l., as well as at the home of the latter's Sole Director, the aforementioned Massimo GUIDOTTI;

- material, both hard copy and in electronic media, seized during the search operations carried out, on 06/21/2011, at the headquarters of the commercial and industrial consulting company BEMBERG S.r.I.[13], as well as at numerous other objectives, both in Italy and abroad, as specified during this Communication;

- material, both hard copy and in electronic media, seized during the search operations carried out, on 06/14/2012, at the headquarters of the commercial and industrial consulting company TECRON S.r.l., as well as at the home of the then Sole Director of the latter VASFI Hormoz;

[11] In this context, the figure of some trustees who provided assistance to the mediators in order to prepare the company vehicle that would have been used to issue invoices concerning non-existent consulting services emerges.
[12] Telephone and email interactions referred to in the following nos. RIT [wire taps]: 3827/10, 3983/10, 4008/10, 4527/10, 326/11, 705/11, 966/11 and 1774/11.
[13] With registered office in Belgium (PV), Via U. Foscolo n. 9 and operating office in S. Donato Milanese (MI [Milan]), Via Triulziana n. 14- VAT no. [redacted].



[signature]

- material shown by the companies involved in the investigations against the Decree of Request for delivery of documents and documents, signed by the Department Proc. De Pasquale, dated 10/12/2012;

- results of witness statements made, from time to time, by some of the parties involved.

The examination of the aforementioned documentation revealed a series of actions aimed at giving a formally lawful appearance to the financial transactions carried out, in reality, to constitute hidden funds to be used, probably, in the opinion of this Judicial Police, for corrupt actions against foreign public officials or with regard to loyal managers of the client companies. In some circumstances, elements have been collected to assume a back payment to unfaithful managers of the same operating companies.

The conduct in question, in addition to the preparation of variously named consulting contracts, provides for the issuance, by shell companies attributable to intermediaries, of invoices, concerning the same activities described in the contracts, which, based on the elements collected and set forth below, must be considered non-existent. In fact, the technical activities and analysis of the documents acquired during the search, have made it possible to clarify, beyond doubt, that the activity carried out by the intermediaries identified from time to time cannot be considered real consulting activities, but unlawful intermediation with the sole purpose - through the payment of sums of money to the managers of the contracting company and/or to foreign public officials to facilitate the assignment of contracts in relation to which the unlawful intermediation has been guaranteed.

The invoices issued by these entities, therefore, would make reference to a service provision that was not actually implemented.

Therefore, the accounting notes of these documents by the Italian intermediate companies, the results of which have merged into the relative Annual Declarations concerning direct and indirect taxes, supplement, in the opinion of this Judicial Police, as better argued and more widely circumstantiated in the continuation of this work (see paragraphs 2.C and 2.D):

- for the legal representatives signing the respective Annual Declarations of the different construction companies involved, the case of "fraudulent declaration through the use of invoices or other documents for non-existent transactions" governed by Art. 2 of Legislative Decree 74/2000;

- for the directors of the various consulting companies involved, the case of "issuance of invoices or other documents for non-existent transactions" governed by Art. 8 of Legislative Decree 74/2000,

aggravated by the circumstance of "transnationality" referred to in Art. 4 of Law 146/2006.



[signature]

The investigation activities, as mentioned in Attachment 1 above, have made it possible to identify 3 groups of intermediaries traceable:

- to the aforementioned Massimo Guidotti ;
- to Stefano BORGHI and Enrico PONDINI [14] (moreover, at least in the case described further below by Bonatti S.p.A., in competition with the same Guidotti);
- to the cited Vasfi Hormoz.

Illegal advice has been invoiced substantially in two "intervention" areas:

- the former has as its reference the Kazakh territory and concerns the assignment of projects relating to the development of Karachaganak and Kashagan oil fields, as outlined in the prospectus referred **to in Attachment 2;**
- - the second concerns the award of construction/development contracts for facilities used to develop projects in the *oil and gas* sector, as outlined in the prospectus referred **to in Attachment 3.**

## 2. ELEMENTS THAT EMERGED DURING THE INVESTIGATION

Below, we will highlight in detail the evidentiary findings on which the complaints regarding tax fraud carried out by the mediators and operating companies using the false invoices issued by the former are based. It is considered easier to proceed with the description of the facts as reconstructed below, focusing on the intermediary who, from time to time, conflicted between the client entity and the operating company. As described in the recitals, the reconstruction of the activity of the mediators included a period of several years.

### A. THE ASSOCIATE GROUPS

First of all, it appears necessary to highlight, for each intermediary, the shell companies established, the trustee involved in the management of the same, as well as the managers of the contracting companies that, in agreement with the intermediary and in exchange for remuneration, worked to facilitate the award of the contract to the operating company supported by the same intermediary. In relation to the above, it is possible to distinguish as follows the set of subjects involved in various capacities.

[14] Born on [redacted] in Galeata (FC) and residing there at [redacted].



[signature]

(1) Subjects and entities attributable to Massimo Guidotti:

- Corporate entities used for false billings: Tecknoskills GM Oil And Gas S.r.l.;
- Nicola TRAMEZZANI[15]. associate of the aforementioned Talenture-Fiduciaria S. A., trustee, to whom the preparation of the purely "administrative" acts was delegated (contract preparation; shipping invoices, etc.) of Techno Skills Ltd;
- Paolo DENTALI[16], Contract Manager of Eni UK Ltd based in London;

(2) Subjects and entities traceable to Vasfi Hormoz:

- corporate entities used for false billings: Tecron Sri and Top Oil. Ltd;
- the already identified Paolo Dentali;
- Bolat NAZAROV, former President of the state-owned company KazMunayGas[17], responsible, as mentioned in the introduction, together with AGIP KCO[18], for the development of Kashagan and Karachaganak projects;
- Murat ZHUREBEKOV, manager of KazMunayGas and one of the managers of Kashagan-Project.

[15] Born on [redacted] in Switzerland.
[16] Born on [redacted] in Monticelli d'Ongina (PC [Piacenza]) and domiciled in [redacted].
[17] Headquartered in Astana (Kazakhstan), 19, Kabanbay Batyr Avenue.
[18] A subsidiary of Agip Caspian Sea B.V., in turn controlled by Eni International B.V., directly owned by Eni S.p.A.



[signature]

(3) Parties and entities attributable to Stefano Borghi:

- corporate entities used for false billings: DANEHURST SERVICES LIMITED, CONTROL CONTRACTING COMPANY and PERCY IN.CO.
- Enrico PONDINI[19], General Manager of Bemberg;
- Mario CANAVESI[20], Chief Commercial Officer of Bemberg;
- Mario MASCITTI[21], Area Manager of FLEX ENGINEERING Ltd[22];
- SCARPA Nunzio[23], Borghi's collaborator with various consulting companies related to the latter;
- TALLERI Matteo[24], associate of the tax and corporate consulting firm Talenture-Fiduciaria S.A.[25], to whom the preparation of the purely "administrative" acts of Danehurst Ltd was delegated;
- FROM Fausto MAGRO , Deputy Director of the tax, corporate and real estate consulting firm Lambertini, Ernest & Partners S. A.[26], to whom the preparation of the purely "administrative" acts of Flex Engineering Ltd was delegated;
- MOMBELLI Stefano, Director of the consulting company and tax and corporate services and international relations company Corfint S. A.[27], to whom the preparation of the purely "administrative" acts of CCC Ltd and Percy In was delegated. Co;

[19] Former Sole Director of Dobfar S.r.l., with registered office in Belgium (PV) No. 9, a company – also owned by Borghi and his wife, Barbara VIANELLI – ceased by incorporation into Bemberg on 08/05/2010. The position of General Manager would be that held according to the official website of the company (www.bemberg.it_index.php_page=contacts).
[20] Born on [redacted] in Legnano (MI) and residing there at [redacted]: office held as reported on the same *online* page indicated above.
[21] Born on [redacted] in Venezuela and residing in Pessano with Bornago (MI), [redacted].
[22] As reported on a business card found, at the headquarters of Bemberg S.r.l., during the search operations carried out by this Department on 21.06.2011. Flex Engineering Ltd, although not having any financial relationship with the construction companies involved in the investigations, was found to be another foreign company vehicle headed by Borghi: it has its registered office in London (Great Britain), Jermyn Street 86 SW1Y 6AW, but its real office at the operating office of Bemberg S.r.l.
[23] Born in Minervino Murge (BA) on [redacted], registered with AIRE since 1990 with address at [redacted]. From the documentation acquired during the investigation, he is domiciled in Lugano (Switzerland), via Cesare Cantù n. 4; from the same documentation, he is a shareholder, together with Borghi, of the aforementioned Danehurst.
[24] Born on [redacted] in Switzerland.
[25] Headquartered in Lugano (Switzerland), Riva Albertolli n. 1.
[26] Headquartered in Lugano (Switzerland), Via F. Pelli, no. 2.
[27] Headquartered in Lugano (Switzerland), Via S. Balestra n. 18.



[signature]

- BRAGHI Diego[28], then *Procurement Manager* of Eni-Zubair S.p.A.[29], a company responsible for Zubair Field-Project[30] in Iraq;
- Nerio CAPANNA[31], Vice-President of Saipem S.p.A.[32], a company, owned by Eni S.p.A., responsible for the Jurassic-Project[33] tender in Kuwait;
- OF Angelo TATA[34], at the time responsible for the Procurement and Procurement Department of Saipem S.p.A.;
- Roberto BENIGNA,[35] - *Chief Operating Officer - Business Development*[36] of Kharafi National LLC, a Kuwaiti company responsible, together with Saipem, for Jurassic-Project in Kuwait.

In fact, common to all the groups described above, the following circumstances appear symptomatic of awareness by the same subjects investigated that their conduct was completely unlawful:

- the choice of **non-“institutional” e-mail addresses, in order to conceal the real user,** as summarized below:
  - BRAGHI→ gaspadin@alice.it
  - DI TATA → monterosa.4638@gmail.com
  - SCARPA → contact@caterham.biz

[28] Born on [redacted] in Piacenza and residing there at [redacted]
[29] With registered office in S. Donato Milanese (MI), Via A. De Gasperi n. 1/B VAT [redacted], Eni group company.
[30] Deposit located near Basra, south of Iraq, with a current production level as of January 2010 of approximately 195,000 barrels per day.
[31] Born on [redacted] in Pesaro and residing there at [redacted].
[32] With registered office in S. Donato Milanese (MI), via Martiri di Cefalonia n. 6 and secondary office in Fano (PU), Via Toniolo n. 1 - VAT No. [redacted]. In a telephone intercept on 12/13/2010, Borghi calls the Hut "environment manager in Fand'.
[33] Deposit located in northern Kuwait: expected to produce 150,000 barrels per day.
[34] Born on [redacted] in Monza and residing in Biassono (MB [Monza e Brianza]), [redacted].
[35] Born on [redacted] in Rocca del Colle (BG [Bergamo]), residing in Kuwait - [redacted] and domiciled in Italy in Curno (BG), [redacted].
[36] See official website www.kharafinational.com/kn/contacts_us.html.



[signature]

- GUIDOTTI→tuschy@virgilio.it
- PESCI →interactivemm@libero.it
- DENTALI→ futuro.pv@libero.it
- CANAVESI→ mmaiorca@gmail.com
- ZHUREBEKOV→- communication2004@hotmail.com;

  - communication2004@gmail.com;
- assistant to Zhurebekov (said Eduardo) → ihpdep555@yahoo.com

- the use, by some of them, of **foreign telephone cards (specifically the Republic of Lithuania for Guidotti and Dental and the United Arab Emirates for Braghi), <u>in the belief that the intercore conversations between them were in no way monitorable.</u>**

## B. GENERAL SUMMARY OF FACTS

Before proceeding with the description of the conduct concerning the issuance and use of invoices for non-existent transactions, it is considered appropriate to process the persons of the intermediaries involved, also using evidence that does not have a direct impact on the conduct relating to tax offenses but, in any case, that allows to provide adequate information on the actual activity carried out by the same.

### (1) The person of Massimo Guidotti

As mentioned in the Recitals, the Guidotti's involvement originates from the statements made before this Judicial Police, on 09/15/2006, by the former ENI representative in Russia Mario Reali, relating to "*the anomalies in Karachaganak*" found by the same on the award of contracts, by companies of the ENI group, for the exploitation of the oil field located in the Karachaganak region in the Republic of Kazakhstan.



[signature]

In particular, former manager Eni stated the following: *"on 11/17/2004* ***I met with Ferlenghi and a certain Massimo Guidotti*** *(...) in Moscow National hotel -* ***and Ferlenghi on this occasion he told me that he had [kickback money [queue]] to take, equal to $1,500,000.00*** *and asked me to help him recycle it (...). I'm talking about it, because (...) it's clear that* ***more had been taken.*** *It went on a little bit until spring 2005 (...).* ***The bribe is related to Karachaganak*** *and takes place as follows: there are sub-supplier companies (...) that, to win the order,* ***with the help of Kazakhs and Eni men, inflate the offer and then return a "total" to Eni men and Kazakhs*** *(...). Money is raised by a company in Israel, turned over banks in the Arabian Gulf (Abu Dabi in particular) and sent back to Europe and with cash cases some Swiss banks put them on the accounts"".*

The following is a detailed summary of the evidence found as a result of the examination of the computer documentation and on paper acquired during the investigation, from which it is noted that the Guidotti drained sums of money, among others, from subjects involved in various capacities in the development projects of the Kazakh oil field called "Kashagan".

It should be noted that the first economic entity to benefit from the illegitimate brokerage of the Guidotti in Kazakhstan would be the BATEMAN LITWIN group[37], which received the first contract (for an administrative validity of approximately $194 million) from Agip KCO in March 2004[38]

From the examination of the documents in electronic format that were seized on October 27, 2010 at the GUIDOTTI home, it emerged that the first company vehicle used by the Guidotti to carry the payment of the unlawful brokerages provided to the companies of the Bateman Group, is identified in the company MEGA ELECTRA S.A. SIGEC - LYBIA[39], that first appears in the email of 11/24/2004, in which Marcello BOLOGNA[40] (technostar@interfree.it) writes to Guidotti attaching a draft consulting agreement between Mega Electra and a company indicated with "XXXXXXXXXX", in relation to a contract under the so-called Kashagan Project (**Att. 20a**):

[37] Headquartered in Amsterdam-Zuidoost (Dutch), Haaksbergweg 59, Bullewjik, 1101 BR. It should be noted that during the rogatory activities carried out, among other things, in the Israeli territory on 06/21/2011, the offices of various companies of the Bateman-Litwin Group were searched. In this context, the Judicial Authority has carried out, also through the local police bodies, numerous interviews with managers of the group, the content of which has been, below, reported, in excerpt.

[38] Specifically, the contract was subsequently "split" into two parts, assigned, respectively, to Bateman Kazakhstan Oil & Gas Company B. V. for on-shore works (contract no. 2002/0971) and to Bateman Eurasia GmbH for off-shore works (contract no. 2003-1053). Further entities of the Israeli Group, namely Bateman Eurasia Oil & Gas Company B. V., will then be involved in the development of the Kashagan project, as it participated in the NCC *joint venture* (contract assignee 2004- 0504), and, again, Bateman Eurasia Gmbh, present, in turn, in the OIC joint venture (contract assignee 2005-84).

[39] Headquartered in Tripoli (Libya), 4 Km Fellah Street, and with branches in Lugano (Switzerland), via Bresso n. 43, and Milan, via Soperga n. 6.

[40] Marcello BOLOGNA, born in Carrara on [redacted], employee of Nuovo Pignone SpA until 2004, his last occupation. In the subsequent period, the same is only earned by INPS.



[signature]

- Extension onshore Power Generation Project;
- Onshore Construction Project.

The BOLOGNA reports an email received from megaelectra.milano@libero.it commenting: *"You have returned to me the first page that already contains all the data.*
*He is the Owner (..), Director, President, .... then signs him: DOMENICO PATRUNO.*
*We can rest assured (..) about Confidential now and in the future"""*

On December 2, 2004, said Gulzhan, assistant to VULIS Felix Jeff[41] (Gulzhan@epa.kz) informs GUIDOTTI (Att. 4) that Vulis asked her to inform him on the following points:

1) The company that will sign the contract is Bateman Eurasia Oil And Gas Company BV;
2) The company registration number is 34197404;
3) The registered address in the Netherlands is Haaksbergweg 59, 1101BR Amsterdam Zuidoost;
4) The agreement will be signed by the director of the bateman eurasia oil and gas company BV, Felix Jeff VULIS.

On December 3, 2004, Gulzhan attached to GUIDOTTI (**Att. 5**) and, for information to VULIS (fivulis@epa.kz), a draft Consulting Agreement, without the indication of the companies involved in the signing of the deed, but with the specification that the contract refers to the projects:

- 2004-0934 (EP and Construction works - Utilities area);
- 2004-0504 (Onshore Construction Contract).

On December 7, 2004, a direct meeting takes place in Milan between VULIS, the Shuki Raz of BATEMAN ENGINEERING and GUIDOTTI (**AII. 6**).

On December 9, 2004 Marco Pesci (interactivemm@libero.it) attached to Vulis (**AII. 6a**) the revised Consultancy Agreement following the comments made by the latter specifying that copies of the registration certificates of the companies MEGAELECTRA and BATEMAN EURASIA would have been attached to the agreement. The VULIS sends the attached contract to Shuki Raz inviting him to return it to him with any changes he deems necessary.

[41] Director of Bateman Eurasia Oil & Gas B.V.

On December 13, 2004, Gulzhan attached a draft of the consulting agreement with the latest changes made (**Att. 7**). The contract specifies that the companies involved are MEGA ELECTRA S.A. and BATEMAN KAZAKHSTAN OIL & GAS COMPANY BV.

A scan of the contract in question is attached to an email dated 05/03/2005 sent by Alon Davidov [42] to Shimmy Belikov [43] without any comment. The same was signed by Domenico Patruno and Jeff Vulis on December 6, 2004 (**Att. 8**).

On April 10, 2005, Guidotti emailed Jeff Vulis a brief presentation of the company. The email in question, on April 11, 2005, is filmed from Vulis to Alon Davidov and Shuki Raz[44]: the latter, finally, on April 14, 2005, films the presentation to Gad Haran[45] and Shimmy Belikov (**Att. 9**).

On May 17, 2005, George Mast[46] (george.mast@batemanswiss.com) requested clarifications from Alon Davidov and, for information, Shimmy Belikoff and such Oded Isvoranu about an invoice received from Mega Electra (**Att. 10**) specifying that he received the invoice with a signature that he does not acknowledge. He also asks for confirmation that the reference account is the one relating to "Utilities" and in this case remains perplexed that there is no "P/R" or "VPA" (probably expense authorization forms). Finally, he asks if he does not have a copy of the relevant contract.

On May 18, 2005, George MAST reiterated his concerns to Shimmy Belikoff (**Att. 11**), specifying that in the invoice attached to him there is a signature that does not recognize and does not even see the second authorization signature. He asks if, according to the procedure, he does not need a PR and a VPA even if Shimmy Belikoff and Alon Davidov agree on the payment. Turning directly to Davidov highlights that the fax cover letter does not tell which account the invoice should be paid from so their new employee does not know what to do.

[42] Chief Financial Officer of Bateman Kazahkstan.
[43] Simon Charles Belikov, Director of Bateman Eurasia GmbH.
[44] CEO of Bateman Litwin.
[45] General Manager of Bateman Litwin.
[46] Employee of Bateman Eurasia GmbH.



[signature]

On the same date, Belikoff urges him to point out that the signatures are those of the directors of BATEMAN KAZAKHSTAN, known by him and Davidov, and discussed with each other and that therefore George Mast must proceed with executing Alon's instructions.

On the same day, George MAST wrote a laconic email to Shimmy Belikoff and for information to Davidov (alond@bateman.kz): *""Shimmy, payment to Mega is made""*.

Another interesting email exchange takes place on February 6, 2006 when such Reints Judith (judith@fivemounts.com), secretary of Peter BLAUW[47], writes to George MAST an email (**Att. 12**) attaching the invoices of MEGA ELECTRA SA no. BK 004/2006 of January 31, 2006 in the amount of USD 649,000.00 and no. BK 0005/2006 of February 28, 2006, in the amount of USD 751,000.00, defining them as "colored" with a sheer irony and closing the sentence with suspension points almost implying a speech perfectly known to the two: *"Some, colorful invoices ..."*.

On February 7, 2006, George MAST wrote to Richard HIERSCHE and, for information, Shimmy BELIKOFF, asking him to sign/approve the attached MEGA invoices and issue the payment instructions.
Even in this case it seems that the same employees of BATEMAN do not clearly understand the reference scope of the relations with MEGA, in fact, on the same date, Richard HIERSCHE[48] writes to BELIKOFF that he does not have any information on the invoices, that he is aware that it is necessary to pay MEGA a customer finder's fee (Finder's fee) but not to know at what point they are in the process and whether these invoices are correct for the approval of the payment. He then asks him to let him know on the basis of what agreement he needs to approve the payment.

The scanning of the "First Amendment" (**Att. 13**) of the contract in question, dated 02/27/2006, with which the amount entered into at the time and indicated in point 6.1 of the Agreement is revised, has also been found. With respect to the Onshore Construction Project, we move from $8,000,000.00 to $4,500,000.00.

The fact that no documents were found, in paper and computer format, seized at the offices and home of Guidotti or acquired through rogatory activities at the offices of Bateman in Israel and Switzerland, communications, documents or exchanges of emails from or having as the recipient the *dominus* of Mega Electra SA, Domenico Patruno, or other employees of the same company appears to be abnormal.

[47] Director of Bateman Engineering N.V.
[48] Chief Financial Officer of Bateman Eurasia Oil & Gas.



[signature]

No trace of the latter (i.e. the direct data subjects) is recorded on February 18, 2006 (Att. 14), when Shimmy BELIKOFF sends the draft of two contracts to GUIDOTTI of which the two previously discussed:

- Mega-BKBV - Contract Amendment;
- Mega (new) - Aventall.

In the second contract, initially on behalf of MEGA ELECTRA, Shimmy tells GUIDOTTI the intention to change the name with another company, but to wait for GUIDOTTI's input to finalize the operation.

Which company will take the place of MEGA in invoicing is clarified on February 27, 2006 (Att. 15) when Shimmy BELIKOFF sends to GUIDOTTI two draft contracts that take into account the indications of GUIDOTTI:

- Techno Aventall - Feb 27, 2006;
- Mega-BKBV - Contract Amendment - Feb 27, 2006.

In particular, the parties in the first contract are indicated in the already known TECHNO SKILLS LIMITED and AVENTALL INTERNATIONAL INC with consulting activities related to the following contracts:

- 2004-0504 Onshore Construction;
- 2005-0584 Offshore Construction.

As a result of the use of the company TECHNO SKILLS, directly attributable to GUIDOTTI, no further communications regarding MEGA ELECTRA SA are detected.

The following are the invoices issued by MEGA ELETRA to Bateman Kazakhstan Oil & Gas Company B.V. found in the paper acquired at the investigation:

| Number | Date | Total Amount(USD) | Payment Instructions | Attachment |
|---|---|---|---|---|
| BK 001 | 05/02/2005 | 2,200,800.00 | RAK Bank Dubai NRAKABAK [redacted] | **16** |
| BK 002 | 08/22/2005 | 1,111,000.00 | RAK Bank Dubai NRAKABAK [redacted] | **17** |
| BK 003 | 09/05/2005 | 499,800.00 | Bank Switzerland Italiana Lugano [redacted] | **18** |
| BK 004/2006 | 01/31/2006 | 649,000.00 | Bank Switzerland Italiana Lugano [redacted] | **19** |
| BK 005/2006 | 02/28/2006 | 751,000.00 | RAK Bank Dubai NRAKABAK [redacted] | **20** |
| **Total** | | **5,211,600.00** | | |



[signature]

From the analysis of the current accounts attributable to the companies of the Bateman group, received as a result of rogatory activities, no payments were recorded for the benefit of Mega Electra's current accounts reported in the invoices above; therefore, it is not excluded that the bank account of Bateman Kazakhstan Ltd [redacted] opened at the Eurasian Bank of Almaty (Kazakhstan) - SWIFT EURIK -KA was used for the transfers in question.

Please note that from the examination of bank account [redacted] in the name of "Winning" Strategy and in the availability of Massimo Guidotti, the incoming transfer was recorded, on 06/13/2005, coming from SWISS MEGA ELECTRA COMPANY LTD TRIPOLI for an amount of USD $1,499,978.00 respectively.

**The date and amounts of the operations described above, as well as subsequent cash withdrawals, in the period July-September, equal to $388,067.56, lead us to believe that with such availability, the Guidotti may have paid Ferlenghi Ernesto the sum of money cited by Royal Mario in his statements.**

The statements made in the records by Bateman managers deemed most relevant for the purposes of the investigation are reported in excerpt.

- Rony Rosemberg[49]

Q. *Our investigation material shows that BATEMAN paid bribes to Kazakh parties in connection with the Kashgan project.*
*A: I don't know, but **I know that Kazakhs were required to pay bribes.** During my work periphery, **the region's Kazakh prosecutor made requests for payment of money and if it had not been paid, it would have created problems with work permits for foreign workers**, during my periphery he was not paid, they did not turn to me but to the Chief **Financial Officer Leonid Wal.** I would like to add that it is known that Kazakhstan is a corrupt country and there were rumors that bribes were being paid to Kazakhs.*

[49] He worked for Bateman in the 2001-2003 and 2009-2010 periods in the role of in situ project director- Kashagan.



[signature]

- **Rafi-Roga Farhat** [50]

*Q: Tell me more about the relationships and topics that asked you to check and prepare for management*
*A: (...) in Switzerland my director was the CFO named George Mast, then came an Israeli, Kashpizky, then a Slovak named Peter Drebnik**; in Israel there was another, vice CFO who followed everything, named Shimi Belikof, he decided everything, meaning that regardless of the titles of the people in Switzerland, he gave the final OK***

(...)

*Q: Who were you in contact with at AGIP?*
A: I was not **in contact with AGIP, Shuky Raz and Shimi Belikof were, and it is very likely that the intermediary with the Israeli company was one named Massimo**

(...)

*D: Tell me everything you know about irregular behavior in the KASHGAN project*
A: *The people you need to question are **Shuky Raz** and the U.S. Chief Financial Officer who resided in KAZAKHSTAN, **who paid "bribes" to people in the KAZAKH government is safe** but I cannot name people or sums*

Q: *How do you make sure "bribes" have been paid?*
A: *from gossip, chat, for example, customs clearance of goods that have been stopped for months*

(...)

Q: *Try to remember who told this and had gossip and chat*

[50] Dependent on Bateman from December 2006 to November 2009 as director, in particular appointed to prepare reports and controls on financial transactions, banking transactions and purchases and to prepare workers' salaries in Kazakhstan.



[signature]

A: *the Israeli accountant and the American financial director, in relation to the control AGIP did, I heard from* ***a girl named Natalia Koblanko, who was the financial director of the project,*** *and she* ***said that AGIP did several checks finding out that many things were irregular***

Q: *Who were the suppliers you interacted with as part of your job?*
A: *(...) I think* ***Natalia*** *is a key person, she went weekly to KAZAKHSTAN to manage the deal*

(...)

D: *Give me details about the agreements signed with Guidotti and the reason for their signature*
A: *at the beginning there was an agreement for which he received a percentage of the deals concluded, then there was a "retainer" contract (fixed share so-called) + expenses and I had a copy of the last contract, he wanted to quote BATEMAN. He is the one who procured the contract in Congo for BATEMAN, and then he also settled another contract for the sale of 4 generators in Congo, and this also did not pay him for it at all*

Q: *Who is the company "AVENTALL"?*

A: ***It is the parent company of BATEMAN*** *in Switzerland, in practice it is a banking company (n.d.t.: Maybe it means holding company) that does not have operating activities only has bank accounts through which they receive credits and make payments, I do not remember where it is registered, certainly, in my opinion, in one of the Virgin Islands*

D: I am submitting bank prints referred to as **Shlomi Pizarro** (3) 6/21/2011 and in these payments AVANTEL makes to the company TECHNOSKILLS, against what are these payments?
A: ***TECHNOSKILLS is also Massimo, I tell her that TECHNOSKILLS is the channel to transfer money for corruption, Massimo was enrolled as the sole owner, there were no other people, who really was behind TECHNOSKILLS, in my opinion, was BATEMAN.*** *I remember Shimi Belikof was pulling me crazy to transfer money through a specific bank, whose name I don't remember, an American bank, where he was the only one authorized to sign, was not a normal transfer through large known banks, and the address of TECHNOSKILLS was in the offices of BATEMAN in London, we always asked ourselves, how is that man,* ***Massimo****, was receiving half a million dollars, every time a barrel of money!*

Q: Were there any money transfers to TECHNOSKILLS even in the years following 2008-2009?



[signature]

A: Breakage between them began in late 2008 in early 2009, I recall similar prints from 2008, **was a fictitious company that provided half a million dollars in invoices every quarter**

D: Who educated the invoices?
A: ***only Shimi Belikof, he was the only one. Invoices were written "services" services.*** *I have no idea what services they were, it can be anything*

(...)

Q: Do you *have anything to add to the previous testimonial?*
A: *I deliver documents requested in the following order: printed with the details of the American bank **JP Morgan**, in which the account of AVENTALL marked as SHLOMI PIZARRO was managed (1) 06/23/2011, column **B** finds **LINOI NESHER** who has the right to sign **A**, this is main, and I'm in column **A**, which means authorization for signature **B (in the original version, the columns are in Latin letters and the signatures in Hebrew) (8) i.e.** on my own initiative, the account manager is **Shimi Belikof**, that with a phone call he decides everything*

(...)

Q: *why do you emphasize that AVENTALL does not appear?*
A: *with reference to his question if it is possible that there is a contract between AVENTALL and TECHNOSKILLS, I say, that the thing is not logical, there is no contract like this, I have never met AVENTALL between service providers or otherwise, AVENTALL did not carry out activities,* ***it was only for the transfer of money from AVENTALL to TECHNOSKILLS***

D: *Would I like to take stock of the U.S. bank when you first heard it? Was this bank also linked to the TECHNOSKILLS issue? was there any business with other companies in which this bank was involved?*
A: *when I was asked to transfer payments to TECHNOSKILLS, it was the first time I heard the name of this bank, the transfers here were in **Shimi Belikof's sole opinion,** this was in other banks just his signature, while in this American bank his telephone authorization was also required.* ***This bank has never been used to pay suppliers or other current items, but exclusively for TECHNOSKILLS***



[signature]

Q: *How many times did they ask you to transfer money from there?*
*A:* ***every three months for about two years** **and always the same sum of half a million***

➢ **Raul Ronen**[51]

D: *What about KAZAKH subjects both at the level of government as well as Kazakh oligarchs?*
A: *Contact with the government was mainly for work permits, I know there were also customs issues for equipment entering the country for the project, but I don't know how they were resolved (...)*

➢ **Simon Charles Belikoff**

Q: *Tell me everything you know about the irregular ways BATEMAN won the KASHGAN project bids*
A: *First, the lowest offer was made but we also had a channel through M**assimo Guidotti**. When asked, they introduced me **to Massimo**, I think, I'm not sure, it was General Director, I mean **Shuky Raz**, presenting him as our contact person with ENI, who knows the structure. (...) **Then Massimo became our contact person with ENI and AGIP, he knew several people, one was the project director of KASHGAN** (.....) Probably **not much of our win of the KASHGAN Plant tender is due to his contact with the AGIP men***

(...)

Q: *Maybe not or almost, tell me exactly what was there?*
A: *He had contact with an ENI Italian who led the project**, Guidotti received payments after the win. The fact that Guidotti paid ENI "bribes" was clear to me from the support, attitude and help we received from these people in the project.***

Q: *before you said your proposal was the cheapest, why did you have to pay a "bribe" to win the tender?*
A: *There was an agreement that if we had won the project we had to pay **Guidotti** a fee, to clarify his demand, there is a variety of considerations not just the cheapest offer.*

Q: were you meeting the minimum conditions of the tender?

[51] Deputy Director of Bateman Litwin Energies.



[signature]

A: *We responded, but lately, others met the minimum conditions, we didn't. We missed them. Then they gave us a new deadline to deliver the minimum conditions document. To the best of my knowledge these were technical issues. They allowed us to deliver late due to* ***Guidotti's contact details.*** *The General Director,* ***Shuky Raz****, and the division director,* ***Gad Heran****, let me know, I don't remember how, that our contact with AGIP allowed us to submit the documents late and finally allowed us to win the project tender. In your question, on our ties, I mean that there was a participation with the company EUROASIA and not BATEMAN EUROASIA, in relation to the projects in KAZAKHSTAN, and they also managed the relations with AGIP. Shukt* ***Raz and Gad Heran*** *let me understand that our presentation, late, had been accepted and that we were likely to win the project for our ties to* ***Guidotti*** *and EUROASIA.*
*There were contracts for services provided by* ***Guidotti****, some of which I had inherited from my superiors in the facility,* ***Shuky Raz****, in recent years there may have been agreements with* ***Guidotti,*** *that I signed myself; the essence of the agreements with* ***Guidotti*** *has clarified for me with the years, at some point I realized that it was money for "bribes" that* ***Guidotti*** *paid at high levels in AGIP, to his question, I don't remember for sure but it seems to me that Guidotti at some point, I have been informed that he bribes some of the senior management money at AGIP, to his question, He didn't tell me how much of the money he paid goes into bribery and I don't know. At his question, in my opinion he paid the AGIP project director, all the items were around that person. With his permission, I look at my iPhone to try to remember who the contact person for the AGIP was, I now see that it is* ***Luigi Diamante.*** *Guidotti passed on invoices to me and I paid them as commercial services and consultancy; At his request, as financial director, I authorized every invoice submitted by* ***Guidotti****, asked me to be responsible for these agreements,* ***Shuky*** *asked me for it and instructed me to pay for the expenses* ***Guidotti*** *presented. At his question, if I remember, we had an agreement between* ***Guidotti*** *and BATEMAN EUROASIA. I transferred payments to a company called GMOIL & GAS and TECHNOSKILLS. I didn't always make the payments, sometimes they came from our partner, EUROASIA but almost in all cases I knew about the payments to* ***Guidotti****. When asked if there were a lot of payments made to* ***Guidotti****, it was normally hundreds of thousands of dollars each quarter*

D: *Were there any other companies, besides GMOIL & GAS, to which you transferred money for* ***Guidotti?***

A: ***<u>it can be, there was another company, before this one, to which transfers were made</u>***, I *don't remember the name.*



[signature]

D: Is *TECHNOSKILLS known to you?*
A: *yes, this is the company I mentioned earlier*

(...)

Q: *What "bribe" payments did you pay to executives in the KAZAKH gas company, members of the KASHGAN Project Steering Committee, through payments to* ***Guidotti?***
A: I *don't know what happened with the money Guidotti had, with regard to ENI men,* ***I realized that Guidotti paid them "bribes",*** *I don't know how when and how much. I don't know, it's the kind of things that I don't want to know, I mean I don't think they would have updated me with these details if I had asked similar questions. I don't know anything about* ***Guidotti*** *and the KAZAKHS.*

(...)

Q: *wasn't it moving for every expense without* ***Shuky****'s permission?*
A: *for every expense that he did not find in a contract that was in order, while the payments to* ***Guidotti*** *were found in a contract that* ***Shuky*** *had authorized and invoices against the contract, and even in these situations, he authorized every exit. I worried about it.*

(...)

Q: *Who is AVENTALL?*
A: *an off-shore financial company, established as part of the tax system of the BATEMAN Group in Switzerland.*

Q: *who are the AGIP Directors who had direct contact with the BATEMAN Group Directors*
A: ***The project manager we had contact with was Luigi Diamante***



[signature]

**(2) The figure of Vasfi Hormoz**

Vasfi was identified as an intermediary in the oil and gas sector by the documentation seized on 06/21/2011, specifically the printout[52] of the email sent, on 06/10/2009, by the employee of PRYSMIAN CAVI E SISTEMI S.r.1.[53] Massimiliano TOMASSINI[54] to Stephanie OLIVIER, another Prysmian employee (**Att. 21**), which reads:

*"this is Kashagan's very important UK-based agent*
WE HAVE 2 AGENTS
SCARPA [55](...)
VASFI (MAIL TECRON AND contact Alessandra)
1 2 AGENTS DO NOT KNOW ONE ANOTHER AND WE TAKE GREAT CARE NOT TO SEND THE OTHER'S EMAIL, THE SITUATION IS VERY DELICATE"

In addition, Guidotti himself, in his "Defense Brief" dated 11/08/2011, regarding the relations between his consulting company and JV SKEMA- TOZZI, on page 13 (**Att. 22**), writes that the relationship between the two companies was *"stopped in May 2007 by express request of TOZZI[56] management to CERVEGLIERI[57], President of SKEMA, as they **alleged to have received instructions in this sense from the Kazakh power system.***
*In fact, MG then became aware that the agreement was entered into with the company Top Oil UK based in London (in 2010 transferred to a company based in Cyprus), which, as CERVEGLIERI said, was controlled by an Iranian Italian, very well-supported "on site".*
Therefore, in Attachment 14 of the same Defense Brief, Guidotti confirms that ***"the JV receives an order from the Kazakhs to take as an adviser the company Top Oil UK, which acts as a shield to a certain Iranian-Italian, "****...introduced to the contractors of the nomenclature of Kazakhstan", says Cerveglieri" (**Att. 23**).*

The investigations carried out revealed significant elements related to economic relations between Vasfi Hormoz and the following companies, **finalized, presumably, the establishment of funds to be allocated to the corruption of subjects, both Italian and foreign, Responsible for awarding tenders related to the implementation of the facilities used for the exploitation of the fields located in the Kashagan and Karachaganak regions, in the Republic of Kazakhstan:**

- the already identified Joint-venture Skema-Tozzi;

---

[52] Found at the office in use in Tomassini Massimiliano, within the headquarters of PRYSMIAN CAVI E SISTEMI S.r.I., located in Milan, v.le Sarca no. 222.
[53] VAT [redacted].
[54] Born on [redacted] in Milan.
[55] Likely, this is the already identified intermediary Nunzio Scarpa.
[56] Probably Tozzi Mario, generalized in point 2., Chairman of the Board of Directors of Tozzi Sud S.p.A., one of the two companies belonging to the joint venture.
[57] Mario Secondo CERVEGLIERI, generalized in point 2., Chairman of the Board of Directors of Skema S.p.A., the other company part of the consortium.



[signature]

- Tenaris Global Service S. A., located in Uruguay, Luis A. de Herrera 1248 - World Trade Center - Building Plaza P. 1, Montevideo;
- the already identified Breda Energia S.p.A.

The three economic entities mentioned above appear in the following documents[58].

- excel document called "bol accounts", consisting of 2 sheets, referred to as "KCO" and "COPIA BOL" respectively (**Att. 24**);
- Word document named "Numbers" (**Att. 25**);
- Word document called "CONTINUES", consisting of 2 sheets (**Att. 26**);
- Word document called “Bolat accounts” consisting of 2 pages. The document in question shows the image of a printout of the previous "CONTAINS" document on which handwritten annotations have been made (**Att. 27**).

The documents mentioned above contain, with reference to the legal subjects identified above, a series of homogeneous information concerning:

➢ the amount of invoices issued by each of the economic entities named above, following the award of contracts entered into with Agip KCO, in the case in question:

  - contract no. 2004/1089 signed by JV Skema-Tozzi;
  - contracts no. 2005/1163 and 2006/0650 signed by Tenaris S.A.;
  - contracts no. 2004/1115, 2004/0199 and 2004/1325 signed by Breda Energia S.p.A.;

[58] The documents were found within the directory called "ACCOUNTS" which can be reached through the following path: Desktop\Backup Katia Alessandra\MOM\KAZAKHSTAN CONTI, allocated in the mass memory of the computer in use by Katia Caruso, one of the secretaries of the company Tecron Srl. The *files* in question report, all, as "created date" and "last modified date" that of 10/24/2010. In this regard, it is likely that this date refers to the creation of a backup copy of the files in question on the computer of Caruso, as suggested by the name of the directory placed in the "Desktop" folder of the computer in use, at Caruso. It should be noted that the mass brief of the latter electronic device was also subject to a forensic copy during the search and seizure operations performed on 06/14/2012 at the office of Tecron Srl in Rome, as shown in the report drafted by the Judicial Police auxiliary involved in the operations, which constitutes Attachment 6 to the minutes drafted by the operating Judicial Police, sent to this Judicial Authority with note no. 454172 of 06/18/2012.



[signature]

- the percentage of commissions due to Top Oil Ltd - a company, directly attributable to Vasfi Hormoz - for the brokerage carried out under the aforementioned contracts;

- the amount of payments made against invoices issued by Top Oil Ltd.

The indications contained in the first and last file are of extreme interest: are the names of these “dentals” reported in both documents? and "bol" with a money figure next to it.

**It is the opinion of this Judicial Police that these indications are to be reported to two managers referred to in point 2.A. above:**

- manager Eni **Paolo Dentali**. Moreover, it proved, in the same investigations, to be a true “man of trust” of Guidotti Massimo, to whom it provided useful data and news to the companies to which the same intermediary provided its advice;

- then President of KazMunayGas **Bolat Nazarov**. It is very important to point out that, with regard to the same, Guidotti, in an e-mail dated 09/29/2009, concerning “*KMG - Company Management and Board of Directors*”[59] (**Att. 28**), assigns him “3 stars” (out of a maximum of 5) in a sort of ranking that he had drawn up regarding the influence in the oil and gas market of the main executives, precisely, of KMG. To support the hypothesis that Bolat Nazarov was committed to corrupt activity, Guidotti himself, in the interrogation made before the Judicial Authority on 05/18/2012, argued that "(...) *was in the public domain that Zhurebekov was substantially* ***a bribe collector for Nazarov".***

**The combination of the names "dental" and "bol" with the sum of money noted next to the amount of the commissions paid by the company awarded the contract to Top Oil Ltd seems to indicate that this money was allocated directly to the two parties identified above.**

Subsequently, points 3.C.(5) and 3.C.(6) will detail the payments related to the business relations with JV Skema-Tozzi and Breda S.p.A., respectively.

[59] Sent to the already identified Mario Secondo Cerveglieri and to his brother, Davide Ennio CERVEGLIERI (born in Milan on [redacted]), delegated director of Skema S.p.A.

**The circumstance, according to which Tecron S.r.l. acted as a "screen" for Top Oil, whose administration took place, in fact, in Italy, is supported by the following facts:**

- in a fax[60] (**Att. 29**), Tecron S.r.l. appears to have a representative relationship in Italy with Top Oil Ltd; in particular, in the fax, sent on 10.05.2007 by TOP OIL UK to JV SKEMA-TOZZI CORPORATE reads: *"(...) Please note that the company responsible for managing all our contracts in Italy for the territory of Kazahkstan is Tecron S.r.l. (...) Managing Director: Mr. Hormoz Vasfi (...)".*

  The analysis of the documentation found at Tecron's headquarters then allowed us to confirm the existence of this relationship, contractualized in 5 Consulting Agreements between Tecron S.r.l. and Top Oil Ltd, all concerning consulting activities to be provided in the territory of the Republic of Kazakhstan (**Att. 30-34**).

- E-mail, dated 04/30/2008, concerning "DRAFT Consultancy Contract Kashagan Hook Up Project" sent from the e-mail address alessandra.bonetti@prysmian.com to the secretarial address@ tecron.net (**Att.35**), with which the documentation for your revision is sent as an attachment to the Tecron employee Alessandra Casaroli[61]: *DRAFT of the Consultancy Contract,* containing a draft agreement between PRYSMIAN CAVI AND SISTEMA ENERGIA ITALIA S.p.A. S.r.l. and Top Oil UK.

  In addition, within the email in question, you can read the content of another email, sent on 04/23/2008, from the above-mentioned email address segreteria@tecron.net to the Prysmian employee Cesare BIGGIOGERA [62]:

  (...) *in reference to his conversation with Dr. Vasfi (...), I am giving you the details of the company with which to enter into the Consultancy Agreement:*
  *UK Top Oil*
  *120 East Road*
  *London N16AA*
  *United Kingdom (...)*
  *Legal Representative (...): Mr. Simon Gabathuler (...)"*

[60] **Press seized, during the search operations of 21.06.2011, at the headquarters of Skema S.p.A.**
[61] Born on [redacted] in Rome.
[62] Born on [redacted] in Milan.



[signature]

Therefore, it should be noted that, on 06/21/2010, the aforementioned Casaroli sends, on behalf of Tecron S.r.l., to TOMASSINI a letter requesting *"a change of company name from Top Oil UK to Top Oil Cyprus"* (**Att. 36**).

As evidence of the essentially corrupt nature of the activity that the Vasfi, through the invoicing of Top Oil Ltd, was disguised as marketing and consulting, a common factor for all the companies that accounted for their invoices, the steps are shown in some **statements made, as people informed about the facts, from Stefano MORRI[63], professional who assisted the above-mentioned Cerveglieri in his relations with Vasfi, and Cosimo PIRCHIO[64], former General Manager of Tozzi Kazakhstan LLP.**

On 07/26/2012, Morri declared before the Public Prosecutor:

*""I confirm that Mr. Brainstorms, from some point on, began to suspect that **Vasfi would give back some of the money received from JV Skema Tozzi.** I would like to clarify that from the speeches I had had with Brains I had learned that **Vasfi in substance had relationships with a vast network of high-level people in Kazakhstan,** including **in the energy sector.** I don't know how Vasfi related to key people in Kazakhstan. It should be noted that Kazakhstan has a social and economic structure in substance based on a few family clans, who hold the main levers of power. Vasfi had to interact with these people.*
(...)
*I read the name of Idenov, who was the first vice president of KazMunayGas at the time of July 2008, in one of these documents, and I remember an episode that should be reported. Around the end of 2008, I was asked by Cerveglieri to accompany him to a meeting he should have had in London together with Mario Tozzi. We went to a luxury hotel in London, I think Lancaster, near Hyde Park, where I met Idenov together with Vasfi, who had organized the meeting.*
*During this meeting, which lasted about an hour, Cerveglieri and Tozzi presented their companies, showed brochures and declared their willingness to operate in Kazakhstan in association with Kazakh companies. Idenov acknowledged it and had a goodwill attitude. Vasfi had a very respectful attitude towards Idenov, and Idenov treated Vasfi with cordiality."*

[63] Born on [redacted] in Carbonia (RN).
[64] Born on [redacted] in Riccione (CI)



[signature]

On 07/31/2012, Cosimo Pirchio confirmed that the lobbying activities of the Vasfi were essentially focused on knowledge at the top management of KazMunayGas:

*""I can report that when there was a need to provide additional L.E.R.s to Ravenna, from the speeches I heard from Bianchi[65], I learned that the local authorities had expressed the pleasure that the new L.E.R.s were built on site, as would have happened for any other project, based on the Kazakh legislation on Local Content.*
*This situation was a concern for Tozzi management, both for Bianchi and Mario Tozzi.*
***In this context, Vasfi aims to carry out a lobbying action through its knowledge in Kazakhstan in order to convince KazMunayGas to support the construction of L.E.R.s. in Ravenna again""***

In fact, Pirchio himself has raised strong doubts about Vasfi's possession of the necessary technical knowledge to provide advice in the oil and gas sector:

*""I don't know what Vasfi was talking to his stakeholders, certainly, to the best of my knowledge **he never showed me specific technical skills in the oil and gas sector**""*

**(3) The figure of Stefano Borghi**

The technical activities described above showed some sort of "interactions" between the Guidotti and the Bemberg group, highlighting, then, **a whole range of activities, gravitating around the other consultant Borghi and the manager Eni- Zubair Braghi, for the establishment of foreign "mill" companies with the purpose of draining money used, among other things, bribery of public officials responsible for awarding various tenders in the *oil and* gas sector abroad.**

The Eni Braghi group managers, first, Capanna and Di Tata second, were the contacts of the Borghi for the "carrying" of confidential data and news, relating to the various tenders in progress, that Borghi himself - directly or through Pondini and his other collaborators - did, then, to arrive, Guidotti assigned the numbers of "stars" to Kazakh project managers Kashagan and Karachaganak. already in the possession of this Department following the search operations previously carried out at the home and offices of the same Guidotti.

[65] Agostino BIANCHI, born on [redacted] in Florence, General Manager of Tozzi Sud S.p.A.



[signature]

**This circumstance suggests that Skema S.p.A. has deliberately deleted from its archives the computer material that it considered compromising.**

**(b) CONCLUSIONS**

- **TAX YEAR 2009**

The expenses relating to invoices for the 2009 tax year have fully merged into the sub-account of the general counsel "miscellaneous consultations" **(Att. 154)** and, therefore, have merged into the calculation of the operating profit for the relative year equal to €7,162,835.00.
In conclusion, in light of the provisions of point 2 of this Communication, **Skema S.p.A. used invoices for non-existent transactions recorded in the mandatory accounting records in order to evade:**

- **income taxes,** indicating in the annual tax return Form U60 for the year 2009 fictitious liabilities amounting to €38,913.49;

- **value added tax,** indicating in the annual declaration VAT Form for the year 2009 non-deductible VAT amounting to €7,782.70,

**This constitutes the hypothesis of a crime envisaged and punished by Art. 2 of Legislative Decree no. 199 of March 10, 2000 74.**

- **TAX YEAR 2010**

The expenses relating to invoices for the 2010 tax year have fully merged into the sub-account of the general practitioner "miscellaneous consultations" **(Att. 155**[105]) and, therefore, have merged into the calculation of the operating profit for the related year equal to €24,319,898.00.

[105] Including the prospectus prepared by the party, where the confluence in the sub-account in question is highlighted, also in the amount of €193.00, of invoice no. 2 of 01/03/2001.



[signature]

In conclusion, in light of what is stated in point 2 of this Communication, **Skema S.p.A. used invoices for non-existent transactions recorded in the mandatory accounting records in order to evade income taxes, indicating in the annual tax return** Form U60 for the year 2010 fictitious elements amounting to €57,072.91, **as the hypothesis of a crime envisaged and punished by Art. 2 of Legislative Decree no. 199 of March 10, 2000 74.**

- **TAX YEAR 2011**

The expenses relating to invoices for the 2011 tax year have fully merged into the sub-account of master "marketing consulting" (**Att. 156**) and, therefore, have merged into the calculation of the operating profit for the relative year equal to €10,006,887.00.
In conclusion, in light of what was stated in point 2 of this Communication, **Skema S.p.A. used invoices for non-existent transactions recorded in the mandatory accounting records in order to evade income taxes,** indicating in the annual tax return Form U60 for the year 2011 fictitious items amounting to €36,123.00, **as the hypothesis of a crime envisaged and punished by Art. 2 of Legislative Decree no. 199 of March 10, 2000 74.**

### (5) SKEMA-TOZZI joint ventures

#### (a) Analysis of the documentation shown

The Skema-Tozzi joint venture (JVST), accounted[106] for invoices issued by the consulting companies attributable to Vasfi and Guidotti in the period 2006 - 2011 for a total of €8,714,298.99 and $17,042,421.00, as specified **in Attachment 157**[107].

[106] Based on the documentation presented by the company against the separate notifications of the delivery Request decrees for documents and documents made by the Department in the header on 05.07.2012 and 10/30/2012, as summarized in the related transaction minutes prepared on 07/05/2012, 07/09/2012 and 07/10/2012.
[107] Including summary statement and 47 invoices and related payments.



[signature]

In addition, the JVST has exhibited the following documentation.

- Regarding relationships with Techno Skills Ltd:

➢ contract dated 01/20/2005 (**Att. 158**), with which the consulting company *""offers to the client a full commercial and marketing support for the above mentioned projects in Kazakhstan"""* [trans: offers the client full commercial and marketing support for the aforementioned projects in Kazakhstan].
For the provision of these services, point 6.1 of the contract provides for a remuneration equal to two solutions of $320,000.00 each.

➢ Contract dated 07/03/2006 (**Att. 159**), with which the consulting company, likewise, *""offers to the client a full commercial and marketing support in Kazakhstan""* [trans: offers the client full commercial and marketing support in Kazakhstan].
In this case, *"" in remuneration for its services, the consultant shall be entitled to a success fee of 5% with regard to amount paid by a client to the company under a contract for a project"* [trad.: by way of compensation for its services, the consultant is entitled to a fee equal to 5% of the sum paid by the client [108]to the company[109] as part of the project].

➢ Amendment no. 1 (**Att. 160**) to the contract referred to in the previous point, dated 07/24/2007, which modifies the fees due to the consulting company in the fixed amount of $550,000.00 (payable in a tranche of $350,000.00 and in a tranche of $200,000.00);

➢ no. 4 *"priority letters"* sent, respectively, on 11/30/2004, 12/10/2004, 12/14/2004 and 12/27/2004, by Techno Skills Ltd to JVST (**Att. 161**).

- With regard to relations with Groupe Cifal S. A.:

➢ Contract dated 08/04/2005 (**Att. 162**), with which the consulting company *""offers to the client a full commercial and marketing support for the above mentioned projects in Kazakhstan""* [trans: offers the client full commercial and marketing support for the aforementioned projects in Kazakhstan].

[108] Specifically, Agip KCO
[109] As mentioned in the same contract, the JVST is understood.



[signature]

Based on point 6.1 of the contract, *""in remuneration for its services, the consultant shall receive a success fee of 4% of the amounts paid by the contractor to the client under the contract relevant to the tender AGIP KCO above stated (i.e. 2004-1089)"* [trad.: by way of compensation for its services, the consultant is entitled to a fee equal to 4% of the amounts paid by the contractor to the customer[110] under the contract relating to the AGIP KCO contract described above (named 2004-1089)].

- Contract closure letter (**Att. 163**), dated 08/01/2008, sent by Groupe Cifal to JV SKEMA-TOZZI CORPORATE.

• Regarding relationships with Top Oil Ltd:

- contract dated 05/02/2007 (**AII. 164**), with which the consulting company *"provides the promotion and marketing of the company's activities set forth herein for the project"* [trad.: will provide for the promotion and marketing of the company[111]'s activities for the projects indicated herein].
The project in question, indicated in Attachment A to the contract, is that relating to the ITT tender 2004/1089 in the territory of Kazakhstan; the fee due to Top Oil, established in Art. 7 of the contract, is equal to ""4*% on the totality of invoices to the client*[112] [trans: 4% of the total amount invoiced to the client].

- Attachment B to the above-mentioned contract, dated 01/14/2008 (**Att. 165**), containing *"invoice scheduling for amendment no. 3 and 4"* for the years from 2008 to 2010.

- Contract between JVST and Top Oil UK dated 04/18/2008 (**Att. 165a**).

- Letter, dated 04/28/2008 (**Att. 166**), sent by Top Oil UK to JVST relating to representation by Tecron S.r.l.

- Letter, dated 05/19/2008 (**Att. 167**), sent by JVST to Top Oil UK regarding the request to the consulting company for the preparation of specific reports in execution of the contract of 05/02/2007.

[110] As mentioned in the same contract, the JVST is understood.
[111] As mentioned in the same contract, the JVST is understood.
[112] Specifically, Agip KCO.



[signature]

- 2 letters, dated 05/20/2008 (**Att. 168**) and 06/09/2008 (**Att. 169**), respectively, sent by JVST to Top Oil UK relating to the recognition of additional amounts compared to the aforementioned contract of 05/02/2007.

- Letter dated 03/16/2009, sent by Top Oil Ltd to JVST, notifying Top Oil of the incorporation, following a more general corporate restructuring, of the Cypriot company SMEKRANO HOLDINGS Ltd[113], and anticipating the intention to change the company name to T.O. TOP OIL (CYPRUS) Ltd (**Att. 170).**

  In this regard, it is represented that **measures carried out on Smekrano Holdings Ltd itself at the database in use at the Mint Global Corps, as well as research on open sources, have failed.**

- No. 3 binders[114], named, respectively, "Report Top Oil Volume 1 - year 2009", "Report Top Oil Volume 2 - year 2010" and "Report Top Oil Volume 3 - year 2011", containing the studies carried out by the consulting company for JVST.

**(b) Additional elements from investigations**

**- Items from the analysis of the seized documentation**

**▪ Relationships with Top Oil Ltd**

It should be explicitly recalled here as mentioned on pages 23-24 of this Notice, in particular that:

- one of the suspects, Massimo Guidotti, in his "Defense Brief", regarding the relations between his consulting company and the company in question, writes that the relationship was *"stopped in May 2007 by express request of TOZZI management to CERVEGLIERI, President of SKEMA, as they **alleged that they had received instructions in this sense from the Kazakh power system.** (...) The agreement was entered into with the company Top Oil UK based in London (in 2010 transferred to a company based in Cyprus), which, as CERVEGLIERI said, was controlled by an Iranian-Italian, very well-supported "on site" (...) **The JV receives an order from Kazakhs to take as an adviser the company Top Oil UK**, which acts as a shield to a certain Iranian-Italian, "...introduced to the contingent workers of the nomenclature of Kazakhstan" says Cerveglieri"";*

- **JVST is one of the companies reported by Vasfi as a party to the unlawful transaction with the aforementioned Eni and KazMunaygaz managers.**

[113] With registered office in Limassol (Cyprus), Arch. Makariou II, 134, Yiota Court - 4th Floor Suite 301.
[114] Given the large amount of the paper documentation in question, please find attached, by way of example, only what is reported later on page 96 of this Communication, without prejudice to the fact that these binders are fully concentrated at the offices of the Department in the header, as they constitute material shown by the party.



[signature]

Recall, so, what was incurred by the Vasfi in point 2.B.(2), in this case, such as the document referred to in Attachment 27 - in relation to the aforementioned contracts no. 2004/1089, 2005/1163 and 2004/1115 and the related brokerage invoices issued by Top Oil - reports, in the form of manuscript notes (as mentioned, added after printing the file referred to in Attachment 26) **the share of the taxable amount indicated in the same invoices, which is about half of the total amount, intended for "Dental?" and "Bol'.**

It is possible to summarize, again in this case, the relations between Vasfi Hormoz and JVST in light of the aforementioned documents and invoices (relating to contract no. 2004/1089) shown by the joint venture itself:

| *Data from files processed by the Vasfi* | | |
|---|---|---|
| Contract number | Contract Amount | VASFI COMMISSION (4%)[115] |
| 2004/1089 amnd. 2 | $37,470,763.00 | $1,223,830.52 |

| *invoices issued by TOP OIL to JVST shown by the party* | |
|---|---|
| date | amount |
| Oct-29-2007 | $ 250,000.00 |
| Mar-13-2008 | $275,000.00 |
| May-27-2008 | $ 400,000.00 |
| Oct-01-2008 | $298,830.00 |
| **Total.** | **$1,223,830.00** |

[115] This is the percentage indicated in the contracts, which was actually applied.

| **"BRIBE"**<br>*Inferred from Vasfi notes* | |
|---|---|
| **AMOUNT** | **RECIPIENT** |
| **$750,000.00** | **Paolo Dentali** |

---000000000---

| *Data from files processed by the Vasfi* | | |
|---|---|---|
| Contract number | Contract Amount | VASFI PROVIDER (4%) |
| 2004/1089 amnd. 3-4 | $73,315,555.00 | $2,932,622.20 |

| payments | *invoices issued by TOP OIL to JVST shown by the party* | |
|---|---|---|
| | date | amount |
| $1,350,000.00 | Feb-01-2008 | $ 500,000.00 |
| | May-02-2008 | $ 250,000.00 |
| | Jul-01-2008 | $ 300,000.00 |
| | Nov-03-2008 | $ 300,000.00 |
| $750,000.00 | Jun-01-2009 | $ 250,000.00 |
| | Sep-01-2009 | $ 250,000.00 |
| | Nov-02-2009 | $ 250,000.00 |
| $832,622.00 | Dec-21-09 | $ 833,000.00 |
| | **Total.** | **2,932,622.00** |

| **"BRIBE"**<br>*Inferred from Vasfi notes* | |
|---|---|
| **AMOUNT** | **RECIPIENT** |
| **$1,400,000.00** | **Bolat Nazarov** |

**It should be noted that, based on the documentation acquired, it was actually possible to "reconstruct" the payments indicated in the documents called "ACCOUNTS" and "Bolat accounts" with the invoices, relating to the recalled amendments issued by Top Oil Ltd itself to JV Skema-Tozzi, and how these payments correspond to the amount indicated on the same sheet as a percentage totally due to the Vasfi.**

It should also be noted that the amounts indicated as values of the various *amendments* actually coincide with what is reported on the official Eni documents delivered following a request sent by fax, on 07/17/2012, to ENI S.p.A. by the Subst. Prof. Dr. Fabio De Pasquale (**Att. 171-173**).

In addition, it should be noted that, with regard to Amendment 2 under contract 2004/1098, the wording *"1,498,830.52 275,000 = USD 1,223,830.52"* coincides with what is reported on another typed sheet (**Att. 174**) - found in the folder "JVST 2004/1089 2009-10-11", seized at the headquarters of Tecron S.r.l. in which it reads "275,000 delta subtracted from 4% due to the old contract closures".

The circumstance is effectively reflected in the aforementioned contract between JVST and Groupe Cifal S. A. (entered into on 08/04/2005 and closed on 08/01/2008).

- **Relationships with companies attributable to Guidotti**

Please refer to 2.B.(1) regarding the previous relationships between Techno- Skills, JVST and the individual companies constituting the consortium; and also, it is considered very important to report here the content of the email of 09/29/2009, concerning *"KMG Company Management and Board of Directors",* already mentioned on page 31 of this Notice, sent by the Guidotti to the Cerveglieri brothers, **illuminating the real reasons underlying the contracts entered into by JVST with the consulting companies of the same Guidotti:**

*"" Dear Mario and Davide, as agreed during our last meeting, please find attached the structure of the new Board of Directors and company management of the KMG.*
However**, I list the positions of the various characters <u>of our interest</u>** and the connections between them and the power system.



[signature]

· *Timur A. Kulibayev (T.K.)*****: head of Samruk, a holding company that controls all state-owned subsidiaries, including KMG. He is the son-in-law of the President and he* ***holds the power of Kazakhstan's ENERGY industry***

· *Kenzhebek Ibrashev****: CEO of KMG. He is a man of T. K. And former manager AGIP KCO, well known to us.* ***Poor power over our things.***

· *Askar Balzhanov****: recently named CEO of KMG Exploration&Production division. Man of T.K. and good charisma. All new Upstream Oil&Gas projects, including Kashagan Phase II and Karagachanak Phase III, will be managed by its division.* ***It's the man we need to visit and who will*** *introduce us to* ***the people we need to talk to.***

· *Maksat Idenov***: until a few months ago, he was KMG's head and now relegated to the position of Director of International Relations.*

· *Bolat Nazarov*** referred to as "il Macchiato" ["the Stained"]: former project manager of Karachaganak and Kashagan, has been appointed President of KazTranGaz, a natural gas transportation company and subsidiary of KMG.*

· *Begjan Kulibayev***: he is the KMG manager for the Kashagan - Experimental Program project. Related to Macchiato, but he is also one who "runs alone." However, he is part of the group of faithful to T.K.*

· *Murat Zhurebekov** "the long": he is the grandson of the Mac Macus and* ***his exactor****. He has a support role for Begjan Kulibayev for the Kashagan project. Little or no power, but* ***the system*** *(especially the Stain)* ***uses it to talk to contractors.***

*These are some of the most important figures we have, have and will deal with. However,* ***there will be others involved in future projects and we will try to meet*** *on our trip to Kazakhstan"".*

These hires demonstrate, once again, how **Guidotti's concerns addressed the possibility of influencing the awarding of contracts in the oil and gas Kazakh sector and not the supply of market studies or similar as commissioned in the contracts exhibited by joint venture Skema-Tozzi.**



[signature]

Furthermore, with regard to Groupe Cifal S.A., confirming the fact that it was actually managed by Guidotti - at least for the "competency" part of the Kazakh territory - the content of an email (**Att. 175**) is reported[116], sent, on 06/30/2006, by said Ricci (valdo@aldaservice.com) to this Fidora (romano.fidora@enel.it) in which we read the following:

*"" Romano,*
*As per the telephone communication,* ***you will be contacted by the CIFAL representative in Italy to clarify the project in KZ. Mr GUIDOTTI*** *is a former (..) NP Manager, and* ***currently operates in KZ with a Local entity; CAIH POWER, of which CIFAL is a Shareholder (...) "".***

In addition, during the search at the office in use at Mario Cerveglieri, among other things, the printout of 13 draft letters was found within the folder named ""09/02/2007 JV SKTOZZI/TECNO SKILLS"", accompanied by a letter concerning *"Hypothesis of exchange of documentation between JV and the Consultant Kazakh who took place before formalizing the Consulting Contract""*", relating to the aforementioned tender no. 1089-2004 (**Att. 176**).

Particularly relevant, with regard to this singular correspondence, is the fact that the letter of "opening" of the paper shows a sequence of 11 points **aimed at justifying the consulting relationship between the two companies.**

**This correspondence reveals at least two abnormal circumstances:**

- firstly, the Italian joint venture suggests to the counterparty the documentation to be produced, also specifying the date;

- secondly, it is likely to assume that the date of composition of the cover letter and, consequently, of the entire paper, is that of 18 January 2006 - as reported in the wording at the top of the same page "*Literature between JV and Kazakh Consultants 18012006"* in contrast with all other "proposed" dates in the subsequent letters, relating to a time period extending from October 26 to December 27, 2004.

These details suggest that the drafts have been prepared in order **to create the official correspondence between JVST and Techno Skills regarding the consulting contract between the two companies**.

[116] Extracted from the forensic copy of the computer material acquired during the aforementioned search operations of 10/27/2010

In fact, **four of the draft letter "expected" were actually produced:** specifically, there is a total correspondence between the already described "preparative letters", dated, respectively, 11/03/2004, 12/10/2004, 12/14/2004 and 12/27/2004, shown by JVST (see Attachment 161), and the related drafts referred to in the paper in question.

- **Elements of witness statements**

**As** proof of the non-existence of the consultations that Vasfi would have provided, please refer to pages 33-34 of this Communication, where the testimony, in this sense, brought by the accountant of the Cerveglieri, Morri Stefano, and the former employee of the Tozzi Cosimo Pirchio group, have already been summarized.

Furthermore, the same Chairman of JVST Cerveglieri Mario, interrogated by the Judicial Authority on 07/17/2012, in the statements below, reinforces the thesis of the real inconsistency of the works of both Guidotti and Vasfi:

*"During one of my meetings with the Whites*[117]***, I was offered the name of Cifal for marketing activities. Bianchi explained to me that it was appropriate for us to establish a relationship with this company because it was a very important company in countries from the CIS area.***
*Bianchi told me that they would follow our things, I mean they would help our business in Kazakhstan. During one of our meetings at Crown Plaza in Milan, if I don't remember badly, I believe in 2005, Bianchi expressed this need to equip me with a marketing service worth 5% of the order. This was unexpected to me because* ***during the tender stage this need had never been discussed.***
*I also went to Paris to see the property where Cifal is based from outside. (...)*
*I would like to point out that I was bothered to pay Cifal because* ***I suspected that there could be returns of [money] from Cifal in favor of Bianchi,*** *but I thought there was nothing else to do.*
*As Bianchi told me,* ***Cifal helped JV's commercial organization Skema Tozzi have its doors open. I mean the presence in the Kazakh territory and the local contacts with the partners of the Kashagan consortium.***

[117] General Director of Tozzi Sud S.p.A., already identified in note 61.



[signature]

*At some point, Bianchi and his assistant Capone[118] **told me that it was necessary to switch to another organization,** I mean to enter into a consulting contract with a different company, **the Techno Skills of Guidotti**. I met Guidotti who did not make a good impression to me both as a person and as an organization, and it **seemed strange to me that he had the offices in the same building as those of Bianchi**.*
*Guidotti told me that he would help us with future job possibilities, **but without providing any further details.** (.....)*
*Bianchi told me that it was better to terminate the relationship with Guidotti because it was expensive and **that the same consultation could proceed with another company, attributable to the person of Vasfi Hormoz.** (...)*
*Guidotti got a lot rid of this decision. About two years later, I met him and he (...) told me that some of the money that JV had paid him, on the advice of Bianchi, had then had to give him back to Bianchi on an account that he mentioned to me and I think is that of the company Alverstone[119] (...).*
*With regard to the consulting relationship with the companies of Vasfi Hormoz, but already before in relation to the liquidation of Techno Skills's competences, I required Tozzi Mario to have the contracts curated in the drafting and execution by a study of professionals, identified by me in the Morri office in Milan, with offices in Piazza Duse. **This I claimed to have some control over the consultant's business**. (...)*
*I had direct relationships with Stefano Morri that I knew before. I told them that I was in a situation that I didn't like because **I thought there was something unclear behind these consultations** (...).*
***Morri claimed from Vasfi that he provided monthly reports of the activity carried out in favor of JV Skema-Tozzi by his companies.** (...) ".*

---

[118] CAPONE Nicola, born on [redacted] in Switzerland and residing in Ravenna, [redacted], at the time Commercial Director of Tozzi Sud S.p.A.
[119] ALVERSTONE INTERNATIONAL Inc., 701 Brazos, Austin 78701 Texas (USA). As confirmation of what was claimed by Cerveglieri, it is hereby stated that, among the electronic documentation found during the search at the premises of GM OIL & GAS S.r.l., an email (**Att. 177**) was found sent, on 07/14/2010, by Tramezzani to Guidotti concerning: "*As agreed*": **invoice no. TSL 05/01/2007 of 07/05/2006 issued by ALVERSTONE against TECHNO SKILLS for the provision of consulting and marketing services related to Project Oil & Gas Kazakhstan in favor of the Skema-Tozzi consortium**, for an amount equal to USD $200,000.00. Moreover, note that, **although Alverstone has its registered office in the USA, the current account of a Swiss bank is reported at the end of the invoice in question**.

**as *the hypothesis* of a crime envisaged and punished by Art. 2 of Legislative Decree no. 199 of March 10, 2000 74.**

- **TAX YEAR 2011**

The expenses relating to the invoices referred to in pages 45-47 of Attachment XXX for the 2008 tax year have merged:

- in the aforementioned sub-account of general practitioner "commercial advice and analysis" for an amount equal to €644,000.00;
- in the aforementioned sub-account of general "commissions" in the amount of $1,788,000.00.

With regard to the invoices referred to in Articles 43-44 of the aforementioned attachment, it is hereby noted that, given the documentation shown by the party, it was not possible to find the amount - equal, respectively, to $850,000.00 and €600,000.00 - in any subaccount of the general practitioner.
However, by reiterating what was described for the 2008 tax year with respect to the statements in the party's records, it can reasonably be believed that the total amount relating to such invoices also merged into the Statement of Income for the year in question.
Therefore, the costs referred to in Articles 43-47 of the aforementioned Attachment XXX have merged into the calculation of the operating profit for the relative year, equal to €1,999,156.00.
In conclusion, in light of the above, **JVST used invoices for non-existent transactions recorded in the mandatory accounting records in order to evade income taxes**, indicating in the annual tax return Form U60 for the year 2011 fictitious items amounting to $2,638,000.00 and €1,244,000.00**, as the hypothesis of a crime envisaged and punished by Art. 2 of Legislative Decree no. 199 of March 10, 2000 74.**



[signature]

**(6) BREDA ENERGIA S.p.A.**

**(a) Analysis of the documentation shown**

The company in question, in the period 2007 - 2011, accounted[120] for invoices issued by the consulting companies directly attributable to Vasfi for a total of €1,890,981.52, as specified in **Attachment 182[121]**

In addition, Breda Energia S.p.A. has shown the following documentation:

- *contract [122](**Att. 183**) between Breda Energia S.p.A. and Top Oil UK, dated 03/01/2006, based on which the Vasfi company would have provided for ""promotion and marketing activities set forth herein for the Project/s in the territory of Kazakhstan (...) as specified in (...) attachment B (...)" [trans: promotion and marketing activities described in this document for projects in the territory of Kazakhstan specified in Attachment B].*
  *The activities, detailed in Attachment A1[123] to this contract, consist essentially of: a) evaluation of competition; b) control of business opportunities; c) advice on the best approach to the market; d) informing the customer about the pre-qualification procedures and methods of bidding; and) subsequent actions for all commercial aspects.*

  The consultant's percentage ranges from 2% to 6% depending on the project involved, as specified in Attachments B to H.

- Private writing (**Att. 184**) between Tecron S.r.l. and Breda Energia S.p.A., dated 11/19/2007, with which Tecron undertakes to provide a market study consisting of an *"Analysis of the Oil & Gas sector in Kazakhstan, with particular reference to development projects in the Kashagan and Karachaganak areas, (...), including the identification of potential customers, projects and related potentials". In consideration of this service, Breda Energia pays the consultant "the following fees: a) Euro 50,000.00 (...) including all expenses".*

[120] *Based on the documentation produced by the company against the notification of the Request for delivery decree for documents and documents indicated in the recitals and analytically described in the minutes of operations carried out drafted by the Sesto San Giovanni Group, respectively, on 10/23/2012 and 10/25/2012*
[121]. Including summary statement, 32 invoices and respective payments (divided, the latter, by beneficiary company).
[122] Including the subsequent Attachments C, D, D-bis, E, F, G and H, and the letter, dated 03/18/2009, sent by Top Oil UK to Breda, with which a percentage of the rights owed to the consultant set forth in Attachment D-bis was modified
[123].*""a) Competition appraisal and competitive analysis vis-à-vis with the Manufacturer Market position; b) Scrutiny of business opportunities; c) Advise on best market approach towards Client organization; d) Providing information on Client prequalification procedure, on the modalities of sending offers, on new Tender related to extension of on-going Project/s e) Contract Follow-up covering the whole commercial aspects from obtaining specifications from the Client up to the final settlement of invoices corresponding to product sold for the contract".*



[signature]

- Letter (**Att. 185**), dated 02/05/2010, with which Top Oil communicates the change of its headquarters, from the English one to the one in Cyprus, in detail indicated above.

**(b) Additional elements from investigations**

As mentioned on pages 30-31 of this Communication, **Breda Energia S.p.A. is one of the companies explicitly reported by Vasfi as a party to the unlawful transaction with the aforementioned Eni and KazMunaygaz managers.**

Recalling what was incurred by the Vasfi in point 2.B.(2), it should be noted that the document referred to in Attachment 27 in relation to the aforementioned contracts no. 2004/1089, 2005/1163 and 2004/1115 and the related brokerage invoices issued by Top Oil - reports, in the form of manuscript notes, added, as mentioned, after printing the file referred to in Attachment 26, **the share of the taxable amount indicated in the same invoices, which is about half of the total amount, intended for "Dentali" and "Bol".**

It is thus possible to outline the relations between Vasfi Hormoz and Breda Energia S.p.A. in light of the aforementioned documents and invoices (relating to contract no. 2004/1115) shown following the notification of the decree of "*Delivery of acts and documents*" on 10/23/2012.

| *Data derived from files processed by the Vasfi* | | |
|---|---|---|
| "installment" | amount | Vasfi commission (6%) |
| 1st | € 2,576,158.12 | € 154,569.49 |
| 2nd | € 3,372,766.61 | € 202,366.00 |
| 3rd-1st installments | € 1,200,000.00 | € 72,000.00 |
| 3rd-2nd installments | € 1,200,000.00 | € 72,000.00 |
| **Total** | **€ 8,348,924.73** | **€ 500,935.49** |





[signature]

- **income taxes**, indicating in the annual tax return Form U60 for the year 2008 fictitious liabilities amounting to €514,568.94;

- **value added tax,** indicating in the annual declaration VAT Form for the year 2008, non-deductible VAT amounting to €10,000.00 (**AII. 189**),

**as well as the hypothesis of a crime envisaged and punished by Art. 2 of Legislative Decree no. 199 of March 10, 2000 74.**

- **TAX YEAR 2009**

The expenses relating to the invoices referred to in pages 15-28 of Attachment 182 for the 2009 tax year have merged:

- in the aforementioned sub-account of general practitioner 831000 "Commissions" for an amount equal to €877,859.81;
- in the sub-account of general practitioner 844731 "Travel expenses with third-party carriers" (**Att. 190**) for an amount equal to €3,057.08;
- in the sub-account of General Ledger 844831 "[Sp.] board/within third-party limits" (**Att. 191**) for an amount equal to €732.00,

and, therefore, merged into the calculation of the operating profit for the relative year equal to €2,817,763.00.
In conclusion, in light of the above, **Breda Energia S.p.A. used invoices for non-existent transactions recorded in the mandatory accounting records in order to evade income taxes,** indicating in the annual tax return Form U60 for the year 2009 fictitious items amounting to €881,631.01**, the hypothesis of a crime envisaged and punished by Art. 2 of Legislative Decree no. 199 of March 10, 2000 74.**

- **TAX YEAR 2010**

The expenses relating to the invoices referred to in Articles 29-30 of Attachment 182 for the 2010 tax year have fully merged into the aforementioned sub-account of General Ledger 831000 "Commissions" and, therefore, have merged into the calculation of the operating profit for the relative year equal to €843,447.00.
In conclusion, in light of **the above, Breda Energia S.p.A. used invoices for non-existent transactions recorded in the mandatory accounting records in order to evade income taxes, indicating in the annual tax return** Form U60 for the year 2010 fictitious items



[signature]

amounting to €129,072.08**, the hypothesis of a crime envisaged and punished by Art. 2 of Legislative Decree no. 199 of March 10, 2000 74.**

- **TAX YEAR 2011**

The expenses relating to the invoices referred to in Articles 31-32 of Attachment 182 for the 2011 tax year have fully merged into the aforementioned sub-account of General Ledger 831000 "Commissions" and, therefore, have merged into the calculation of the operating profit for the relative year equal to €984,572.00.
In conclusion, in light of the above, **Breda Energia S.p.A. used invoices for non-existent transactions recorded in the mandatory accounting records in order to evade income taxes,** indicating in the annual tax return Form U60 for the year 2011 fictitious items amounting to €308,444.89**, the hypothesis of a crime envisaged and punished by Art. 2 of Legislative Decree no. 199 of March 10, 2000 74.**

**(7) TOZZI SOUTH S.p.A.**

**(a) Analysis of the documentation shown**

Tozzi Sud S.p.A. appears to have accounted for[124] 7 invoices issued by Top Oil Ltd, as summarized below:

| NOTES | NUMBER | DATE | AMOUNT in $ (indicated on invoice) | AMOUNT in € (indicated in the accounting records) | | **ATTACHMENT** (invoice with related payment) |
|---|---|---|---|---|---|---|
| | | | | TAXABLE | VAT at 20% | |
| | | 07/06/2007 | 20,000.00 | 14,710.00 | == | **192**[125] |
| | | 11/05/2008 | 90,228.13 | 70,107.33 | 14,021.47 | **193** |
| | | 03/09/2009 | 36,885.00 | 29,356.14 | 5,871.23 | **194** |
| | | 10/08/2009 | 91,028.93 | 61,658.15 | 12,331.63 | **195** |
| | | 03/09/2010 | 33,238.65 | 24,517.73 | 4,903.55 | **196** |
| Credit Note[126] | | 03/31/2010 | 33,238.68 | - 24,517.73 | - 4,903.55 | **197** |

[124] Based on the documentation produced by the company against the notification of the *Request for delivery decree for documents and documents* indicated in the same recitals and analytically described in the minutes of operations carried out drafted, respectively, on 10/23/2012 and 10/29/2012, by the Ravenna Tax Police Unit and transmitted with note prot. no. 435550 of 11/02/2012.
[125] Total taxable amount of € 14,511.00 as an equivalent value of the amount in dollars expressed in the invoice and € 198.53 as "interchange differences" (**Att. 192A**): the entire cost, as analytically described in this Communication, then merged into the sub-account "costs for technical consulting facilities".
[126] The taxable expense indicated in the invoice referred to in Attachment 196 for the 2010 tax year has been neutralized by recording the credit note in question and, therefore, has not flowed into the operating profit of the



[signature]

| | | | | | | |
|---|---|---|---|---|---|---|
| | 2011/05/008 | 05/24/2011 | 273,282.54 | 193,968.73 | 40,733.43 | **198** |
| | 2011/12/004 | 12/20/2011 | 63,302.75 | 48,418.81 | 10,167.95 | **199** |
| | | | *Total* | *418,219.16* | *77,254.48* | |

- All the invoices listed above report as a reason the wording ""<<*Agreement between Tozzi Sud and Top Oil>> Promotion, marketing and supporting to obtain KPO Contract"* relating, from time to time, to 5 different construction contracts in the territory of the Republic of Kazakhstan entered into between Tozzi Sud S.p.A. and KPO - Karachaganak Petroleum Operating B.V.[127], specifically:

- ITT 06/*785;*
- *Extension of ITT 07/869;*
- *AD/D/06/0866*
- *Extension of AP/D/06/1823;*
- *Extension of AP*/Y/09/2355.

The consulting contract in question, entered into between Top Oil and the company in question, dated 05/24/2007, also shown by the party (**Att. 200**), provides that "(...) *the Consultant (...) agrees to provide the promotion and marketing activities set forth herein for the Project/s in the territory of Kazakhstan (...). The Consultant agrees to promote (...) the salt of the Product and Services for the Project/s (...). Consultant shall the Company in the whole commercial aspects from obtaining specifications from the client up the final settlement of invoices corresponding to product sold for the above mentioned Contract* (...)" [trad.: the consultant undertakes to provide for the promotion and marketing activities established in this contract for the project in the territory of Kazahkstan. The consultant is committed to promoting the sale of the product and services for the project. The consultant assists the company in all commercial aspects, from obtaining technical characteristics from the Customer until final settlement of invoices related to the sale of the product for the above-mentioned contract].

relative year. For the same reason, the aforementioned Attachment 196 consists only of the invoice, being without related payment

[127] Consortium initially composed of 4 multinational companies - the English BG Group, the Italian Eni S.p.A. (with 32.5% of the shares per head), the US Chevron (with 20%) and the Russian Lukoil (with 15%) - to which, since 06/28/2012, the Kazakh State Company KazMunaiGaz has been added.

TRANSPERFECT

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the following documents are, to the best of my knowledge and belief, true and accurate translations from Italian into English:

- The Plea Bargaining Judgment No. 119/17 of the Court of Monza dated February 10, 2017.
- The Crime Report by the Financial Police of Milan in relation to the criminal investigation No. 25303/10 dated May 30, 2014.

________________________
Jacqueline Yorke

Sworn to before me this
March 24, 2025

________________________
Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 2027

________________________
Stamp, Notary Public

| | | ALL.TI |
|---|---|---|
| (10) TECNIMONT KT S.p.A. | *pag. 122* | 248 -274 |
| (11) SINI S.p.A. | *pag. 134* | 275 - 313 |
| (12) TECNIMONT S.p.A. | *pag. 146* | 314 - 326 |
| D. L'EMISSIONE DI FATTURE PER OPERAZIONI INESISTENTI | *pag. 151* | 327 |
| (1) Società riconducibili al Guidotti | *pag. 151* | |
| (2) Società riconducibili al Borghi | *pag. 151* | 328 |
| (3) Società riconducibili al Vasfi | *pag. 152* | |
| 3. CONSIDERAZIONI IN MERITO ALLA SUSSISTENZA DEI REATI DI CUI ALL'ART. 2 E 8 DEL D.LGT. 74/2000 | *pag. 153* | |

## 1. PREMESSA

Il procedimento penale 25303/10 è originato dalle dichiarazioni rese da REALI Mario[6], già rappresentante ENI S.p.A. in Russia, sull'assegnazione di appalti da parte di società del gruppo Eni, concernenti le attività di sfruttamento di due giacimenti petroliferi siti in Kazakhstan nelle località di Karachaganak[7] e di Kashagan[8].

Secondo tali dichiarazioni, i fornitori avrebbero pagato tangenti pari al 10% dell'importo delle gare vinte. Le somme in questione sarebbero state poi "girate" a beneficio di esponenti del locale governo kazako ed a funzionari Eni.

Da uno di questi ultimi, FERLENGHI Ernesto[9], il Reali riferiva di aver appreso, alla fine del 2004, dell'esistenza di una tangente dell'importo pari a Euro 1.500.000,00 destinata allo stesso Ferlenghi.

Quest'ultimo avrebbe ricevuto la somma in questione per il tramite dell'intermediario GUIDOTTI Massimo.

Il Reali apprendeva, inoltre, dallo stesso Ferlenghi che le movimentazioni di denaro, originate dalle tangenti di cui sopra, sarebbero state "gestite" attraverso una società israeliana, ovvero riconducibile a soggetti israeliani[10]. Per le citate movimentazioni di denaro il 'soggetto' israeliano avrebbe utilizzato conti correnti bancari di Dubai o Abu Dhabi con la Svizzera come destinazione finale di tali somme.

---

[6] Nato a Foiano Chiana (AR) il [redacted]. E' stato dipendente Eni dal 1981 al 2002, quindi, dal 30.06.2002 al 31.2005, ne è stato collaboratore esterno: ha sempre lavorato presso gli uffici Eni a Mosca.

[7] Giacimento situato nel nord-ovest del Kazakhstan, uno dei più grandi al mondo con i suoi oltre 280 km quadrati, con un potenziale stimato di 1.200 milioni di tonnellate di petrolio e 1,35 trilioni di metri cubi di gas. Oggi, il consorzio firmatario del contratto di sfruttamento del sito, denominato KPO - Karachaganak Petroleum Operating, è formato da Eni S.p.A., BG GROUP (prime firmatarie del contratto nal 1992), Chevron, Lukoil (aggiuntesi nel 1997) e l'azienda di Stato kazakha KazMunayGas (subentrata nel 2011).

[8] Giacimento petrolifero *offshore* localizzato nella parte nord-orientale del Mar Caspio, al largo delle coste del Kazakhstan, 80 km a sud della città di Atyrau: si stima che abbia riserve commerciali tra i 9 e i 16 miliardi di barili di petrolio. La AGIP Caspian Sea B.V. (società controllata da Eni International B.V., direttamente posseduta da Eni S.p.A.) ha sottoscritto, in data 18.11.1997, il *Production Sharing Agreement* per le attività di sfruttamento del sito di Kashagan, stipulato tra la Repubblica del Kazakhstan e 7 compagnie petrolifere internazionali, fra cui la stessa Eni S.p.A. e KazMunayTeniz, controllata dalla KazMunayGas, delegata, a sua volta, dal governo kazako ad agire quale suo rappresentante. AGIP Caspian Sea B.V. ha altresì, quale rappresentante di tutti i Contractor nei confronti della Repubblica del Kazakhstan, sottoscritto il *Joint Operating Agreement*, che ha definito attribuzioni e responsabilità per lo svolgimento delle operazioni. AGIP Caspian Sea B.V. opera sul territorio attraverso la sua controllata AGIP KCO.

[9] Nato a Roma il [redacted] e domiciliato in Rocca Priora (RM), [redacted], iscritto all'AIRE sin dal 2005, con domicilio estero in Mosca (Russia), Konsomolsky Prospekt 32 Kv. 92 32. Fu rappresentante Eni in Kazakhstan dal 2002 al 2005, quando venne inviato presso gli uffici di Mosca che erano stati del Reali, dove è ancora oggi capo dell'Ufficio per le Relazioni Internazionali di Eni. **Anche dopo il suo trasferimento a Mosca, a detta del Reali, ""*di fatto* (...) *Ferlenghi sta curando tutt'ora i rapporti con il Kazakhstan*""**.

[10] In proposito, il Reali afferma testualmente *"... potrebbe anche essere stata registrata altrove ed essere semplicemente di proprietà di israeliani"*.

Le indagini scaturite dalle dichiarazioni del Reali – effettuate da questo Reparto nell'ambito della delega emessa, in data 22.09.2010, dal Sost. Proc. della Procura della Repubblica del Tribunale di Milano dott. Fabio De Pasquale, e delle successive deleghe impartite dalla stessa A. G. – come descritto nell'**allegato 1**, che sintetizza cronologicamente le attività svolte, hanno portato alla luce una fitta rete di illeciti contatti tra alcuni **dirigenti di società committenti responsabili dell'aggiudicazione di appalti nel settore dell'*oil and gas*** in determinate aree geografiche (Kazakhstan, Kuwait ed Emirati Arabi Uniti) e **dirigenti di diverse società interessate a tali gare d'appalto**, mediate da **gruppi di intermediari**, che si sono avvalsi, a loro volta, di società italiane, nonché di società formalmente con sede all'estero[11] ma, di fatto, gestite dal territorio italiano.

Pertanto, questo Reparto ha provveduto all'esame della seguente documentazione:

- risultanze delle indagini tecniche[12] svolte nei periodi dal 20.10.2010 al 10.07.2011 e dal 20.03.2012 al 03.07.2012;

- materiale, sia cartaceo che in supporto informatico, sequestrato durante le operazioni di perquisizione effettuate, in data 27.10.2010, presso la sede della società di consulenza commerciale ed industriale GM OIL AND GAS S.r.l., nonché presso l'abitazione dell'Amministratore Unico di quest'ultima, il già citato GUIDOTTI Massimo;

- materiale, sia cartaceo che in supporto informatico, sequestrato durante le operazioni di perquisizione effettuate, in data 21.06.2011, presso la sede della società di consulenza commerciale ed industriale BEMBERG S.r.l.[13], nonché presso numerosi altri obiettivi, sia in Italia che in territorio estero, come specificato nel corso della presente Comunicazione;

- materiale, sia cartaceo che in supporto informatico, sequestrato durante le operazioni di perquisizione effettuate, in data 14.06.2012, presso la sede della società di consulenza commerciale ed industriale TECRON S.r.l., nonché presso l'abitazione dell'allora Amministratore Unico di quest'ultima VASFI Hormoz;

---

[11] In questo contesto emerge la figura di alcuni fiduciari che hanno fornito assistenza ai mediatori allo scopo di approntare il veicolo societario che sarebbe stato utilizzato per l'emissione delle fatture concernenti le inesistenti prestazioni di consulenza.

[12] Intercettazioni telefoniche e di posta elettronica di cui ai seguenti nn. RIT: 3827/10, 3983/10, 4008/10, 4527/10, 326/11, 705/11, 966/11 e 1774/11.

[13] Con sede legale in Belgioioso (PV), via U. Foscolo n. 9 e sede operativa in S. Donato Milanese (MI), via Triulziana n. 14 – [redacted].

- materiale esibito dalle società coinvolte nelle indagini a fronte del decreto di *Richiesta di consegna atti e documenti*, a firma del Sost. Proc. De Pasquale, datato 12.10.2012;

- risultanze delle dichiarazioni testimoniali rese, di volta in volta, da alcuni dei soggetti coinvolti.

La disamina della suddetta documentazione ha rivelato una serie di azioni volta a dare un'apparenza formalmente lecita alle transazioni finanziarie poste in essere, in realtà, per costituire fondi occulti da utilizzare, verosimilmente, a parere di questa P.g., per azioni corruttive nei confronti di pubblici ufficiali stranieri ovvero nei confronti di manager infedeli delle società committenti. In alcune circostanze, sono stati raccolti elementi tali da supporre un retropagamento a favore di manager infedeli delle stesse società operative.
Le condotte in questione, oltre alla predisposizione di contratti di consulenza variamente denominati, prevedono l'emissione, da parte di società di comodo riconducibili agli intermediari, di fatture, aventi ad oggetto le medesime attività descritte nei contratti, che, sulla base degli elementi raccolti e di seguito esposti, devono ritenersi inesistenti. Infatti, le attività tecniche e l'analisi dei documenti acquisiti in sede di perquisizione, hanno permesso di acclarare, al di là di ogni dubbio, che quella posta in essere dagli intermediari di volta in volta individuati non può ritenersi reale attività di consulenza, bensì illecita intermediazione avente come unico scopo – attraverso la corresponsione di somme di denaro ai manager della società appaltante e/o a pubblici ufficiali stranieri – di facilitare l'assegnazione degli appalti in relazione ai quali è stata garantita l'illecita intermediazione.

Le fatture emesse da queste entità, farebbero, di conseguenza, riferimento ad una prestazione di servizio di fatto mai posta in essere.

Pertanto, l'annotazione in contabilità di tali documenti da parte delle società italiane intermediate, le cui risultanze sono confluite nelle relative Dichiarazioni Annuali concernenti le imposte dirette ed indirette, integra, a parere di questa p.g., come meglio argomentato e più ampiamente circostanziato nel prosieguo del presente lavoro (vgs. paragrafi *2.C* e *2.D*):

- in capo ai rappresentanti legali firmatari delle rispettive Dichiarazioni Annuali delle diverse società di costruzione coinvolte, la fattispecie di "dichiarazione fraudolenta mediante uso di fatture o di altri documenti per operazioni inesistenti" disciplinata dall'art. 2 del D.Lgs. 74/2000;

- in capo agli amministratori delle diverse società di consulenza coinvolte, la fattispecie di "emissione di fatture o di altri documenti per operazioni inesistenti" disciplinata dall'art. 8 del D.Lgs. 74/2000,

aggravate dalla circostanza della "transnazionalità" di cui all'art. 4 della L. 146/2006.

Le attività di indagine, come anticipato nel precedete allegato 1, hanno permesso di individuare 3 gruppi di intermediari riconducibili:

- al citato Guidotti Massimo;
- a BORGHI Stefano e PONDINI Enrico[14] (peraltro, almeno nel caso descritto meglio successivamente della Bonatti S.p.A., in concorso con lo stesso Guidotti);
- al citato Vasfi Hormoz.

Le illecite consulenze sono state fatturate sostanzialmente in due ambiti "di intervento":

- il primo ha come riferimento il territorio kazako e riguarda l'asegnazione di progetti relativi allo svliluppo dei giacimenti petroliferi di Karachaganak e Kashagan, come schematizzato nel prospetto di cui all'**allegato 2**;
- il secondo riguarda l'assegnazione di appalti di costruzione/sviluppo di strutture serventi allo sviluppo di progetti nel settore dell'*oil and gas*, come schematizzato nel prospetto di cui all'**allegato 3**.

## 2. ELEMENTI EMERSI NEL CORSO DELLE INDAGINI

Verranno, di seguito, dettagliatamente evidenziate le risultanze probatorie sulle quali vengono fondate le censure concernenti la frode fiscale posta in essere dai mediatori e dalle società operative utilizzatrici delle fatture mendaci emesse dai primi. Si ritiene più agevole procedere con la descrizione dei fatti così come di seguito ricostruiti, focalizzando l'attenzione sull'intermediario che, di volta in volta, si è frapposto tra l'entità committente e la società operativa. Come descritto in premessa la ricostruzione dell'attività dei mediatori ha ricompreso un arco temporale di diversi anni.

### A. I GRUPPI DI SODALI

In primo luogo appare necessario evidenziare, per ciascun intermediario, le società di comodo costituite, il fiduciario coinvolto nella gestione delle stesse, nonché i managers delle società appaltanti che, in accordo con l'intermediario ed in cambio di una remunerazione, si adoperavano per favorire l'assegnazione dell'appalto alla società operativa supportata dallo stesso intermediario. In relazione a quanto sopra è possibile distinguere come segue l'insieme dei soggetti a vario titolo coinvolti.

[14] Nato il [redacted] a Galeata (FC) ed ivi residente in [redacted]

(1) Soggetti ed entità riconducibili a Guidotti Massimo:

- Entità societarie utilizzate per le false fatturazioni: Tecknoskills GM Oil And Gas S.r.l.;

- TRAMEZZANI Nicola[15], associato della citata Talenture-Fiduciaria S. A., fiduciario, al quale veniva delegata la predisposizione degli atti meramente "amministrativi" (preparazione contratti; spedizione fatture, ecc.) della Techno Skills Ltd;

- DENTALI Paolo[16], *Contract Manager* di Eni UK Ltd di base a Londra;

(2) Soggetti ed entità riconducibili a Vasfi Hormoz:

- entità societarie utilizzate per le false fatturazioni: Tecron Srl e Top Oil Ltd;

- il già identificato Dentali Paolo;

- NAZAROV Bolat, già Presidente dell'azienda di stato kazakha KazMunayGas[17], responsabile, come accennato in premessa, insieme ad AGIP KCO[18], dello sviluppo dei progetti Kashagan e Karachaganak;

- ZHUREBEKOV Murat, dirigente di KazMunayGas e uno dei responsabili del Kashagan-Project.

[15] Nato il [redacted] in Svizzera.
[16] Nato il [redacted] a Monticelli d'Ongina (PC) e domiciliato in Pavia, [redacted]
[17] Con sede ad Astana (Kazakhstan), 19, Kabanbay Batyr Avenue.
[18] Società controllata da Agip Caspian Sea B.V., a sua volta controllata da Eni International B.V., direttamente posseduta dall'Eni S.p.A..

(3) Soggetti ed entità riconducibili a Borghi Stefano:

- entità societarie utilizzate per le false fatturazioni: DANEHURST SERVICES LIMITED, CONTROL CONTRACTING COMPANY e PERCY IN.CO.

- PONDINI Enrico[19], *General Manager* di Bemberg;

- CANAVESI Mario[20], Direttore Commerciale di Bemberg;

- Mario MASCITTI[21], *Area Manager* della FLEX ENGINEERING Ltd[22];

- SCARPA Nunzio[23], collaboratore del Borghi in seno a diverse società di consulenza a quest'ultimo riconducibili;

- TALLERI Matteo[24], associato dello studio di consulenza fiscale ed aziendale Talenture-Fiduciaria S.A.[25], al quale veniva delegata la predisposizione degli atti meramente "amministrativi" della Danehurst Ltd;

- DAL MAGRO Fausto, Vicedirettore dello studio di consulenza fiscale, aziendale ed immobiliare Lambertini, Ernest & Partners S. A.[26], al quale veniva delegata la predisposizione degli atti meramente "amministrativi" della Flex Engineering Ltd;

- MOMBELLI Stefano, Direttore della società di consulenza e servizi fiscali e societari e relazioni internazionali Corfint S. A.[27], al quale veniva delegata la

---

[19] Già Amministratore Unico della Dobfar S.r.l., con sede legale in Belgioioso (PV) n. 9, società – anch'essa di proprietà del Borghi e della moglie di quest'ultimo, Barbara VIANELLI – cessata per incorporazione nella stessa Bemberg in data 05.08.2010. La carica di General Manager sarebbe quella ricoperta stando al sito ufficiale della società (www.bemberg.it_index.php_page=contatti).

[20] Nato il [redacted] a Legnano (MI) ed ivi residente in [redacted]: carica ricoperta secondo quanto riportato alla stessa pagina *online* indicata sopra.

[21] Nato il [redacted] in Venezuela e residente in Pessano con Bornago (MI), [redacted].

[22] Come riportato su un biglietto da visita rinvenuto, presso la sede della Bemberg S.r.l., durante le operazioni di perquisizione effettuate da questo Reparto in data 21.06.2011. La Flex Engineering Ltd, pur non avendo avuto alcun rapporto economico con le società di costruzione coinvolte nelle indagini, è risultata essere un altro veicolo societario società esterovestito facente capo al Borghi: la medesima ha sede dichiarata in Londra (Gran Bretagna), Jermyn Street 86 SW1Y 6AW, ma sede reale presso quella operativa della Bemberg S.r.l..

[23] Nato a Minervino Murge (BA) il [redacted], iscritto all'AIRE dal [redacted] Dalla documentazione acquisita all'indagine, risulta domiciliato a Lugano (Svizzera), [redacted] dalla stessa documentazione, risulta socio, insieme al Borghi, della citata Danehurst.

[24] Nato il [redacted] in Svizzera.

[25] Con sede a Lugano (Svizzera), [redacted]

[26] Con sede a Lugano (Svizzera), [redacted]

[27] Con sede a Lugano (Svizzera), [redacted]

predisposizione degli atti meramente "amministrativi" della CCC Ltd e della Percy In. Co;

- BRAGHI Diego[28], all'epoca *Procurement Manager* di Eni-Zubair S.p.A.[29], società responsabile del Zubair Field-Project[30] in Iraq;
- CAPANNA Nerio[31], Vice-President della Saipem S.p.A.[32], società, posseduta da Eni S.p.A., responsabile della gara Jurassic-Project[33] nel Kuwait;
- DI TATA Angelo[34], all'epoca responsabile dell'Ufficio Acquisti ed Approvvigionamenti della Saipem S.p.A.;
- Roberto BENIGNA,[35] - *Chief Operative Officer – Business Development*[36] della Kharafi National LLC, società kuwaitiana responsabile, insieme alla Saipem, del Jurassic-Project in Kuwait.

A fattor comune a tutti i gruppi sopra descritti, appaiono sintomatiche della consapevolezza da parte degli stessi soggetti indagati che il loro comportamento fosse del tutto illecito, le seguenti circostanze:

- la scelta di **indirizzi di posta elettronica non "istituzionali", allo scopo di celarne il reale utilizzatore**, come compendiato di seguito:
    - BRAGHI ➔ gaspadin@alice.it
    - DI TATA ➔ monterosa.4638@gmail.com
    - SCARPA ➔ contact@caterham.biz

[28] Nato il [redacted] a Piacenza ed ivi residente in via [redacted]
[29] Con sede legale in S. Donato Milanese (MI), via A. De Gasperi n. 1/B - P. I. [redacted], società del gruppo Eni.
[30] Giacimento situato nei pressi di Bassora, nel sud dell'Iraq, con un livello di produzione corrente al gennaio 2010 pari a circa 195 mila barili al giorno.
[31] Nato il [redacted] a Pesaro ed ivi residente in via [redacted]
[32] Con sede legale in S. Donato Milanese (MI), via Martiri di Cefalonia n. 6 e sede secondaria in Fano (PU), via Toniolo n. 1 - P.I. [redacted]. In una intercettazione telefonica del 13.12.2010, il Borghi definisce Capanna "*responsabile dell'ambiente a Fano*".
[33] Giacimento situato nel nord del Kuwait: secondo le previsioni, si dovrebbero produrre 150 mila barili al giorno.
[34] Nato il [redacted] a Monza e residente a Biassono (MB), via dell'Olmo n. 29.
[35] Nato il [redacted] a Rocca del Colle (BG), residente in Kuwait – [redacted] Safat e domiciliato in Italia a Curno (BG), [redacted]
[36] Cfr. sito ufficiale www.kharafinational.com/kn/contacts_us.html.

- GUIDOTTI ➔ tuschy@virgilio.it
- PESCI ➔interactivemm@libero.it
- DENTALI ➔ futuro.pv@libero.it
- CANAVESI ➔ mmaiorca@gmail.com
- ZHUREBEKOV ➔ - communication2004@hotmail.com;
  - communication2004@gmail.com;
- assistente di Zhurebekov (tale Eduardo) ➔ ihpdep555@yahoo.com

- l'utilizzo, da parte di alcuni di loro, di **schede telefoniche estere (nello specifico della Repubblica della Lituania per Guidotti e Dentali e degli Emirati Arabi Uniti per Braghi),** **nella convinzione che le conversazioni intercorenti fra le stesse non fossero in alcun modo monitorabili**.

## B. SINTESI GENERALE DEI FATTI

Prima di procedere con la descrizione delle condotte concernenti l'emissione e l'utilizzo delle fatture per operazioni inesistenti, si ritiene opportuno tratteggiare le figure degli intermediari attenzionati ricorrendo anche ad evidenze che non hanno una diretta incidenza sulle condotte relative ai reati fiscali ma che, comunque, consentono di fornire una adeguata informazione sulla reale attività svolta dai medesimi.

### (1) La figura di Guidotti Massimo

Come accennato in Premessa, il coinvolgimento del Guidotti trae origine dalle dichiarazioni rese davanti a questa P. G., in data 15.09.2006, dal già rappresentante ENI in Russia Reali Mario, relative a "*"delle anomalie a Karachaganak*"" dallo stesso riscontrate sull'assegnazione di appalti, da parte di società del gruppo ENI, per lo sfruttamento del giacimento petrolifero sito, appunto, nella regione di Karachaganak nella Repubblica del Kazakhstan.

In particolare, l'ex manager Eni affermava quanto segue: ""*il 17/11/2004* ***mi incontro con Ferlenghi*** ***e con un certo Guidotti Massimo*** *(...) a Mosca – albergo National – e* ***Ferlenghi in questa occasione mi dice che ha una coda di tangente da prendere, pari a 1.500.000,00 $*** *e mi chiede di aiutarlo a riciclarla (...). Parlo di coda, perché (...) è evidente che* ***ne aveva prese altre****. La cosa è andata avanti un po' fino alla primavera del 2005 (...).* ***La tangente è relativa a Karachaganak*** *e avviene così: ci sono società subfornitrici (...) che, per vincere la commessa,* ***con l'aiuto dei Kazakhi e degli uomini Eni, gonfiano l'offerta e poi restituiscono un "tot" agli uomini Eni ed ai Kazakhi*** *(...). I soldi vengono raccolti da una società in Israele, girati su banche del Golfo Persico (Abu Dabi in particolare) e rimandati in Europa e con le valigette in contanti alcune banche svizzere le mettono sui conti*"".

Di seguito vengono dettagliatamente compendiate le evidenze rinvenute all'esito della disamina della documentazione informatica e su supporto cartaceo acquisita all'indagine dalle quali si rileva come il Guidotti abbia drenato somme di denaro, fra gli altri, da soggetti a vario titolo coinvolti nel progetti di sviluppo del campo petrolifero kazako denominato "Kashagan".

Si premette che la prima entità economica a beneficiare dell'illecita intermediazione del Guidotti in Kazakhstan sarebbe stato il gruppo BATEMAN LITWIN[37], che ricevette il primo contratto (per una validità amministrativa di circa $ 194 milioni) da Agip KCO nel marzo 2004[38].

Dall'esame dei documenti in formato elettronico sottoposti a sequestro in data 27 ottobre 2010 presso l'abitazione del GUIDOTTI, è emerso che il primo veicolo societario utilizzato dal Guidotti per veicolare il pagamento delle illecite intermediazioni fornite alle società del Gruppo Bateman, si identifica nella società MEGA ELECTRA S.A. SIGEC – LYBIA[39], che appare per la prima volta

[37] Con sede in Amsterdam-Zuidoost (Olanda), Haaksbergweg 59, Bullewjik, 1101 BR. Si evidenzia che nel corso delle attività rogatoriali espletate, fra l'altro, nel territorio israeliano in data 21/06/2011, sono state perquisite le sedi di varie società del Gruppo Bateman-Litwin. In tale contesto, l'Autorità giudiziaria adita, ha effettuato, anche a mezzo dei locali organi di polizia, numerose interviste a manager del gruppo, il cui contenuto, è stato, di seguito, riportato, in stralcio.

[38] Nello specifico, il contratto venne successivamente "splittato" in due parti, assegnate, rispettivamente, alla Bateman Kazakhstan Oil & Gas Company B. V. per i lavori *on-shore* (contratto n. 2002/0971) ed alla Bateman Eurasia Gmbh per lavori *off-shore* (contratto n. contratto nr. 2003-1053). In seguito, nello sviluppo del progetto Kashagan, saranno coinvolte ulteriori entità del Gruppo israeliano, ovvero la Bateman Eurasia Oil & Gas Company B. V., in quanto partecipe della *joint-venture* NCC (assegnataria del contratto 2004-0504), e, nuovamente, la Bateman Eurasia Gmbh, presente, a sua volta, nella *joint-venture* OIC (assegnataria del contratto 2005-84).

[39] Con sede in Tripoli (Libia), 4 Km Fellah Street, e con filiali a Lugano (Svizzera), via Bresso n. 43, e Milano, via Soperga n. 6.

nell'e-mail del 24.11.2004, in cui Marcello BOLOGNA[40] (technostar@interfree.it) scrive al Guidotti allegando una bozza di consulting agreement tra la Mega Electra ed una società indicata con *"XXXXXXXXXX"*, in relazione ad un appalto nell'ambito del cosiddetto Progetto Kashagan (**All. 20a**):

- Extension onshore Power Generation Project;
- Onshore Construction Project.

Il BOLOGNA riporta una email pervenutagli da megaelectra.milano@libero.it commentando: "*Mi ha ritornato la prima pagina che comunque contiene già tutti i dati.*
*Lui è il Propietario (..), Amministratore, Presidente, ..... quindi firma lui: DOMENICO PATRUNO.*
*Possiamo stare tranquilly (..) sulla Confidenziale ora ed in futuro""*".

Il 2 dicembre 2004 tale Gulzhan, assistente di VULIS Felix Jeff[41] (Gulzhan@epa.kz) comunica al GUIDOTTI (**All. 4**) che il Vulis le ha chiesto di informarlo sui seguenti punti:
1) La società che firmerà il contratto è la Bateman Eurasia Oil And Gas Company BV;
2) Il numero di registrazione della società è [redacted]
3) L'indirizzo registrato in Olanda è Haaksbergweg 59, 1101BR Amsterdam Zuidoost;
4) L'accordo sarà firmato dal direttore della bateman eurasia oil and gas company BV, Felix Jeff VULIS.

Il 3 dicembre 2004 Gulzhan allega al GUIDOTTI (**All. 5**) e, per conoscenza al VULIS (fjvulis@epa.kz), una bozza di Consulting Agreement, sprovvista dell'indicazione delle società che intervengono nella stipula dell'atto, ma con la specifica che il contratto si riferisce ai progetti:

- 2004-0934 (EP and Construction works – Utilities area);
- 2004-0504 (Onshore Construction Contract).

Il giorno 7 dicembre 2004 in Milano avviene un incontro diretto tra il VULIS, lo Shuki Raz della BATEMAN ENGINEERING ed il GUIDOTTI (**All. 6**).

Il 9 dicembre 2004 Marco Pesci (interactivemm@libero.it) allega al Vulis (**All. 6a**) il Consultancy Agreement revisionato a seguito dei commenti formulati da

[40] Marcello BOLOGNA, nato a Carrara il [redacted] dipendente della Nuovo Pignone SpA fino al 2004, sua ultima occupazione. Nel periodo successivo il medesimo risulta percepire redditi solo dall'INPS.
[41] Direttore della Bateman Eurasia Oil & Gas B.V..

quest'ultimo con la specifica che le copie dei certificati di registrazione delle società MEGAELECTRA e BATEMAN EURASIA sarebbero state allegate all'accordo. Il VULIS invia il contratto allegato allo Shuki Raz invitandolo a restituirglielo con qualsiasi modifica questi possa ritenere necessaria.

Il 13 dicembre 2004 Gulzhan allega una bozza del contratto di consulting agreement con le ultime modifiche apportate (**All. 7**). Il contratto reca la specifica che le società coinvolte sono la MEGA ELECTRA S.A. e la BATEMAN KAZAKHSTAN OIL & GAS COMPANY BV.

Una scansione del contratto in questione risulta allegato ad una mail del 03/05/2005 inviata da Alon Davidov[42] a Shimmy Belikov[43] senza alcun commento. Lo stesso risulta siglato dal Domenico Patruno e Jeff Vulis in data 6 dicembre 2004 **(All. 8)**.

Il 10 aprile 2005, il Guidotti invia a Jeff Vulis via e-mail, una breve presentazione della società. La mail in questione, l'11 aprile 2005, viene girata dal Vulis ad Alon Davidov e a Shuki Raz[44]: quest'ultimo, infine, il 14 aprile 2005, gira la presentazione a Gad Haran[45] e Shimmy Belikov **(All. 9)**.

Il 17 maggio 2005 George Mast[46] (george.mast@batemanswiss.com) chiede chiarimenti ad Alon Davidov e, per conoscenza, a Shimmy Belikoff e tale Oded Isvoranu circa una fattura ricevuta dalla Mega Electra (**All. 10**) specificando di aver ricevuto la fattura provvista di una firma che egli non riconosce. Chiede altresì conferma che il conto di riferimento sia quello relativo alle "Utilities" ed in tal caso rimane perplesso che non ci sia un "P/R" o una "VPA" (probabilmente moduli di autorizzazione della spesa). Infine chiede se non dovesse avere una copia del relativo contratto.

Nel prosieguo dello scambio di email in data 18 maggio 2005 il George MAST ribadisce allo Shimmy Belikoff le sue perplessità (**All. 11**) precisando che nella fattura allegata da lui ricevuta c'è una firma che non riconosce e non vede neanche la seconda firma di autorizzazione. Chiede se, secondo la procedura, non abbia bisogno di un PR ed un VPA anche se lo Shimmy Belikoff ed Alon Davidov sono d'accordo sul pagamento. Rivolgendosi direttamente al Davidov evidenzia che la lettera di accompagnamento del fax non dice da quale account debba essere pagata la fattura pertanto il loro nuovo impiegato non sa cosa fare.

[42] Direttore Finanziario della Bateman Kazahkstan.
[43] Simon Charles Belikov, Direttore della Bateman Eurasia Gmbh.
[44] CEO di Bateman Litwin.
[45] General Manager di Bateman Litwin.
[46] Dipendente della Bateman Eurasia Gmbh.

In pari data il Belikoff lo incalza sottolineando che le firme sono quelle dei direttori di BATEMAN KAZAKHSTAN, conosciuti da lui e da Davidov, e discusse tra di loro e che pertanto il George Mast deve procedere ad eseguire le *istruzioni di Alon*.

Lo stesso giorno il George MAST scrive una email laconica allo Shimmy Belikoff e per conoscenza al Davidov (alond@bateman.kz): ""*Shimmy, il pagamento a Mega è fatto*"".

Un altro interessante scambio di email avviene a partire dal giorno 6 febbraio 2006 quando tale Reints Judith (judith@fivemounts.com), segretaria di Peter BLAUW[47], scrive a George MAST una email (**All. 12**) allegando le fatture della MEGA ELECTRA SA n. BK 004/2006 del 31 gennaio 2006 dell'importo di USD 649.000,00 e n. BK 0005/2006 del 28 febbraio 2006 dell'importo di USD 751.000,00, definendole "colorite" con una velata ironia e chiudendo la frase con dei punti di sospensione quasi a sottintendere un discorso perfettamente noto ai due: "*Some, colorful invoices ...*" .

Il giorno 7 febbraio 2006 il George MAST scrive a Richard HIERSCHE e, per conoscenza, a Shimmy BELIKOFF, chiedendogli di firmare/approvare le fatture allegate della MEGA ed emettere le istruzioni di pagamento.
Anche in tale caso sembra che gli stessi dipendenti della BATEMAN non abbiano ben chiaro l'ambito di riferimento dei rapporti con la MEGA, infatti, in pari data, Richard HIERSCHE[48] scrive a BELIKOFF di non avere alcuna informazione sulle fatture, di essere a conoscenza che bisogna pagare a MEGA una commissione di intermediazione per procacciamento clienti (Finder's fee) *ma non di sapere a che punto sono nel processo e se tali fatture siano corrette* per l'approvazione del pagamento. Gli chiede pertanto di fargli sapere sulla base di quale accordo lui debba approvare il pagamento.

E' stata inoltre reperita, la scansione del "First Amendment" (**All. 13**) del contratto in questione, datata 27/02/2006 con la quale viene rivisto, al ribasso, l'importo a suo tempo stipulato ed indicato al punto 6.1 dell'Agreement. Con riferimento all'Onshore Costruction Project, si passa da una somma di 8.000.000,00 di dollari a 4.500.000,00 di dollari.

Appare oltremodo anomalo il fatto che non siano state reperite, tra la documentazione in formato cartaceo ed informatico sequestrato presso gli uffici e l'abitazione del Guidotti ovvero acquisite tramite attività rogatoriale presso le sedi della Bateman in Israele e in Svizzera, comunicazioni, documenti ovvero

[47] Direttore della Bateman Engineering N.V..
[48] Direttore Finanziario di Bateman Eurasia Oil & Gas.

scambi di email provenienti o aventi come destinatario il *dominus* della Mega Electra SA, Domenico Patruno, ovvero altri dipendenti della stessa società.

Nessuna traccia di questi ultimi (ovvero i diretti interessati) si rileva il giorno 18 febbraio 2006 (**All. 14**), quando Shimmy BELIKOFF invia al GUIDOTTI la bozza di due contratti dei quali i due hanno discusso in precedenza:

- Mega-BKBV – Contract Amendment;
- Mega (new) – Aventall.

Nel secondo contratto, inizialmente a nome di MEGA ELECTRA, lo Shimmy indica al GUIDOTTI l'intenzione di cambiare il nome con un'altra società, ma di aspettare l'input del GUIDOTTI per finalizzare l'operazione.

Quale sia la società che prenderà il posto della MEGA nella fatturazione viene chiarito il giorno 27 febbraio 2006 (**All. 15**) quando Shimmy BELIKOFF invia al GUIDOTTI due bozze di contratto che tengono conto delle indicazioni del GUIDOTTI:

- Techno – Aventall – 27 feb 2006;
- Mega – BKBV – Contract Amendment – 27 Feb 2006.

In particolare, le parti nel primo contratto vengono indicate nelle già note TECHNO SKILLS LIMITED e AVENTALL INTERNATIONAL INC con attività di consulenza riferita ai seguenti contratti:

- 2004-0504 Onshore Construction;
- 2005-0584 Offshore Construction.

A seguito dell'utilizzo della società TECHNO SKILLS, direttamente riconducibile al GUIDOTTI, non vengono rilevate ulteriori comunicazioni inerenti la MEGA ELECTRA SA.

Di seguito si elencano le fatture emesse dalla MEGA ELETTRA nei confronti di Bateman Kazakhstan Oil & Gas Company B.V. rinvenute nel carteggio acquisito all'indagine:

| Numero | Data | Importo totale (USD) | Istruzioni di pagamento | Allegato |
|---|---|---|---|---|
| BK 001 | 02/05/2005 | 2.200.800,00 | RAK Bank Dubai NRAKABAK [redacted] | **16** |
| BK 002 | 22/08/2005 | 1.111.000,00 | RAK Bank Dubai NRAKABAK [redacted] | **17** |

| | | | | |
|---|---|---|---|---|
| BK 003 | 05/09/2005 | 499.800,00 | Banca Svizzera Italiana Lugano [redacted] | 18 |
| BK 004/2006 | 31/01/2006 | 649.000,00 | Banca Svizzera Italiana Lugano [redacted] | 19 |
| BK 005/2006 | 28/02/2006 | 751.000,00 | RAK Bank Dubai NRAKABAK [redacted] | 20 |
| **Totale** | | **5.211.600,00** | | |

Dall'analisi dei conti correnti riconducibili alle società del gruppo Bateman, pervenuti a seguito di attività rogatoriale, non sono stati rilevati, pagamenti a beneficio dei conti correnti della Mega Electra riportati nelle fatture di cui sopra; pertanto, non si esclude che per i bonifici in argomento sia stato utilizzato il conto corrente della Bateman Kazakhstan Ltd [redacted] acceso presso la Eurasian Bank di Almaty (Kazakhstan) - SWIFT EURIKZKA.

Si evidenzia che dall'esame del conto corrente [redacted] intestato "Strategia Vincente" e nella disponibilità del Massimo Guidotti, è stato rilevato il bonifico in entrata, in data 13.06.2005, proveniente dalla SWISS MEGA ELECTRA COMPANY LTD TRIPOLI per un importo di USD rispettivamente pari a 1.499.978,00.

**La data e gli importi dell'operazioni sopra descritta, nonché i successivi prelievi di denaro contante, nel periodo luglio-settembre, pari a $ 388.067,56, inducono a ritenere che con tali disponibilità, il Guidotti potrebbe aver corrisposto, al Ferlenghi Ernesto la somma di denaro citata dal Reali Mario nelle sue dichiarazioni.**

Si riportano, in stralcio, le dichiarazioni rese in atti da manager Bateman ritenute maggiormente rilevanti ai fini dell'indagine.

- **Rony Rosemberg**[49]

D. *Dal nostro materiale di indagini, risulta che BATEMAN pagava tangenti a soggetti Kazaki, in relazione al progetto Kashgan.*
R: *Non so di concreto, però* ***so che da parte dei Kazaki c'erano richieste di pagamento di tangenti****. Durante il mio periodo di lavoro,* ***il procuratore Kazako della regione ha fatto richieste di pagamento di danaro e se non fosse stato pagato avrebbe creato problemi relativamente ai permessi di lavoro per i lavoratori stranieri****, durante il mio periodo lui non fu pagato, non*

[49] Ha lavorato per la Bateman nei periodi 2001-2003 e 2009-2010 con il ruolo di direttore *in situ* del progetto-Kashagan.

*si erano rivolti a me ma al direttore finanziario* **Leonid Wal.** *Vorrei aggiungere che è noto che il Kazakstan è un paese corrotto e c'erano voci che venivano pagate tangenti ai Kazaki.*

- **Rafi-Roga Farhat**[50]

D: *mi dica di più sulle relazioni e gli argomenti che le chiedevano di controllare e preparare per la direzione*
R: (...) *in Svizzera il mio direttore era il direttore finanziario di nome George Mast, poi è arrivato un israeliano, Kashpizky, poi uno slovacco di nome Peter Drebnik;* ***in Israele c'era un altro, vice direttore finanziario che seguiva tutto, di nome Shimi Belikof, lui decideva tutto, significa che indipendentemente dai titoli delle persone in Svizzera, lui dava l'OK finale***

(...)

D: *con chi nella società AGIP eravate in contatto?*
R: *io non ero* ***in contatto con AGIP****, lo* ***erano Shuky Raz e Shimi Belikof*** *ed* ***è molto probabile che l'intermediario con la società israeliana fosse uno di nome Massimo***

(...)

D: *Racconti tutto ciò che sa su comportamenti irregolari nel progetto KASHGAN*
R: *le persone che deve interrogare sono* ***Shuky Raz*** *e il direttore finanziario americano che risiedeva in KAZAKSTAN,* ***che pagassero "tangenti" a persone del governo KAZAKO è sicuro*** *ma non posso indicare nomi di persone o somme*

D: *come fa a essere certo che sono state pagate "tangenti"?*
R: *da pettegolezzi, chiacchiere, per esempio, sdoganamento di merce ferma da mesi*

(...)

D: *provi a ricordare chi raccontava questo e faceva i pettegolezzi e le chiacchiere*

[50] Dipendete Bateman dal dicembre 2006 al novembre 2009 con il ruolo di amministratore, deputato, in particolare, alla stesura di resoconti e controlli su operazioni finanziarie, transazioni bancarie ed acquisti ed alla preparazione degli stipendi dei lavoratori in Kazakhstan.

R: *il contabile israeliano e il direttore finanziario americano, relativamente al controllo che ha fatto AGIP ho sentito parlare da* ***una ragazza di nome Natalia Koblanko, che era la direttrice finanziaria del progetto****, e lei* ***diceva che AGIP ha fatto diversi controlli scoprendo che molte cose erano irregolari***

D: *chi erano i fornitori con i quali interloquiva nell'ambito del suo lavoro?*
R: (...) *io credo che* ***Natalia*** *è una persona chiave, andava settimanalmente in KAZAKSTAN per gestire l'affare*

(...)

D: *Mi dia dettagli sugli accordi firmati con Guidotti e il motivo della loro firma*
R: *all'inizio c'era un accordo per il quale riceveva una percentuale sugli affari conclusi , poi c'era un contratto di "retainer"* (n.d.t quota fissa) *+ spese ed ho copia dell'ultimo contratto, lui voleva citare BATEMAN. Lui è quello che ha procurato a BATEMAN il contratto in Congo, e allora ha sistemato anche un altro contratto per la vendita di 4 generatori in Congo, e anche questo non glielo hanno pagato per niente*

D: *chi è la società "AVENTALL"?*

R: ***E' la società madre di BATEMAN*** *in Svizzera, in pratica è una società bancaria* (n.d.t.: Forse intende holding) *che non ha attività operative ha solo conti bancari tramite i quali ricevono accrediti e fanno pagamenti , non ricordo dove sia registrata, certamente, secondo me, in una delle Isole Vergini*

D: Le presento stampati bancari indicati come **Shlomi Pizarro** (3) 21.6.11 e in esse pagamenti che fa AVANTEL alla società TECHNOSKILLS, a fronte di cosa sono questi pagamenti?
R: ***TECHNOSKILLS è anch'essa di Massimo, le dico che TECHNOSKILLS è il canale per trasferire soldi per corruzioni, Massimo era iscritto come unico proprietario, non c'erano altre persone, chi veramente c'era dietro la TECHNOSKILLS, a mio parere, era BATEMAN****. Ricordo che* ***Shimi Belikof*** *mi tirava pazzo per trasferire soldi tramite una specifica banca, il cui nome non ricordo, una banca americana, dove lui era l'unico autorizzato alla firma, non era un trasferimento normale tramite grandi banche note, inoltre, l'indirizzo della TECHNOSKILLS era negli uffici della BATEMAN a Londra, ci chiedevamo sempre, com'è che quell'uomo,* ***Massimo,*** *riceveva mezzo milione di Dollari, ogni volta una botta di soldi !*

D: ci sono stati trasferimenti di denaro verso TECHNOSKILLS anche negli anni successivi al 2008-2009?

R: La rottura tra loro è iniziata a fine 2008 inizio 2009, ricordo stampe simili del 2008, **era una società fittizia che forniva fatture di mezzo milione di dollari ogni trimestre**

D: Chi istruiva le fatture?
R: ***solo Shimi Belikof, lui era l'unico. Sulle fatture c'era scritto "services" servizi****. Non ho idea che servizi fossero, può essere qualsiasi cosa*

(...)

D: *ha nulla da aggiungere alla testimonianza precedente?*
R: *consegno documenti richiesti secondo il seguente ordine: stampate con i dettagli della banca americana* ***JP Morgan*** *, nella quale veniva gestito il conto della AVENTALL segnati come SHLOMI PIZARRO (1) 23.06.11, alla colonna* ***B*** *trova* ***LINOI NESHER*** *che ha diritto di firma* ***A****, ciò è principale, e io sono alla colonna* ***A*** *, che significa autorizzazione alla firma* ***B (n.d.t.*** *nella versione originale le colonne sono in lettere latine e le firme in ebraico) (8) cioè di mia iniziativa, il responsabile del conto è* ***Shimi Belikof,*** *che con una telefonata decide tutto*

(...)

D: *perché sottolinea il fatto che AVENTALL non compare?*
R: *con riferimento alla sua domanda se è possibile che ci sia un contratto tra AVENTALL e TECHNOSKILLS, io dico , che la cosa non è logica, non esiste contratto del genere, non ho mai incontrato AVENTALL tra i fornitori di servizi o altro, AVENTALL non svolgeva attività,* ***serviva solo per il passaggio di denaro da AVENTALL a TECHNOSKILLS***

D: *Vorrei, col suo permesso, fare il punto relativamente alla banca americana, quando ne ha sentito il nome per la prima volta? Questa banca era collegata anche alla questione TECHNOSKILLS? c'erano affari con altre società nei quali questa banca era coinvolta?*
R: *quando sono stato richiesto di trasferire dei pagamenti a TECHNOSKILLS, fu la prima volta che sentii il nome di questa banca, i trasferimenti qui erano ad esclusivo parere di* ***Shimi Belikof,*** *ciò'è in altre banche bastava la sua firma, mentre in questa banca americana era necessaria anche la sua autorizzazione telefonica.* ***Questa banca non è mai servita per pagare fornitori o altro cose correnti, ma esclusivamente per TECHNOSKILLS***

D: *quante volte ti hanno chiesto di trasferire denaro da lì?*
R: ***ogni tre mesi per circa due anni* e sempre la stessa soma di *mezzo milione***

➢ **Raul Ronen**[51]

D: *Cosa mi dice di soggetti KAZAKI sia a livello del governo sia oligarchi kazaki?*
R: *Il contatto con il governo era principalmente per i permessi di lavoro, so che c'erano anche problemi doganali per attrezzatura che entrava nel paese per il progetto, ma non so come siano stati risolti* (…)

➢ **Simon Charles Belikoff**

D: *mi dica tutto ciò che sa sulle modalità irregolari con le quali BATEMAN ha vinto le gare per il progetto KASHGAN*
R: *Anzitutto è stata fatta l'offerta più bassa ma avevamo anche un canale tramite* ***Massimo Guidotti*** *. Alla sua domanda, mi hanno presentato* ***Massimo,*** *credo, non sono sicuro, fosse il Dir. Gen. intendo* ***Shuky Raz,*** *presentandolo come nostra persona di contatto con ENI, che conosce la struttura. (…)* ***Poi Massimo è diventato il nostro referente con ENI e AGIP, conosceva diverse persone, uno era il direttore del progetto di KASHGAN*** (…). *Probabilmente,* ***non poco della nostra vincita della gara per la centrale di KASHGAN è dovuto ai suoi contatti con gli uomini dell'AGIP***

(…)

D: *non forse o quasi, mi dica con precisione cosa c'era?*
R: *Aveva contatti con un italiano dell'ENI che dirigeva il progetto,* ***Guidotti riceveva dei pagamenti dopo la vincita. Il fatto che Guidotti pagasse "tangenti" all'ENI mi era chiaro dal supporto, atteggiamento e aiuto che ricevevamo da queste persone nel progetto****.*

D: *prima ha detto che la vostra proposta era la più economica, perché dovevate pagare una "tangente" per vincere la gara?*
R: *C'era un accordo che se avessimo vinto il progetto avemmo dovuto pagare a* ***Guidotti*** *un compenso, a chiarimento della sua domanda, c'è una varietà di considerazioni non solo l'offerta più economica.*

D: *rispondevate alle condizioni minime della gara?*

[51] Vice-direttore della Bateman Litwin Energies.

R: *Abbiamo risposto, ma con ritardo, altri hanno rispettato le condizioni minime, noi no. Le abbiamo mancate. Allora ci hanno concesso un nuovo termine per consegnare il documento sul rispetto delle condizioni minime. Per quanto sappia io erano questioni tecniche. Ci hanno permesso di consegnare in ritardo in virtù dei contatto di* ***Guidotti.*** *Il Dir. Gen. ,* ***Shuky Raz,*** *e il direttore della divisione,* ***Gad Heran,*** *mi hanno lasciato capire, non ricordo come, che il nostro contatto con AGIP ci ha permesso di presentare i documenti in ritardo e, finalmente, ci ha permesso di vincere la gara del progetto. Alla sua domanda, sui nostri legami, intendo dire che c'era una partecipazione con la società EUROASIA e non BATEMAN EUROASIA, relativamente ai progetti in KAZAKSTAN, e loro gestivano i rapporti anche con AGIP.* ***Shukt Raz e Gad Heran*** *mi hanno lasciato capire che la nostra presentazione, con ritardo, era stata accettata e che avevamo buone probabilità di vincere il progetto per i nostri legami con* ***Guidott****i e EUROASIA.*
*C'erano contratti per servizi forniti da* ***Guidotti*** *,parte dei quali avevo ricevuto in eredità da miei superiori nella struttura,* ***Shuky Raz,*** *negli ultimi anni potrebbero esserci stati accordi con* ***Guidott****i, che io stesso firmai; l'essenza degli accordi con* ***Guidotti*** *si è chiarita per me con gli anni, a un certo punto capii che si trattava di soldi per "tangenti" che* ***Guidotti*** *pagava agli alti livelli in AGIP, alla sua domanda, non ricordo con certezza ma mi sembra che* ***Guidotti*** *a un certo punto, mi abbia messo a conoscenza che lui corrompe con parte dei soldi alti dirigenti in AGIP, alla sua domanda , non mi ha detto quanto del denaro a lui pagato va in corruzione e io non lo so. Alla sua domanda, a mio parere pagava il direttore del progetto dell'AGIP, tutte le voci erano intorno a quella persona. Col suo permesso guardo il mio I-Phone per tentare di ricordare chi era la persona di contatto dell'AGIP, vedo ora che si tratta di* ***Luigi Diamante. Guidotti*** *mi passava delle fatture e io le pagavo come servizi commerciali e consulenze; Alla sua domanda, quale direttore finanziario, autorizzavo ogni fattura presentata da* ***Guidotti,*** *mi chiesero di essere responsabile di tali accordi,* ***Shuky*** *me lo chiese e mi istruì di pagare le spese che* ***Guidotti*** *presentava. Alla sua domanda, se ben ricordo, avevamo un accordo tra* ***Guidotti*** *e BATEMAN EUROASIA. Trasferivo i pagamenti a una società di nome GMOIL & GAS e TECHNOSKILLS. Non facevo sempre io i pagamenti, a volte arrivavano dal nostro socio, EUROASIA ma quasi in tutti i casi ero a conoscenza dei pagamenti a* ***Guidotti.*** *Alla domanda se c'erano molti pagamenti fatti a* ***Guidotti,*** *normalmente erano centinaia di migliaia di Dollari ogni trimestre*

D: *C'erano altre società, oltre a GMOIL & GAS, alle quali ha trasferito denaro per* ***Guidotti?***
R: ***può essere, c'era un'altra società, prima di questa, alla quale sono stati fatti trasferimenti****, non ricordo il nome.*

D: *TECHNOSKILLS le è nota?*
R: *si, questa è la società che ho indicato prima*

(...)

D: *quali pagamenti di "tangenti" ha pagato a dirigenti nella società del gas KAZAKA, membri comitato direttivo del progetto KASHGAN, attraverso pagamenti a* ***Guidotti?***
R: *Io non so cosa succedeva col denaro che aveva* ***Guidotti,*** *relativamente agli uomini ENI,* ***ho capito che Guidotti pagava loro "tangenti"****, non so come quando e quanto. No lo so, è il genere di cose che è meglio non sapere non raccontare, intendo dire che non credo che mi avrebbero aggiornato con questi dettagli se avessi fatto domande simili. Relativamente a* ***Guidotti*** *e i KAZAKI non so niente.*

(...)

D: *per ogni spesa non si muoveva senza l'autorizzazione di* ***Shuky?***
R: *per ogni spesa che non aveva riscontro in un contratto che fosse in ordine, mentre i pagamenti a* ***Guidotti*** *avevano riscontro in un contratto che* ***Shuky*** *aveva autorizzato e fatture a fronte del contratto, e persino in queste situazioni, lui autorizzava ogni uscita. Io me ne preoccupavo.*

(...)

D: *chi è la società AVENTALL?*
R: *una società finanziaria off-shore, costituita come parte del sistema fiscale del gruppo BATEMAN in Svizzera.*

D: *chi sono i direttori AGIP che avevano contatti diretti coi direttori del gruppo BATEMAN*
R: ***Il direttore del progetto col quale avevamo contatto era Luigi Diamante***

### (2) La figura di Vasfi Hormoz

Vasfi è stato individuato come figura di intermediario nel settore dell'*oil and gas* dalla documentazione sottoposta a sequestro in data 21.06.2011, nello specifico la stampa[52] dell'e-mail inviata, in data 10.06.2009, dal dipendente della PRYSMIAN CAVI E SISTEMI S.r.l.[53] TOMASSINI Massimiliano[54] ad OLIVIER Stephanie, altro dipendente Prysmian **(All. 21)**, in cui si legge:

"*questo è l'agente importantissimo basato in UK del Kashagan*
ABBIAMO 2 AGENTI
SCARPA[55] (...)
VASFI (MAIL TECRON E *contatto* Alessandra)
I 2 AGENTI NON SANNO UNO DELL'ALTRO E PRESTIAMO MASSIMA ATTENZIONE A NON INVIARE ALL'UNO MAIL DELL'ALTRO
LA SITUAZIONE E' MOLTO DELICATA"

Inoltre, lo stesso Guidotti, nella sua "Memoria difensiva" datata 08.11.2011, a proposito dei rapporti intercorsi tra la sua società di consulenza e la JV SKEMA-TOZZI, a pag. 13 (**All. 22**), scrive che il rapporto tra le due società venne "*interrotto nel maggio 2007 per espressa richiesta del management TOZZI*[56] *a CERVEGLIERI*[57]*, Presidente di SKEMA, in quanto essi* ***sostenevano di aver ricevuto istruzioni in tal senso dal sistema di potere kazako****.*
*Infatti MG è poi venuto a conoscenza che l'accordo fu stipulato con la società Top Oil UK con sede a Londra (nel 2010 trasferito ad una società con sede a Cipro), la quale, come disse il CERVEGLIERI, era controllata da un italo-iraniano, molto ben appoggiato "in loco"* "".
Quindi, nell'allegato 14 della stessa Memoria Difensiva, il Guidotti conferma che ""***la JV riceve ordine dai Kazakhi di prendere come advisor la ditta Top Oil UK*** *che fa da scudo ad un certo italo-iraniano, "...introdotto ai contrattisti della nomenclatura del Kazakhstan" riferisce Cerveglieri*"" (**All. 23**).

Dalle indagini effettuate sono emersi elementi di notevole importanza riferibili a rapporti economici intercorsi fra il Vasfi Hormoz e le seguenti società, **finalizzati, presumibilmente, alla costituzione di fondi da destinare alla corruzione di soggetti, sia italiani che stranieri, responsabili**

[52] Rinvenuta presso l'ufficio in uso a Tomassini Massimiliano, all'interno della sede della PRYSMIAN CAVI E E SISTEMI S.r.l., sita a Milano, v.le Sarca n. 222.
[53] P. I. [redacted]
[54] Nato il [redacted] a Milano.
[55] Verosimilmente, si tratta del già identificato intermediario Scarpa Nunzio.
[56] Verosimilmente Tozzi Mario, generalizzato al punto *2.*, Presidente del CdA della Tozzi Sud S.p.A., una delle due società facenti parte della joint-venture.
[57] CERVEGLIERI Mario Secondo, generalizzato al punto *2.*, Presidente del Cda della Skema S.p.A., l'altra società parte del consorzio.

**dell'assegnazione di gare d'appalto relative all'implementazione degli impianti asserviti allo sfruttamento dei giacimenti ubicati nelle regione del Kashagan e Karachaganak, nella Repubblica del Kazakhstan**:

- la già individuata Joint-venture Skema-Tozzi;
- la Tenaris Global Service S. A., con sede in Uruguay, Luis A. de Herrera 1248 – World Trade Center – Edificio Plaza P. 1, Montevideo;
- la già individuata Breda Energia S.p.A..

Le tre entità economiche sopra menzionate, compaiono nei seguenti documenti[58]:

- documento in formato excel denominato "conti bol", composto da n. 2 fogli, denominati, rispettivamente, "KCO" e "COPIA BOL" (**All. 24**);
- documento in formato word denominato "Numbers" (**All. 25**);
- documento in formato word denominato "CONTI", composto da n. 2 fogli (**All. 26**);
- documento in formato word denominato "conti Bolat" composto da nr. 2 pagine. Il documento in questione, riporta l'immagine di una stampa del precedente documento "CONTI" sulla quale sono state apportate delle annotazione manoscritte (**All. 27**).

I documenti testé menzionati riportano, con riferimento ai soggetti giuridici sopra identificati, una serie di informazioni omogenee concernenti:

➢ l'ammontare delle fatture emesse, da ciascuna delle entità economiche sopra nominate, a seguito dell'aggiudicazione di contratti stipulati con Agip KCO, nella fattispecie:

  - contratto n. 2004/1089 sottoscritto dalla JV Skema-Tozzi;
  - contratti nn. 2005/1163 e 2006/0650 sottoscritti dalla Tenaris S.A.;
  - contratti nn. 2004/1115, 2004/0199 e 2004/1325 sottoscritti dalla Breda Energia S.p.A.;

[58] I documenti sono stati rinvenuti all'interno della *directory* denominata "CONTI" raggiungibile attraverso il seguente percorso: Desktop\Backup Katia\Alessandra\MOM\KAZAKHSTAN\CONTI, allocata nella memoria di massa del computer in uso alla Katia Caruso una delle segretarie della società Tecron Srl. I *files* in questione riportano, tutti, come "data creazione" e "data ultima modifica" quella del 24/10/2010. A tal proposito, è verosimile ritenere che tale data faccia riferimento alla creazione di una copia di back up dei file in questione nel computer della Caruso, come lascia supporre il nome della directory posizionata nella cartella "Desktop" del computer in uso alla Caruso. Si precisa che anche la memoria di massa di quest'ultimo dispositivo elettronico è stato oggetto di copia forense nel corso delle operazioni di perquisizione e sequestro eseguite in data 14.06.2012 presso la sede della Tecron Srl di Roma come risulta dal rapporto redatto dall'ausiliario di p.g. intervenuto alle operazioni, che costituisce l'allegato 6 al verbale redatto dalla p.g. operante, trasmesso a Codesta A.G. con nota n. 454172 del 18.06.2012.

- la percentuale delle provvigioni spettanti alla Top Oil Ltd – società, riconducibile direttamente al Vasfi Hormoz – per l'intermediazione svolta nell'ambito dei citati contratti;

- l'ammontare dei pagamenti avvenuti a fronte delle fatture emesse dalla Top Oil Ltd.

Di estremo interesse sono le indicazioni contenute nel primo e nell'ultimo file: in entrambi i documenti vengono riportati i nominativi di tali "*dentali*" e "*bol*" con accanto una cifra di denaro.

**È parere di questa p. g. che tali indicazioni siano da riferire a due dirigenti di cui al precedente punto *2.A.*:**

- il manager Eni **Dentali Paolo**. Peraltro, il medesimo si è dimostrato, nelle stesse indagini, vero e proprio "uomo di fiducia" del Guidotti Massimo, al quale forniva dati e notizie utili alle società cui lo stesso intermediario prestava la propria consulenza;

- l'allora Presidente della KazMunayGas **Nazarov Bolat**. E' molto importante sottolineare come, a proposito dello stesso, il Guidotti, in una e-mail del 29.09.2009, avente per oggetto "*KMG – Company Management and Board of Directors*"[59] (**All. 28**), gli assegna "3 stelle" (su un massimo di 5) in una sorta di classifica che egli aveva stilato in merito all'influenza nel mercato dell'*oil and gas* dei principali dirigenti, appunto, della KMG. A suffragare l'ipotesi che Bolat Nazarov fosse dedito ad attività corruttiva, lo stesso Guidotti, nell'interrogatorio reso davanti all'A. G. il 18.05.2012, ha sostenuto che ""(...) *era di dominio pubblico che Zhurebekov era sostanzialmente* ***un collettore di tangenti per Nazarov***"".

***L'accostamento dei nominativi "dentali" e "bol" con la somma di denaro annotata accanto all'ammontare delle commissioni corrisposte dalla società aggiudicataria del contratto alla Top Oil Ltd sembra indicare che tale denaro sia stato destinato direttamente ai due soggetti sopra identificati.***

Successivamente, ai punti *3.C.(5)* e *3.C.(6)* verranno dettagliati i pagamenti relativi ai rapporti commerciali intercorsi, rispettivamente, con JV Skema-Tozzi e Breda S.p.A.

[59] Inviata al già identificato Cerveglieri Mario Secondo ed al fratello di questi, CERVEGLIERI Davide Ennio (nato a Milano il 22.03.1967), consigliere delegato della Skema S.p.A..

**La circostanza, secondo cui la Tecron S.r.l. facesse da "schermo" alla Top Oil, la cui amministrazione avveniva, di fatto, in territorio italiano, sono suffragati dai seguenti fatti**:

- in un fax[60] (**All. 29**), la Tecron S.r.l. risulta avere un rapporto di rappresentanza in Italia con la Top Oil Ltd; in particolare, nel fax, inviato in data 10.05.2007 dalla TOP OIL UK alla JV SKEMA-TOZZI CORPORATE si legge: "(...) *Vi comunichiamo che la società incaricata di gestire tutti i nostri contratti in Italia per il territorio del Kazahkstan è la Tecron S.r.l.* (...) – *Managing Director: Mr. Hormoz Vasfi* (...)".

  L'analisi della documentazione rinvenuta presso la sede della Tecron ha, poi, permesso di confermare l'esistenza di tale rapporto, contrattualizzato in n. 5 *Consulting Agreement* intercorsi fra le stesse Tecron S.r.l. e Top Oil Ltd, aventi tutti per oggetto attività di consulenza da fornire nel territorio della Repubblica del Kazakhstan (**All. 30-34**).

- E-mail, datata 30.04.2008, avente per oggetto "DRAFT – Consultancy Contract – Kashagan Hook Up Project" inviata dall'indirizzo di posta elettronica alessandra.bonetti@prysmian.com all'indirizzo segreteria@ tecron.net (**All. 35**), con la quale viene trasmessa in allegato alla dipendente Tecron Alessandra Casaroli[61] "*la documentazione per Vs. revisione: DRAFT del Consultancy Contract*", contenente bozza del contrato tra PRYSMIAN CAVI E SISTEMA ENERGIA ITALIA S.p.A. S.r.l. e Top Oil UK.

  Inoltre, all'interno dell'e-mail in questione, si può leggere il contenuto di un'altra e-mail, inviata in data 23.04.2008, dal sopra citato indirizzo di posta elettronica segreteria@tecron.net al dipendente Prysmian BIGGIOGERA Cesare[62]:

  "" (...) *in riferimento alla sua conversazione con il dr. Vasfi* (...), *le comunico i dettagli della società con cui stipulare il Consultancy Agreement:*
  *Top Oil UK*
  *120 East Road*
  *London N16AA*
  *United Kingdom (...)*
  *Legale Rappresentante (...): Mr. Simon Gabathuler (...)*"

---

[60] **Stampa sequestrata, durante le operazioni di perquisizione del 21.06.2011, presso la sede della Skema S.p.A.**.
[61] Nata il [redacted] a Roma.
[62] Nato il [redacted] a Milano.

Quindi, si sottolinea come, in data 21.06.2010, la già citata Casaroli invia, per conto della Tecron S.r.l., al TOMASSINI una lettera in cui viene chiesto "*un cambio di ragione sociale da Top Oil UK a Top Oil Cyprus*" (**All. 36**).

A riprova della natura essenzialmente corruttiva dell'attività che il Vasfi, tramite la fatturazione della Top Oil Ltd, mascherava da attività di marketing e consulenza, a fattor comune per tutte le società che ne hanno contabilizzato le fatture, si riportano i passaggi si alcune **dichiarazioni rese, in qualità di persone informate sui fatti, da MORRI Stefano**[63]**, professionista che ha assistito il sopra citato Cerveglieri nei suoi rapporti con il Vasfi, e PIRCHIO Cosimo**[64]**, già Direttore Generale della Tozzi Kazakhstan LLP**.

In data 26.07.2012, Morri dichiarava davanti all'A.G.:

""*Confermo che il sig. Cerveglieri, da un certo momento in poi, cominciò a sospettare che* ***Vasfi retrocedesse parte del denaro ricevuto dalla JV Skema Tozzi****. Vorrei chiarire che dai discorsi avuti con Cerveglieri avevo appreso che* ***Vasfi nella sostanza aveva relazioni con una vasta rete di persone di alto livello in Kazakhstan****, anche* ***nel settore dell'energia****. Io non so quali fossero le modalità attraverso le quali Vasfi si relazionasse con le persone chiave in Kazakhstan. Bisogna tenere presente che il Kazakhstan ha una struttura sociale ed economica nella sostanza basata su pochi clan familiari, che hanno in mano le principali leve del potere. Vasfi doveva interagire con queste persone.*
(...)
*Leggo in uno di questi documenti il nome di Idenov, che era a quell'epoca – luglio 2008 – il First Vice President di KazMunayGas, e mi ricordo di un episodio che è il caso di riferire. Intorno alla fine del 2008, mi fu chiesto da Cerveglieri di accompagnarlo in un incontro che avrebbe dovuto avere a Londra insieme a Mario Tozzi. Ci recammo presso un albergo lussuoso di Londra, credo il Lancaster, vicino Hyde Park, dove ho incontrato Idenov insieme al Vasfi, che aveva organizzato l'incontro.*
*Nel corso di questo incontro, che durò circa un'ora, Cerveglieri e Tozzi presentarono le loro aziende, mostrano delle brochure e dichiararono la loro disponibilità ad operare in Kazakhstan in associazione con società kazake. Idenov ne prendeva atto e aveva un atteggiamento di benevolenza. Vasfi teneva un atteggiamento molto rispettoso nei confronti di Idenov e quest'ultimo trattava Vasfi con cordialità""*.

[63] Nato il [redacted] a Riccione (RN).
[64] Nato il [redacted] a Carbonia (CI).

In data 31.07.2012, Pirchio Cosimo confermava che le attività di lobbying del Vasfi fossero imperniate essenzialmente sulle conoscenze presso il top management della KazMunayGas:

*""Posso riferire che quando vi è stata la necessità di fornire ulteriori L.E.R. a Ravenna, da discorsi che ho sentito fare al Bianchi[65], ho appreso che le autorità locali avevano manifestato il gradimento che le nuove L.E.R. venissero costruite in loco, come del resto sarebbe avvenuto per qualsiasi altro progetto, sulla scorta della normativa kazaka sul Local Content.*
*Questa situazione era fonte di preoccupazione per il management Tozzi, sia per Bianchi che per Tozzi Mario.*
***In questo contesto, Vasfi si propone di svolgere un'azione di lobbying attraverso le sue conoscenze in Kazakhstan al fine di convincere la KazMunayGas ad assecondare la costruzione delle L.E.R. sempre a Ravenna*""**

Lo stesso Pirchio ha, infatti, avanzato forti dubbi circa il possesso da parte del Vasfi delle necessarie cognizioni tecniche per fornire consulenze nel settore dell'*oil and gas*:

*""Non so di cosa parlasse il Vasfi con i suoi interlocutori, di certo, per quanto mi risulta* ***non mi ha mai mostrato specifiche competenze tecniche nel settore dell'oil & gas*""*.*

**(3) La figura di Borghi Stefano**

Le attività tecniche descritte sopra hanno evidenziato una sorta di "interazioni" fra il Guidotti ed il gruppo della Bemberg, evidenziando, poi, **tutta una serie di attività, gravitanti intorno all'altro consulente Borghi ed al manager Eni-Zubair Braghi, volte alla costituzione di società "cartiere" esterovestite con lo scopo di drenare denaro utilizzato, tra le altre cose, alla corruzione di pubblici ufficiali responsabili dell'aggiudicazione di varie gare d'appalto nel settore dell'*oil and gas* in territorio estero**.

I dirigenti del gruppo Eni Braghi, in primo luogo, Capanna e Di Tata in secondo, erano i referenti del Borghi per la "veicolazione" di dati e notizie riservate, relative alle varie gare in corso, che lo stesso Borghi – direttamente o per il tramite del Pondini e degli altri suoi collaboratori – faceva, poi, pervenire, alle

[65] BIANCHI Agostino, nato il [redacted] a Firenze, Direttore Generale della Tozzi Sud S.p.A..

Guidotti assegnava i numeri di "stelle" ai responsabili kazahki dei progetti Kashagan e Karachaganak, già in possesso di questo Reparto in seguito alle operazioni di perquisizione effettuate in precedenza presso l'abitazione e gli uffici dello stesso Guidotti.

**Tale circostanza lascia presumere che la Skema S.p.A. abbia volutamente cancellato dai propri archivi del materiale informatico che riteneva compromettente.**

## (b) CONCLUSIONI

- **ANNO D'IMPOSTA 2009**

Le spese relative alle fatture per l'anno d'imposta 2009 sono interamente confluite nel sottoconto di mastro "consulenze varie" (**all. 154**) e, pertanto, sono confluite nel calcolo dell'utile d'esercizio del relativo anno pari ad € 7.162.835,00.
In conclusione, alla luce di quanto sostenuto al punto *2.* della presente Comunicazione, la **Skema S.p.A. si è avvalsa di fatture per operazioni inesistenti registrate nelle scritture contabili obbligatorie al fine di evadere:**

- **le imposte sui redditi**, indicando nella dichiarazione annuale dei redditi Modello U60 per l'anno 2009 elementi passivi fittizi ammontanti ad € 38.913,49;

- **l'imposta sul valore aggiunto,** indicando nella dichiarazione annuale Modello IVA per l'anno 2009 IVA indetraibile ammontante ad € 7.782,70,

**configurandosi l'ipotesi di reato prevista e punita dall'art. 2 del D. Lgs. 10 marzo 2000 n. 74.**

- **ANNO D'IMPOSTA 2010**

Le spese relative alle fatture per l'anno d'imposta 2010 sono interamente confluite nel sottoconto di mastro "consulenze varie" (**all. 155**[105]) e, pertanto, sono confluite nel calcolo dell'utile d'esercizio del relativo anno pari ad € 24.319.898,00.

[105] Comprendente prospetto elaborato dalla parte, dove viene evidenziata la confluenza nel sottoconto in questione, anche, nella quota di € 193,00, della fattura n. 2 del 03.01.2001.

In conclusione, alla luce di quanto sostenuto al punto *2.* della presente Comunicazione, la **Skema S.p.A. si è avvalsa di fatture per operazioni inesistenti registrate nelle scritture contabili obbligatorie al fine di evadere le imposte sui redditi**, indicando nella dichiarazione annuale dei redditi Modello U60 per l'anno 2010 elementi passivi fittizi ammontanti ad € 57.072,91, **configurandosi l'ipotesi di reato prevista e punita dall'art. 2 del D. Lgs. 10 marzo 2000 n. 74.**

- **ANNO D'IMPOSTA 2011**

Le spese relative alle fatture per l'anno d'imposta 2011 sono interamente confluite nel sottoconto di mastro "consulenze marketing" (**all. 156**) e, *pertanto, sono confluite nel calcolo dell'utile d'esercizio del relativo anno* pari ad € 10.006.887,00.
In conclusione, alla luce di quanto sostenuto al punto *2.* della presente Comunicazione, la **Skema S.p.A. si è avvalsa di fatture per operazioni inesistenti registrate nelle scritture contabili obbligatorie al fine di evadere le imposte sui redditi**, indicando nella dichiarazione annuale dei redditi Modello U60 per l'anno 2011 elementi passivi fittizi ammontanti ad € 36.123,00, **configurandosi l'ipotesi di reato prevista e punita dall'art. 2 del D. Lgs. 10 marzo 2000 n. 74.**

## (5) Joint-venture SKEMA-TOZZI

### (a) Analisi della documentazione esibita

La joint-venture Skema-Tozzi (JVST), ha contabilizzato[106], nel periodo 2006 – 2011, *fatture emesse dalle società di consulenza riconducibili al Vasfi ed al* Guidotti per un totale di € 8.714.298,99 e $ 17.042.421,00, come specificato in **allegato 157**[107].

[106] Sulla base della documentazione esibita dalla società a fronte delle separate notifiche dei decreti di *Richiesta di consegna atti e documenti* effettuate dal Reparto in intestazione in data 05.07.2012 e 30.10.2012, come compendiato nei relativi verbali di operazione compiute redatti in data 05.07.2012, 09.07.2012 e 10.07.2012.
[107] Comprensivo di prospetto riepilogativo e n. 47 fatture e relativi pagamenti.

Inoltre, la JVST ha esibito la seguente documentazione.

- In merito ai rapporti con Techno Skills Ltd:

  - contratto datato 20.01.2005 (**All. 158**), con il quale la società di consulenza “”*offers to the client a full commercial and marketing support for the above mentioned projects in Kazakhstan*“” [trad.: offre al cliente un supporto completo commerciale e di marketing per i menzionati progetti in Kazakhstan].
    Per la fornitura di tali servizi, il *punto 6.1* del contratto prevede una remunerazione pari a due soluzioni da $ 320.000,00 cada una.

  - Contratto datato 03.07.2006 (**All. 159**), con il quale la società di consulenza, allo stesso modo, “”*offers to the client a full commercial and marketing support in Kazakhstan*“” [trad.: offre al cliente un supporto completo commerciale e di marketing in Kazakhstan].
    In questo caso, “”*in remuneration for its services, the consultant shall be entitled to a success fee of 5% with regard to amount paid by a client to the company under a contract for a project*“” [trad.: a titolo di compenso per i suoi servizi, il consulente ha diritto a una commissione pari al 5% della somma pagata dal cliente[108] alla compagnia[109] nell'ambito del progetto].

  - Amendment n. 1 (**All. 160**) al contratto di cui al punto precedente, datato 24.07.2007, che modifica i compensi spettanti alla società di consulenza nella quota fissa di $ 550.000,00 (pagabile in una *tranche* da $ 350.000,00 ed in una da $ 200.000,00);

  - n. 4 “”*lettere preliminari*“” inviate, rispettivamente, in data 03.11.2004, 10.12.2004, 14.12.2004 e 27.12.2004, dalla Techno Skills Ltd alla JVST (**All. 161**).

- In merito ai rapporti con Groupe Cifal S. A.:

  - Contratto datato 04.08.2005 (**All. 162**), con il quale la società di consulenza “”*offers to the client a full commercial and marketing support for the above mentioned projects in Kazakhstan*“” [trad.: offre al cliente un supporto completo commerciale e di marketing per i menzionati progetti in Kazakhstan].

---

108 Nello specifico, Agip KCO.
109 Come detto nello stesso contratto, si intende la JVST.

In base al punto *6.1* del contratto, “”*in remuneration for its services, the consultant shall receive a succes fee of 4% of the amounts paid by the contractor to the client under the contract relevant to the tender AGIP KCO above staded (i.e. 2004-1089)*“” [trad.: a titolo di compenso per i suoi servizi, il consulente ha diritto a una commissione pari al 4% degli importi versati dal contraente al cliente[110] in base al contratto relativo all'appalto AGIP KCO sopra descritto (denominato 2004-1089)].

- Lettera di chiusura contratto (**All. 163**), datata 01.08.2008, inviata da Groupe Cifal a JV SKEMA-TOZZI CORPORATE.

• In merito ai rapporti con Top Oil Ltd:

- contratto datato 02.05.2007 (**All. 164**), con il quale la società di consulenza “”*provide the promotion and marketing of the company's activities set forth herein for the project*“” [trad.: provvederà alla promozione ed al marketing delle attività della compagnia[111] per i progetti qui indicati].
  Il progetto in questione, indicato nell'*Attachment A* al contratto, è quello relativo al tender ITT 2004/1089 nel territorio del Kazakhstan; il compenso spettante alla Top Oil, stabilito nell'art. 7 del contratto, è pari al “”*4% on the totality of invoices to the client*[112]“” [trad.: 4% di quanto complessivamente fatturato al cliente].

- *Attachment B* al contratto di cui sopra, datato 14.01.2008 (**All. 165**), contenente “”*invoices scheduling for amendment n° 3 and 4*“” per gli anni dal 2008 al 2010.

- Contratto fra JVST e Top Oil UK del 18.04.2008 (All. **165a**).

- Lettera, datata 28.04.2008 (**All. 166**), inviata da Top Oil UK a JVST relativa alla rappresentanza da parte della Tecron S.r.l.

- Lettera, datata 19.05.2008 (**All. 167**), inviata da JVST a Top Oil UK relativa alla richiesta alla società di consulenza della predisposizione di specifici report in esecuzione del contratto del 02.05.2007.

---

[110] Come detto nello stesso contratto, si intende la JVST.
[111] Come detto nello stesso contratto, si intende la JVST.
[112] Nello specifico, Agip KCO.

- N. 2 lettere, datate, rispettivamente, 20.05.2008 (**All. 168**) e 09.06.2008 (**All. 169**), inviate da JVST a Top Oil UK relative al riconoscimento di importi aggiuntivi rispetto al predetto contratto del 02.05.2007.

- Lettera datata 16.03.2009, inviata da Top Oil Ltd a JVST, in cui si comunica l'avvenuta incorporazione da parte di Top Oil, a seguito di una più generale ristrutturazione aziendale, della società cipriota SMEKRANO HOLDINGS Ltd[113], e si anticipa l'intenzione di modificare la ragione sociale in T.O. TOP OIL (CYPRUS) Ltd (**All. 170**).

  A tal proposito, si rappresenta come **visure effettuate sulla medesima Smekrano Holdings Ltd presso la banca-dati in uso al Corpo Mint Global, così come ricerche su fonti aperte, abbiano dato esito negativo**.

- N. 3 raccoglitori[114], denominati, rispettivamente, "Repor Top Oil Volume 1 – anno 2009", "Repor Top Oil Volume 2 – anno 2010" e "Repor Top Oil Volume 3 – anno 2011", contenenti gli studi effettuati dalla società di consulenza per la JVST.

**(b) Ulteriori elementi emersi dalle indagini**

- **Elementi emersi dall'analisi della documentazione sequestrata**

▪ **Rapporti con la Top Oil Ltd**

Giova qui ricordare esplicitamente quanto anticipato alle pp. 23-24 della presente Comunicazione, in particolare che:

- uno degli indagati, Massimo Guidotti, nella sua "Memoria difensiva", a proposito dei rapporti intercorsi tra la sua società di consulenza e la società in argomento, scrive che il rapporto venne ""*interrotto nel maggio 2007 per espressa richiesta del management TOZZI a CERVEGLIERI, Presidente di SKEMA, in quanto essi **sostenevano di aver ricevuto istruzioni in tal senso dal sistema di potere kazako**.* (...) *L'accordo fu stipulato con la società Top Oil UK con sede a Londra (nel 2010 trasferito ad una società con sede a Cipro), la quale,*

[113] Con sede dichiarata in Limassol (Cipro), Arch. Makariou II, 134, Yiota Court – 4th Floor – Suite 301.
[114] Data l'ingente mole della documentazione cartacea in questione, si allega, a titolo esemplificativo, solo quanto riportato successivamente a pag. 96 della presente Comunicazione, fermo restando che tali raccoglitori sono integralmente concentrati presso gli uffici del Reparto in intestazione, in quanto costituiscono materiale esibito dalla parte.

*come disse il CERVEGLIERI, era controllata da un italo-iraniano, molto ben appoggiato "in loco"* (...) ***La JV riceve <u>ordine dai Kazakhi</u> di prendere come advisor la ditta Top Oil UK*** *che fa da scudo ad un certo italo-iraniano, "...introdotto ai contrattisti della nomenclatura del Kazakhstan" riferisce Cerveglieri*"";

- **<u>JVST è una delle società segnalate dal Vasfi come parte in causa nell'illecita transazione avvenuta con i citati dirigenti di Eni e KazMunaygaz</u>.**

Si richiama, quindi, quanto sostenuto a carico del Vasfi al precedente punto 2.*B.(2)*, nella fattispecie, come il documento di cui all'allegato 27 – relativamente ai citati contratti nn. 2004/1089, 2005/1163 e 2004/1115 ed alle relative fatture di intermediazione emesse da Top Oil – riporta, sotto forma di appunti manoscritti (come detto, aggiunti successivamente alla stampa del file di cui all'allegato 26) **<u>la quota dell'imponibile indicato nelle stesse fatture, corrispondente a circa la metà dell'importo complessivo, destinata a "*Dentali*" e "*Boi*"</u>**.

E' possibile così schematizzare, anche in questo caso, i rapporti intercorsi fra il Vasfi Hormoz e JVST alla luce dei citati documenti e delle fatture (relative al contratto n. 2004/1089) esibite dalla stessa joint-venture:

| *Dati desunti dai files elaborati dal Vasfi* | | |
|---|---|---|
| Numero contratto | Importo contratto | PROVVIGIONE VASFI (4%)[115] |
| 2004/1089 amnd. 2 | $ 37.470.763,00 | $ 1.223.830,52 |

| *fatture emesse da TOP OIL a JVST esibite dalla parte* | |
|---|---|
| data | importo |
| 29-ott-07 | $ 250.000,00 |
| 13-mar-08 | $ 275.000,00 |
| 27-mag-08 | $ 400.000,00 |
| 1-ott-08 | $ 298.830,00 |
| **Tot.** | **$ 1.223.830,00** |

[115] È la percentuale indicata nei contratti, risultata effettivamente applicata.

| "TANGENTE"<br>*Dato desunto dagli appunti del Vasfi* | |
|---|---|
| **IMPORTO** | **DESTINATARIO** |
| **$ 750.000,00** | **Paolo Dentali** |

---ooo000ooo---

| *Dati desunti dai files elaborati dal Vasfi* | | |
|---|---|---|
| Numero contratto | Importo contratto | PROVVIGIONE VASFI (4%) |
| 2004/1089 amnd. 3-4 | $ 73.315.555,00 | $ 2.932.622,20 |

| pagamenti | *fatture emesse da TOP OIL a JVST esibite dalla parte* | |
|---|---|---|
| | data | importo |
| $ 1.350.000,00 | 1-feb-08 | $ 500.000,00 |
| | 2-mag-08 | $ 250.000,00 |
| | 1-lug-08 | $ 300.000,00 |
| | 3-nov-08 | $ 300.000,00 |
| $ 750.000,00 | 1-giu-09 | $ 250.000,00 |
| | 1-set-09 | $ 250.000,00 |
| | 2-nov-09 | $ 250.000,00 |
| $ 832.622,00 | 21-dic-09 | $ 833.000,00 |
| | **Tot.** | **2.932.622,00** |

| "TANGENTE"<br>*Dato desunto dagli appunti del Vasfi* | |
|---|---|
| **IMPORTO** | **DESTINATARIO** |
| **$ 1.400.000,00** | **Bolat Nazarov** |

**Si evidenzia come, sulla base della documentazione acquisita, sia stato effettivamente possibile "ricostruire" i pagamenti indicati nei documenti denominati "CONTI" e "conti Bolat" con le fatture, relative agli *amendment* richiamati, emesse dalla stessa Top Oil Ltd nei confronti della JV Skema-Tozzi, e come tali pagamenti corrispondano alla cifra indicata sullo stesso foglio quale *percentuale complessivamente spettante al Vasfi*.**

Si sottolinea, inoltre, come anche gli importi indicati come valori dei vari *amendment* coincidano realmente con quanto riportato sui documenti ufficiali dell'Eni consegnati a seguito di richiesta inviata via fax, in data 17.07.2012, a ENI S.p.A. dal Sost. Proc. dott. Fabio De Pasquale (**All. 171-173**).

Altresì, si evidenzia come, a proposito dell'*Amendent* 2 al contratto 2004/1098, la dicitura "*1.498.830,52 – 275.000 = USD 1.223.830,52*" trovi coincidenza con quanto riportato su un altro foglio dattiloscritto (**All. 174**) – rinvenuto nel faldone "JVST 2004/1089 2009-10-11", sequestrato presso la sede della Tecron S.r.l. – nel quale, si legge "275.000 *delta sottratto al 4% per effetto delle chiusure vecchio contratto*".

La circostanza trova effettivo riscontro nel sopra citato contratto fra JVST e Groupe Cifal S. A. (stipulato in data 04.08.2005 e chiuso in data 01.08.2008).

- **Rapporti con le società riconducibili al Guidotti**

Si rimanda a quanto *2.B.(1)* in merito ai pregressi rapporti fra Techno-Skills, JVST e le singole società costituenti il consorzio; inoltre, si ritiene molto importante riportare qui per esteso il contenuto dell'e-mail del 29.09.2009, avente per oggetto "*KMG – Company Management and Board of Directors*", già accennata a pag. 31 nella presente Comunicazione, inviata dal Guidotti ai fratelli Cerveglieri, **illuminante delle reali motivazioni sottese ai contratti stipulati da JVST con le società di consulenza dello stesso Guidotti**:

*""" Cari Mario e Davide, come concordato durante il ns ultimo meeting, vi allego la struttura del nuovo Board of Directors e company Management della KMG.*
*Comunque **vi elenco le posizioni dei vari personaggi <u>di ns interesse</u>** e le connessioni che ci sono tra loro e il sistema di potere.*

*· Timur A. Kulibayev (T.K.)*****: capo della Samruk, holding che controlla tutte le società partecipate dallo stato, tra cui KMG. E' il genero del Presidente ed è lui che* ***detiene il potere dell'industria dell'ENERGY del Kazakhstan***
*· Kenzhebek Ibrashev****: CEO della KMG. E' un uomo di T. K. Ed ex manager AGIP KCO, a noi ben noto.* ***Scarso potere sulle ns cose.***

*· Askar Balzhanov****: recentemente nominato CEO della KMG Exploration&Production division. Uomo di T.K. e di buon carisma. Tutti i nuovi progetti di Upstream Oil&Gas, inclusi Kashagan Phase II e Karagachanak phase III, saranno gestiti dalla sua divisione****. E' l'uomo che dobbiamo andare a trovare e che ci presenterà le persone con cui dovremo dialogare****.*

*· Maksat Idenov***: è stato fino a pochi mesi fa il capo di KMG ed ora relegato alla posizione di Direttore per le relazioni internazionali.*

*· Bolat Nazarov*** detto "il Macchiato": ex responsabile dei progetti di Karachaganak e Kashagan, è stato nominato Presidente ella KazTranGaz, società di trasporto gas naturale e controllata da KMG.*

*· Begjan Kulibayev***: è il responsabile della KMG per il progetto Kashagan – Experimental Programme. Legato al Macchiato, ma è anche uno che "corre da solo". Comunque fa parte del gruppo dei fedeli a T.K.*

*· Murat Zhurebekov** "il lungo": è il nipote del Macchiato e* ***suo esattore****. Ha un ruolo di supporto di Begjan Kulibayev per il progetto Kashagan. Potere scarso o nullo, ma* ***il sistema*** *(soprattutto il Macchiato)* ***lo utilizza per dialogare con i contrattisti****.*

*Queste sono alcune delle figure più importanti con cui abbiamo, hai e avremo a che fare. Comunque* ***ci saranno altre persone coinvolte nei progetti futuri e che cercheremo d'incontrare*** *in occasione del ns viaggio in Kazakhstan "".*

Tali assunti dimostrano, ancora una volta, come **le preoccupazioni del Guidotti fossero rivolte alle possibilità di influenzare l'aggiudicazione di appalti nel settore dell'*oil and gas* kazakho e non alla fornitura di studi di mercato o simili come commissionato nei contratti esibiti dalla jv Skema-Tozzi**.

Inoltre, a proposito della Groupe Cifal S.A., a conferma della circostanza secondo cui fosse di fatto gestita dal Guidotti – quanto meno per la parte di "competenza" del territorio kazakho – si riporta il contenuto di una e-mail (**All. 175**)[116], inviata, in data 30.06.2006, da tale Ricci (ricciolivaldo @aldaservice.com) a tale Fidora (romano.fidora@enel.it) in cui leggiamo quanto segue:

"" *Romano,*

*come da comunicazione telefonica,* ***verrai contattato dal rappresentante CIFAL in Italia, per avere chiarimenti circa il progetto in KZ. Mr GUIDOTTI*** *è un'ex (..) Dirigente NP, e* ***attualmente opera in KZ con un'entità Locale; CAIH POWER, della quale CIFAL è Azionista*** (…) "".

Altresì, durante la perquisizione presso l'ufficio in uso al Mario Cerveglieri, è stata rinvenuta, tra le altre cose, all'interno della cartellina denominata ""2.9.07 JV SKTOZZI/TECNO SKILLS"", la stampa di n. 13 bozze di lettere, accompagnate da una lettera avente per oggetto ""*Ipotesi di scambio di documentazione fra la JV ed il Consulente Kazakho intercorsa prima della formalizzare il Contratto di Consulenza*"", relativo al citato tender n. 1089-2004 (**All. 176**).

Particolarmente rilevante, in merito a tale singolare corrispondenza, il fatto che la lettera di "apertura" del carteggio riporta una sequenza di 11 punti **volti a giustificare il rapporto di consulenza fra le due società**.

**Tale corrispondenza rivela almeno due circostanze anomale**:

- in primo luogo, è la joint venture italiana a suggerire alla controparte la documentazione da produrre, specificandone anche la data;

- in secondo luogo, è verosimile ipotizzare che la data di composizione della lettera di accompagnamento e, di conseguenza dell'intero carteggio, sia quella del 18 gennaio 2006 – come riportato nella dicitura in alto sulla stessa pagina "*Letteratura fra JV e Consulenti Kazakhi 18012006*" – in contrasto con tutte le altre date "proposte" nelle successive lettere, relative ad un periodo temporale che si estende dal 26 ottobre al 27 dicembre 2004.

Tali particolarità lasciano presumere che le bozze siano state preparate allo scopo di **creare *a posteriori* la corrispondenza ufficiale fra la**

[116] Estrapolata dalla copia-forense del materiale informatico acquisito durante le citate operazioni di perquisizione del 27.10.2010.

**JVST e la Techno Skills relativa al contratto di consulenza fra le due società**.
Infatti, **quattro delle bozze di lettera "previste" sono state effettivamente prodotte**: nello specifico, **c'è totale corrispondenza fra le già descritte ""*lettere preliminari*"", datate, rispettivamente, 03.11.2004, 10.12.2004, 14.12.2004 e 27.12.2004, esibite dalla JVST** (cfr. all. 161), **e le relative bozze di cui al carteggio in questione**.

- **Elementi emersi da dichiarazioni testimoniali**

A riprova dell'inesistenza delle consulenze che avrebbe fornito il Vasfi, si rimanda alle pagg. 33-34 della presente Comunicazione, dove sono state già sintetizzate le testimonianze, in tal senso, portate dal commercialista dei Cerveglieri, Morri Stefano, e dell'ex-dipendente del gruppo Tozzi Cosimo Pirchio.

Inoltre, lo stesso Presidente di JVST Cerveglieri Mario, interrogato dall'A. g. in data 17.07.2012, nelle dichiarazioni riportate sotto, rafforza la tesi della reale inconsistenza dei lavori sia del Guidotti che del Vasfi:

"" *Durante uno dei miei incontri con il Bianchi*[117] ***mi venne proposto il nome della Cifal per attività di marketing. Bianchi mi spiegò che era opportuno che stabilissimo un rapporto con questa società perché era una società molto importante nei Paesi dall'area CIS***.
*Il Bianchi mi disse che avrebbero seguito le nostre cose, intendo dire che avrebbero aiutato il nostro business in Kazakhstan. Durante uno dei nostri incontri al Crown Plaza a Milano, se non ricordo male, credo nel 2005, Bianchi mi esplicitò questa necessità di dotarsi di un servizio marketing del valore del 5% della commessa. La cosa fu per me inaspettata perché* ***durante la fase di partecipazione alla gara non si era mai parlato di questa necessità***.
*Sono anche andato a Parigi a vedere da fuori l'immobile in cui ha sede la Cifal. (...)*
*Faccio presente che a me dava fastidio pagare Cifal perché* ***sospettavo che ci potessero essere ritorni di denato da Cifal a favore di Bianchi***, *ma ritenevo non ci fosse altro da fare.*
*A quanto mi diceva Bianchi,* ***la Cifal ha aiutato l'organizzazione commerciale della JV Skema Tozzi ad avere le porte aperte. Intendo dire la presenza sul territorio kazako ed i contatti locali con i partner del consorzio Kashagan***.

[117] Direttore Generale della Tozzi Sud S.p.A., già identificato in nota 61.

*Ad un certo punto il Bianchi ed il suo assistente Capone*[118] ***mi dissero che bisognava passare ad un'altra organizzazione****, intendo dire stipulare un contratto di consulenza con una diversa società,* ***la Techno Skills di Guidotti****. Ho incontrato Guidotti che non mi fece una buona impressione sia come persona che come organizzazione, e peraltro* ***mi sembrava strano che avesse gli uffici nella stessa palazzina di quelli del Bianchi.***

*Il Guidotti mi disse che ci avrebbe aiutato per future possibilità di lavoro,* ***ma senza fornire ulteriori dettagli****.* (…)

*Bianchi mi disse che era meglio interrompere il rapporto con il Guidotti perché era costoso e che* ***alla stessa consulenza poteva proseguire con altra società, riconducibile alla persona di Vasfi Hormoz****.* (…)

*Guidotti si irritò molto di questa decisione. Circa due anni dopo lo incontrai e lui (…) mi disse che una parte del denaro che la JV gli aveva corrisposto, su consiglio di Bianchi, l'aveva poi dovuto retrocedere allo stesso Bianchi su un conto che mi menzionò e credo sia quello della società Alverstone*[119] (…).

*Con riguardo al rapporto di consulenza con le società di Vasfi Hormoz, ma già prima in relazione alla liquidazione delle competenze di Techno Skills ho imposto a Tozzi Mario che i contratti fossero curati nella stesura e nell'esecuzione da uno studio di professionisti, da me individuato nello studio Morri di Milano, con uffici in piazza Duse.*

***Ciò ho preteso per avere un qualche controllo sull'attività dei consulenti****.* (…)

*Io ho avuto rapporti diretti con Stefano Morri che conoscevo da prima. A questi dissi che ero in una situazione che non mi piaceva perché* ***pensavo che dietro queste consulenze ci fosse qualcosa di non chiaro*** (…).

***Morri ha preteso da Vasfi che lo stesso fornisse dei reports mensili dell'attività svolta in favore della JV Skema-Tozzi dalle sue società****.* (…) "".

[118] CAPONE Nicola, nato il [redacted] in Svizzera e residente a Ravenna, via [redacted], all'epoca Direttore Commerciale della Tozzi Sud S.p.A..

[119] ALVERSTONE INTERNATIONAL Inc., 701 Brazos, Austin 78701 Texas (USA). A conferma di quanto sostenuto da Cerveglieri, si rappresenta che, tra la documentazione in formato elettronico rinvenuta in sede di perquisizione presso i locali della GM OIL & GAS S.r.l., è stata rinvenuta un'e-mail (**All. 177**) inviata, in data 14.07.2010, da Tramezzani a Guidotti avente per oggetto: "*Come concordato*": **alla stessa viene allegata la fattura n. TSL 01/05.07 del 05.07.2006 emessa dalla ALVERSTONE nei confronti della TECHNO SKILLS a fronte di prestazione di servizi di consulenza e marketing relativi al Progetto Oil & Gas Kazakhstan in favore del consorzio Skema-Tozzi**, per un importo pari a 200.000,00 USD. Peraltro, si noti come, **pur avendo la Alverstone sede dichiarata negli USA, in calce alla fattura in questione venga riportato il c/c di una banca svizzera**.

**configurandosi l'ipotesi di reato prevista e punita dall'art. 2 del D. Lgs. 10 marzo 2000 n. 74.**

- **ANNO D'IMPOSTA 2011**

Le spese relative alla fatture di cui ai progg. 45-47 dell'allegato XXX per l'anno d'imposta 2008 sono confluite:

- nel predetto sottoconto di mastro "consulenze e analisi commerciali" per un importo pari a € 644.000,00;
- nel predetto sottoconto di mastro "provvigioni" per un importo pari a $ 1.788.000,00.

Per quanto concerne le fatture di cui ai progg. 43-44 del suddetto allegato, si rappresenta che, stante la documentazione esibita dalla parte, non è stato possibile riscontrarne l'importo – pari, rispettivamente, a $ 850.000,00 ed € 600.000,00 – in alcun sottoconto di mastro.
Pur tuttavia, ribadendo quanto descritto per l'anno d'imposta 2008 in merito alle dichiarazioni in atti della parte, si può ragionevolmente ritenere che anche l'importo complessivo relativo a tali fatture sia confluito nella Dichiarazione dei Redditi per l'anno in questione.
Pertanto, i costi di cui ai progg. 43-47 del predetto allegato XXX sono confluiti nel calcolo dell'utile d'esercizio del relativo anno, pari ad € 1.999.156,00.
In conclusione, alla luce di quanto sostenuto sopra, **JVST si è avvalsa di fatture per operazioni inesistenti registrate nelle scritture contabili obbligatorie al fine di evadere le imposte sui redditi**, indicando nella dichiarazione annuale dei redditi Modello U60 per l'anno 2011 elementi passivi fittizi ammontanti ad $ 2.638.000,00 ed € 1.244.000,00 **configurandosi l'ipotesi di reato prevista e punita dall'art. 2 del D. Lgs. 10 marzo 2000 n. 74.**

## (6) BREDA ENERGIA S.p.A.

### (a) Analisi della documentazione esibita

La società in questione, nel periodo 2007 – 2011, ha contabilizzato[120] fatture emesse dalle società di consulenza direttamente riconducibili al Vasfi per un totale di € 1.890.981,52, come specificato in **allegato 182**[121].

Inoltre, la Breda Energia S.p.A. ha esibito la seguente documentazione:

- contratto[122] (**All. 183**) fra Breda Energia S.p.A. e Top Oil UK, datato 01.03.2006, in base al quale la società del Vasfi avrebbe provveduto a ""*promotion and marketing activities set forth herein for the Project/s in the territory of Kazakhstan* (...) *as specified in* (...) *attachment B* (...)"" [trad.: attività di promozione e marketing descritti nel presente documento per i progetti nel territorio del Kazakhstan specificati in allegato B].
  Le attività, dettagliate nell'allegato A[123] al presente contratto, consistono sostanzialmente in: a) valutazione della concorrenza; b) controllo delle opportunità di business; c) consigli sul miglior approccio al mercato; d) informare il cliente sulle procedure di pre-qualificazione e sulle modalità di offerte; e) azioni successive per tutti gli aspetti commerciali.

  La percentuale spettante al consulente varia dal 2% al 6% a seconda del progetto interessato, come specificato negli *Attachment* da B ad H.

- Scrittura privata (**All. 184**) fra Tecron S.r.l. e Breda Energia S.p.A., datata 19.11.2007, con cui Tecron si impegna a fornire uno studio di mercato consistente in una ""*Analisi del settore Oil & Gas in Kazakhstan, con particolare riferimento ai progetti di sviluppo nelle aree Kashagan e*

[120] Sulla base della documentazione prodotta dalla società a fronte della notifica del decreto di *Richiesta di consegna atti e documenti* indicato in premessa ed analiticamente descritta nei verbali di operazioni compiute redatti dal Gruppo Sesto San Giovanni, rispettivamente, in data 23.10.2012 e 25.10.2012.
[121] Comprendente prospetto riepilogativo, n. 32 fatture e rispettivi pagamenti (suddivisi, quest'ultimi, per società beneficiaria).
[122] Comprensivo dei successivi *Attachment* C, D, D-bis, E, F, G ed H, e della lettera, datata 18.03.2009, inviata da Top Oil UK a Breda, con cui veniva modificata una percentuale dei diritti spettanti al consulente prevista nell'*Attachment* D-bis.
[123] ""*a) Competition appraisal and competitive analysis vis-à-vis with the Manufacturer Market position; b) Scrutiny of business opportunities; c) Advise on best market approach towards Client organization; d) Providing information on Client prequalification procedure, on the modalities of sending offers, on new Tender related to extension of on-going Project/s e) Contract Follow-up covering the whole commercial aspects from obtaining specifications from the Client up to the final settlement of invoices corresponding to product sold for the contract*"".

*Karachaganak, (...), comprendenti l'identificazione dei potenziali clienti, progetti e relative potenzialità*"". A fronte di tale prestazione, Breda Energia riconosce al consulente ""*i seguenti compensi: a) Euro 50.000,00 (...) comprensivi di tutte le spese*"".

- Lettera (**All. 185**), datata 05.02.2010, con cui Top Oil comunica il cambiamento della propria sede, da quella inglese a quella di Cipro, dettagliatamente indicata in oggetto.

**(b) Ulteriori elementi emersi dalle indagini**

Come anticipato alle pp. 30-31 della presente Comunicazione, la **Breda Energia S.p.A. è una delle società esplicitamente segnalate dal Vasfi come parte in causa nell'illecita transazione avvenuta con i citati dirigenti di Eni e KazMunaygaz**.

Richiamando quanto sostenuto a carico del Vasfi al precedente punto *2.B.(2)*, si sottolinea come il documento di cui all'allegato 27 – relativamente ai citati contratti nn. 2004/1089, 2005/1163 e 2004/1115 ed alle relative fatture di intermediazione emesse da Top Oil – riporta, sotto forma di appunti manoscritti, aggiunti, come detto, successivamente alla stampa del file di cui all'allegato 26, **la quota dell'imponibile indicato nelle stesse fatture, corrispondente a circa la metà dell'importo complessivo, destinata a "*Dentali*" e "*Boi*"**.

E' possibile così schematizzare i rapporti intercorsi fra il Vasfi Hormoz e la Breda Energia S.p.A. alla luce dei citati documenti e delle fatture (relative al contratto n. 2004/1115) esibite a seguito della notifica di decreto di "*Consegna di atti e documenti*" avvenuto in data 23.10.2012.

| *Dati desunti dai files elaborati dal Vasfi* | | |
|---|---|---|
| "instalment" | importo | provvigione Vasfi (6%) |
| 1^ | € 2.576.158,12 | € 154.569,49 |
| 2^ | € 3.372.766,61 | € 202.366,00 |
| 3^ - 1^ tranche | € 1.200.000,00 | € 72.000,00 |
| 3^ - 2^ tranche | € 1.200.000,00 | € 72.000,00 |
| **Tot.** | **€ 8.348.924,73** | **€ 500.935,49** |

- **le imposte sui redditi**, indicando nella dichiarazione annuale dei redditi Modello U60 per l'anno 2008 elementi passivi fittizi ammontanti ad € 514.568,94;

- **l'imposta sul valore aggiunto,** indicando nella dichiarazione annuale Modello IVA per l'anno 2008 IVA indetraibile ammontante ad € 10.000,00 (**All. 189**),

**configurandosi l'ipotesi di reato prevista e punita dall'art. 2 del D. Lgs. 10 marzo 2000 n. 74**.

- **ANNO D'IMPOSTA 2009**

Le spese relative alla fatture di cui ai progg. 15-28 dell'allegato 182 per l'anno d'imposta 2009 sono confluite:

- nel predettp sottoconto di mastro 831000 "Provvigioni" per un importo pari ad € 877.859,81;
- nel sottoconto di mastro 844731 "Spese viaggio con vettore – terzi" (**All. 190**) per un importo pari ad € 3.057,08;
- nel sottoconto di mastro 844831 "Sp. vitto/all. nei limiti-terzi" (**All. 191**) per un importo pari ad € 732,00,

e, pertanto, sono confluite nel calcolo dell'utile d'esercizio del relativo anno pari ad € 2.817.763,00.
In conclusione, alla luce di quanto sostenuto sopra, la **Breda Energia S.p.A. si è avvalsa di fatture per operazioni inesistenti registrate nelle scritture contabili obbligatorie al fine di evadere le imposte sui redditi**, indicando nella dichiarazione annuale dei redditi Modello U60 per l'anno 2009 elementi passivi fittizi ammontanti ad € 881.631,01 **configurandosi l'ipotesi di reato prevista e punita dall'art. 2 del D. Lgs. 10 marzo 2000 n. 74**.

- **ANNO D'IMPOSTA 2010**

Le spese relative alla fatture di cui ai progg. 29-30 dell'allegato 182 per l'anno d'imposta 2010 sono interamente confluite nel predetto sottoconto di mastro 831000 "Provvigioni" e, pertanto, sono confluite nel calcolo dell'utile d'esercizio del relativo anno pari ad € 843.447,00.
In conclusione, alla luce di quanto sostenuto sopra, la **Breda Energia S.p.A. si è avvalsa di fatture per operazioni inesistenti registrate**

**nelle scritture contabili obbligatorie al fine di evadere le imposte sui redditi**, indicando nella dichiarazione annuale dei redditi Modello U60 per l'anno 2010 elementi passivi fittizi ammontanti ad € 129.072,08 **configurandosi l'ipotesi di reato prevista e punita dall'art. 2 del D. Lgs. 10 marzo 2000 n. 74.**

- **ANNO D'IMPOSTA 2011**

Le spese relative alla fatture di cui ai progg. 31-32 dell'allegato 182 per l'anno d'imposta 2011 sono interamente confluite nel predetto sottoconto di mastro 831000 "Provvigioni" e, pertanto, sono confluite nel calcolo dell'utile d'esercizio del relativo anno pari ad € 984.572,00.
In conclusione, alla luce di quanto sostenuto sopra, la **Breda Energia S.p.A. si è avvalsa di fatture per operazioni inesistenti registrate nelle scritture contabili obbligatorie al fine di evadere le imposte sui redditi**, indicando nella dichiarazione annuale dei redditi Modello U60 per l'anno 2011 elementi passivi fittizi ammontanti ad € 308.444,89 **configurandosi l'ipotesi di reato prevista e punita dall'art. 2 del D. Lgs. 10 marzo 2000 n. 74.**

**(7) TOZZI SUD S.p.A.**

**(a) Analisi della documentazione esibita**

La Tozzi Sud S.p.A. *risulta aver contabilizzato*[124] *n. 7 fatture emesse dalla* Top Oil Ltd, come compendiato di seguito:

| NOTE | NUMERO | DATA | IMPORTO in $ (indicato in fattura) | IMPORTO in € (indicato nei registri contabili) | | **ALLEGATO** (fattura con relativo pagamento) |
|---|---|---|---|---|---|---|
| | | | | IMPONIBILE | IVA al 20% | |
| | | 06/07/2007 | 20.000,00 | 14.710,00 | == | **192**[125] |
| | | 05/11/2008 | 90.228,13 | 70.107,33 | 14.021,47 | **193** |

[124] Sulla base della documentazione prodotta dalla società a fronte della notifica del decreto di *Richiesta di consegna atti e documenti* indicato nella stessa premessa ed analiticamente descritta nei verbali di operazioni compite redatti, rispettivamente, in data 23.10.2012 e 29.10.2012, dal Nucleo di Polizia Tributaria Ravenna e trasmessi con nota num. prot. 435550 del 02.11.2012.
[125] Imponibile complessivo di € 14.511,00 quale controvalore dell'importo in dollari espresso in fattura e di € 198,53 quale "differenze su cambi attivi" (**All. 192A**): l'intero costo, come analiticamente descritto nella presente Comunicazione è, poi, confluito nel sottoconto "costi per consul. tecnic. impianti".

Case 4:25-mc-00536 Document 2-9 Filed 03/25/25 in TXSD Page 92 of 92



| | | | | | | |
|---|---|---|---|---|---|---|
| | | 09/03/2009 | 36.885,00 | 29.356,14 | 5.871,23 | **194** |
| | | 08/10/2009 | 91.028,93 | 61.658,15 | 12.331,63 | **195** |
| | | 09/03/2010 | 33.238,65 | 24.517,73 | 4.903,55 | **196** |
| Nota di credito[126] | | 31/03/2010 | 33.238,68 | - 24.517,73 | - 4.903,55 | **197** |
| | 2011/05/008 | 24/05/2011 | 273.282,54 | 193.968,73 | 40.733,43 | **198** |
| | 2011/12/004 | 20/12/2011 | 63.302,75 | 48.418,81 | 10.167,95 | **199** |
| | | | *Totale* | *418.219,16* | *77.254,48* | |

- Tutte le fatture sopra elencate riportano come causale la dicitura “”*<<Agreement between Tozzi Sud and Top Oil>> Promotion, marketing and supporting to obtain KPO Contract*“” relativi, di volta in volta, a n. 5 diversi contratti di costruzione nel territorio della Repubblica del Kazakhstan stipulati fra la stessa Tozzi Sud S.p.A. e la KPO – Karachaganak Petroleum Operating B.V.[127], nello specifico:

- ITT 06/785;
- Extension of ITT 07/869;
- AD/D/06/0866
- Extension of AP/D/06/1823;
- Extension of AP/Y/09/2355.

Il contratto di consulenza in questione, stipulato tra la Top Oil e la società in oggetto, datato 24.05.2007, anch'esso esibito dalla parte (**all. 200**), prevede che “”(…) *the Consultant* (…) *agrees to provide the promotion and marketing activities set forth herein for the Project/s in the territory of Kazakhstan* (…). *The Cosultant agrees to promote* (…) *the sale of the Product and Services for the Project/s* (…). *Consultant shall the Company in the whole commercial aspects from obtaining specifications from the client up the final settlement of invoices corresponding to product sold for the above mentioned Contract* (…)“” [trad.: il consulente si impegna a provvedere alle attività di promozione e commercializzazione stabilite nel presente contratto per il progetto nel territorio del Kazahkstan. Il consulente si impegna a promuovere la vendita del prodotto e dei servizi per il progetto. Il consulente assiste l'azienda in tutti gli aspetti commerciali, dall'ottenimento delle caratteristiche tecniche dal Cliente fino alla liquidazione finale delle fatture relative alla vendita del prodotto per l'appalto di cui sopra].

[126] La spesa relativa all'imponibile indicato in fattura di cui all'allegato 196 per l'anno d'imposta 2010 è stata neutralizzata mediante registrazione della nota di credito in questione e, pertanto, non è confluita nell'utile d'esercizio del relativo anno. Per lo stesso motivo, il citato allegato 196 consta della sola fattura, essendo privo di relativo pagamento.

[127] Consorzio composto inizialmente da 4 multinazionali – l'inglese BG Group, l'italiana Eni S.p.A. (con il 32,5% delle quote a testa), la statunitense Chevron (con il 20%) e la russa Lukoil (con il 15%) – alle quali, dal 28.06.2012, si è aggiunta l'azienda di Stato kazaka KazMunaiGaz.